CC: FILED PFP SUBM.

ORIGINAL

Laurie Thorson, pro se
P. O. Box 1409
Kailua, Hawaii 96734
(808) 222-5885
Lthorson7@gmail.com

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

OCT 04 2023

at 11 o'clock and 00 min. A M
Lucy H. Carrillo, Clerk
LS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LAURIE THORSON<br>        pro se plaintiff | ) Civil Case No. _____ |
| | ) |
| v. | ) **COMPLAINT** |
| | ) |
| HAWAII PUBLIC HOUSING AUTHORITY<br>        aka: HPHA | )**CV23  00412 LEK** WRP |
| *and* | ) |
| Hakim Ouansafi, HPHA Executive Director | ) |
| Ryan Akamine, HPHA Chief Compliance Ofr | ) |
| Lyle Matsuura, HPHA Supervisor IV | ) |
| _____ | ) |

**Defendants:**

**Hawaii Public Housing Authority (aka: HPHA)**
1002 North School Street
Honolulu, Hawaii  96817
hphas8office@hawaii.gov
(808) 832-6040

**Hakim Ouansafi, Executive Director**
**Hawaii Public Housing Authority**
1002 North School Street
Honolulu, Hawaii  96817
hakim.ouansafi@hawaii.gov
(808) 832-4694 & (808) 832-4696 & (808) 832-4679

**(more defendants continued on next page)**
(to navigate through this complaint, refer to the Table of Contents at the end)

**Ryan Akamine, Chief Compliance Officer**
**Hawaii Public Housing Authority**
1002 North School Street
Honolulu, Hawaii  96817
ryan.m.akamine@hawaii.gov
(808) 832-4680

**Lyle Matsuura, Supervisor IV**
**Hawaii Public Housing Authority**
1002 North School Street
Honolulu, Hawaii  96817
lyle.f.matsuura@hawaii.gov
(808) 832-5916 & (808) 832-5863 & (808) 466-2581

## A. VENUE AND JURISDICTION

1.    This venue is proper because defendants, Hawaii Public Housing Authority (HPHA) and its employees (hereinafter referred to as defendants) are located in this judicial district.

2.    This venue is proper because the acts of defendants that caused the plaintiff harm occurred in this judicial district.

3.    This court has jurisdiction over this action because defendants receive federal funds from HUD (U.S. Department of Housing and Urban Development) to implement the Section 8 Housing Choice Voucher Program in Hawaii.

4.    This court has jurisdiction over this action because it pertains to federal laws and HUD guidelines that dictate how the defendants are to implement the Section 8 Housing Choice Voucher Program.

5.    This court has jurisdiction over this action because it pertains to noncompliance by defendants for illegally deleting from and/or adding to the federal laws and HUD guidelines that govern how the Section 8 Housing Choice Voucher Program is to be implemented.

6.    This court has jurisdiction over this action because it pertains to noncompliance by defendants for failure to ensure that their administrative plan conforms to the federal rules and HUD guidelines.

## B.  PLAINTIFF'S CLAIMS AGAINST THE DEENDANTS

1.    Plaintiff claims defendants are not in compliance with the federal rules and HUD guidelines that dictate how the Section 8 Housing Choice Voucher Program is to be implemented.

2.    Plaintiff claims defendants adopted an illegal policy to use **one low comparable in all their rent reasonableness determinations,** which is not in compliance with the federal rules and the HUD guidelines.

The argument is not whether rent reasonableness determinations should or should not be performed, but rather the methodology in which the defendants are collecting data in rent reasonableness determinations.

3.    Plaintiff claims defendants illegal policy to use one low comparable does not benefit the tenant or the landlord/owner, but only benefits the defendants. Defendants use one low comparable as policy to lower the contract rent for the purpose of accumulating as much "surplus grant funds" as they can, which amount exceeds approximately $32M per year.

4.    Plaintiff claims there is no rule in defendants Administrative Plan to support defendants policy to use one low comparable in rent reasonableness determinations. In fact, plaintiff can prove that the defendants current Administrative Plan is not in compliance with the federal rules and HUD guidelines (as required 24 CFR §982.54).

5.    Plaintiff claims defendants policy to use one low comparable was not in effect prior to the employment of Executive Director Hakim Ouansafi, who was hired on January 3, 2012. Plaintiff claims Hakim Ouansafi created and enforces the illegal policy to use one low comparable in all rent reasonableness determinations.

6.    Plaintiff claims that she reported to Executive Director Hakim Ouansafi (and other government officials) that there were discrepancies in the handling of her voucher, including using the one low comparable. To date, the plaintiff is alone to defend for herself and this is why plaintiff is filing this complaint.

7.   Plaintiff claims that defendants discriminated, intimidated, harassed, defamed, and retaliated against the plaintiff (and continue to do so) for the purpose of intentionally interfering with plaintiff's housing, and interfering with plaintiff's approved reasonable accommodations.

8.   Plaintiff claims that the defendants purposefully and intentionally retaliated against the plaintiff, as outlined below:

(a) **retaliated** against the plaintiff **after** she complained to the agency that they were not using the correct payment standard charts, and correct utility allowance charts, and used one **low comparables** in the rent reasonable determinations that caused the plaintiff's contract rent to be drastically reduced and nullified plaintiff's 120% reasonable accommodation, *and then,*

(b) **retaliated** against the plaintiff *again* **after** she complained about the one low comparable being used, by interfering with the plaintiff's reasonable accommodation to have a **live in aide**, *and then,*

(c) **retaliated** against the plaintiff *again* (a year and a half later) **after** the plaintiff filed her FHEO complaint, in order to interfere with the plaintiff's **live in aide** under the guise of an on-going "investigation" into plaintiff's live in aide, *and then,*

(d) **retaliated** against the plaintiff *again* by **defaming** the plaintiff and live in aide by communicating to members of the public, outside the agency, that the plaintiff and live in aide are going to prison for fraud. Defendants never communicated to the plaintiff or live in aide that they were not in compliance with any federal or administrative rule. Had defendants done so, the plaintiff and live in aide would have immediately complied. To date, the plaintiff still does not know what would warrant the defendants to claim the plaintiff and live in aide are guilty of fraud.

9.   Plaintiff claims that the defendants intentionally use one **low** comparable "as policy" in all rent reasonableness determinations. By using the low comparable, defendants **interfered** with plaintiff's housing

by causing the plaintiff's payment standard and contract rent to be reduced from $4,000 to $3,273, and which nullified plaintiff's 120% reasonable accommodation (considered by HUD as plaintiff's "approved exception payment standards").

10.    Plaintiff claims that the defendants consistently use **low** comparables "as policy" in **all** their rent reasonableness determinations. This policy is not in compliance with the HUD rules that are outlined in HUD/PIH Housing Choice Voucher Program Guidebook, Chapter 3, titled Rent Reasonableness, which confirms:

> "...**PHA should collect data on units with gross rents at least 20-25 percent *above* the greater of the payment standard or the FMR, including any HUD approved exception payment standards...**"

**HUD/PIH Housing Choice Voucher Program Guidebook, Chapter 3, Rent Reasonableness**
"...PHAs should take a common-sense approach to valuing a unit based on these factors..."
3.1.2  PHAs need to be careful **not** to limit their rent reasonableness analysis to only mid-range units or only units in certain more affordable neighborhoods. **Voucher families may choose to rent units above the payment standard.** As a rule of thumb, the <u>**PHA should collect data on units with gross rents at least 20-25 percent *above* the greater of the payment standard or the FMR, including any HUD approved exception payment standards**</u> (which "exception payment standard" is plaintiff's 120% reasonable accommodation, approved in 2017).

https://www.hud.gov/program_offices/public_indian_housing/programs/hcv/guidebook

11.    Plaintiff claims that the defendants consistently use one **low** comparables **as policy** in all their rent reasonableness determinations for the purpose of accumulating as much "surplus grant funds" as possible. The total "surplus grant funds" per voucher is the difference between the full value of the voucher (which defendants receive as grant funds from HUD) *and* the contract rent. The lower the defendants can get the contract rent, the more "surplus grant funds" defendants get to keep.

Refer to this HUD link, last sentence on page 7:

"... If the recipient [HPHA] approves unit rents that are reasonable, but are **less than the FMR** used to determine the grant award, then **there may be a <u>surplus of grant funds</u>** and the recipient [PHA] may be able to serve additional program participants..."

https://files.hudexchange.info/resources/documents/CoC-Rent-Reasonableness-and-FMR.pdf    (Refer to the last sentence on page 7)

12.    Plaintiff claims it is illegal for the defendants to consistently use low comparables as policy for the purpose of intentionally lowering the contract rent for the purpose of accumulating "surplus excess funds".

13.    Plaintiff's claims that the defendants interfered with her payment standard, interfered with her contract rent, interfered with her reasonable accommodation to have a live in aide, and interfered with her 120% reasonable accommodation which was considered as her approved "exception payment standard" in the amount of $4,031. As a result of defendants using the low comparable as policy in their rent reasonableness determinations, the defendants lowered her contract rent to $3,273.  This means the defendants are accumulating **$758 each month as "surplus grant funds" from plaintiff's Section 8 voucher.**

Here is the calculation:

|   |   |   |
|---|---|---|
|    | $4,031 | plaintiff's approved "exception payment standard" |
| - | $3,273 | plaintiff's contract rent (lowered as a result of defendants using one low comparable) |
| = | **$758** | **"surplus grant funds" defendants collect each month** |
|    | x 12 | months per year |
|    | **$9,096** | **per year (defendants accumulate each year from plaintiff's Section 8 voucher)** |

14.    Defendant's website (board meeting on 09.21.23) confirms that in one month defendants "...expended a total of **$4,765,532** in housing assistance payments (HAP) to private landlords on behalf of **3,528** voucher holders....".

Refer to Page 26
http://www.hpha.hawaii.gov/boardinfo/board_mtgs_completed/2023_Public/09.21.23%20Public%20Packet%20HPHA%20Regular.pdf

15.    Based on the **3,528** Section 8 vouchers, it is reasonable to assume that defendants are receiving "surplus grant funds" for each voucher because of their policy to use one low comparable in all rent reasonableness determinations.  Assuming the defendants receive $758 in "surplus grant funds" from each **3,528** vouchers.  That would mean that the **defendants are accumulating approximately $2,674,224 each month in "surplus grant funds.**

$758        "surplus grant funds" per voucher, per month
x 3,528     vouchers managed by defendants each month
= **$2,674,224    "surplus grant funds" defendants accumulate
each month (approximately)**

16.    Based on the $2,674,224 of "surplus grant funds" that the defendants accumulate each month, is can be determined that **defendants are accumulating approximately a total of $32,090,688 each year in "surplus grant funds".**

$2,674,224    defendants monthly "surplus grant funds"
x 12          per month
**$32,090,688    "surplus grant funds" defendants accumulate
each year (approximately)**

17.    Defendanta illegal policy to use one low comparable in all rent re7sonableness determinations does not benefit the landlord and does not benefit the tenant, but only benefits the defendants. It is reasonable to expect that the defendants would adopt policy that is in the best interest of the landlords and tenants, not just the defendants:

(a)    **Landlords** are required to reduce their contract rent **below the contract rent,** below HUD's FMR, and below the tenant's payment standard. It is expected that landlords/owners should be consistent in renting out their units based on HUD's FMR by zip code and by bedroom size.  But if the landlord decides to rent to a Section 8 recipient, it will always work out that the landlord will be required to lower the rent in order to accommodate the defendants using even one low comparables. Landlords will never be allowed to at least get the FMR value for their

rental. Now I understand why landlords in Hawaii do not want to rent to Section 8 recipients.

(b)   **Tenants/Section 8 recipients** use the payment standard amount communicated to them on their voucher to assist them in finding a rental.  Only to find out in the end that defendants will always use a low comparable to lower the contract rent. This means the tenant must start searching for another rental (before the voucher expires). The tenant must find another rental or the landlord must lower the contract rent.

(c)   **Plaintiff** lost her "approved exception payments standard" (which included plaintiff's 120% reasonable accommodation) when the defendants used the low comparable to lower the contract rent (from $4,000 to $3,273.  The landlord accepted the lower contract rent, and the plaintiff agreed to appeal defendants decision to use low comparables "as policy" in all their rent reasonableness determinations.

18.   Plaintiff claims that the defendants acted outside the scope of their duties and are unable to claim their motive is/was to use the "surplus excess funds" to support other recipients and programs, which HUD permits.  This thinking is equivalent to robbing a bank and giving the money to the poor.  A crime is still being committed.

19.   Plaintiff claims that the defendants have not revised their Administrative Plan to reflect their policy to use one low comparable (in conjunction with two high comparables) in their rent reasonableness determinations.

This is the short version of defendants Administrative Plan:

> "...**At least <u>three</u> comparable units will be used for each rent determination and of which <u>at least two must have a gross rent that exceeds the subject gross contract rent</u>**

This is the full version of defendants Administrative Plan:

HPHA ADMINISTRATIVE PLAN
SECTION 8 – HOUSING CHOICE VOUCHER PROGRAM
Chapter 8
8-III.D PHA RENT REASONABLENESS METHODOLOGY

How Market Data is Collected

"...The rent for a unit proposed for HCV assistance will be compared to the rent charged for comparable units **in the same market area**. The PHA will develop a range of prices for comparable units by bedroom size within defined market areas. Units proposed for HCV assistance will be compared to the units within this rent range. **At least <u>three</u> comparable units will be used for each rent determination and of which <u>at least two must have a gross rent that exceeds the subject gross contract rent,</u> and the total average gross rent of the comparable units exceeds the subject gross rent.** Because units may be similar, but not exactly like the unit proposed for HCV assistance, the PHA may make adjustments to the range of prices to account for these differences. In certain cases where rent comparable unit data is unavailable in the immediate district and/or zip code area, the agency will expand its search into **the next** adjacent district(s).

## 20. Contract Rent v. Payment Standards/FMR

There is another conflict in defendants illegal policy to use one low comparable.  Defendants collect data [comparables] against the contract rent, and HUD guidelines required that defendants collect data [comparables] against the payment standards.

This proves that the defendants are purposefully and intentionally using the one low comparable "as policy" in all their rent reasonableness determinations in order to purposefully and consistently lower the contract rent.  This is the only way the defendants can increase the amount of "surplus grant funds" that they can accumulate.

**Here's the proof:**

This is the defendants policy that confirms defendants use comparables against the Contract Rent:

"...at least two must have a gross rent that exceeds the subject gross **contract rent**..."
(in conjunction with one low comparable below the contract rent}

This is the HUD guidelines policy that confirms defendants are required to use comparables against the Payment Standards/FMR:

> "...PHA should collect data on units with gross rents at least 20-25 percent *above* the greater of the **payment standard or the FMR, including any HUD approved exception payment standards...**"

> (note: plaintiff's "approved exception payment standard" included her approved 120% reasonable accommodation)

21.   Plaintiff can provide an extensive study to prove that the **defendants are the only PHA in the country that uses one low comparable as policy in all their rent reasonableness determinations**. All other PHAs are in compliance with the HUD guidelines, and can prove it by their written methodology outlined in their Administrative Plan.

22.   Plaintiff claims that after she complained to the defendants about the low comparable being used to lower her contract rent, which nullified her 120% reasonable accommodation, the defendants **retaliated** against the plaintiff by purposefully and intentionally **interfering** with the plaintiff's live in aide.  The reasonable accommodation to have a live in aide was approved by defendants in 2017, and every year thereafter for five years (2017-2022).

23.   Plaintiff claims that federal rules and HUD guidelines require that plaintiff's live in aide (1) is permitted to reside in plaintiff's home *only* when providing support services which includes disability-related overnight care as needed, (2) is not permitted to reside in plaintiff's home when not providing support services, (3) is required to have his own separate residence, and (4) must have a job to provide for his own expenses (especially considering that  plaintiff only receives SSDI and is unable to pay for or care for a live in aide.

24.   Plaintiff claims that the defendants acted outside the scope of their duties by acting as the gatekeeper to determine whether or not the plaintiff is entitled to have a live in aide.

In the Federal Register noted below, HUD confirms that the **defendants are not the gatekeepers** to assess the nature and character of plaintiff's disability, may not inquire into the nature or extent of plaintiff's disability, if the plaintiff can or can't live independently, and/or if the plaintiff does or does not need supportive services. The doctors do that.

**Federal Register 98-10374, pages 23850,** HUD writes:

> "...**HA does not assess the nature and character of the occupant's disability** in order to match the occupant with requirements for occupancy...or to assure that the occupant will benefit from appropriate supportive services...",

> "...**An elderly or disabled Section 8 participant chooses** whether to live in a group home or in other housing that satisfies the HUD housing quality standards.  The HA may not bar access to group housing **because the HA believes that the participant can live independently, and does not need supportive services.** Conversely, the HA may not bar access to group housing **because the HA believes that the participant needs supportive services** that are not available at the housing...",

> "...**the HA has no responsibility or authority to act as a gatekeeper who determines whether the assisted family has or lacks the capacity to live independently...",**

> "...**The HA may not inquire into the nature or extent of disability...**"

https://www.govinfo.gov/content/pkg/FR-1998-04-30/pdf/98-10374.pdf

25.   Plaintiff claims that defendants intentionally **retaliated** against the plaintiff by **refusing to accept as verification** four (4) letters from four (4) different doctors over the span of eight (8) years, and a voluminous amount of medical records, to prove that plaintiff is disabled and is required to have a live in aide.

26.    Plaintiff claims that defendants acted outside the scope of their duties when defendants required that the plaintiff, the plaintiff's current doctor, and the plaintiff's live in aide, all answer numerous interrogatory questions regarding plaintiff's disability and live in aide; even requiring that the plaintiff answer the questions in **2 hours and 43 minutes**, or the inspection scheduled the following morning would be cancelled.

The facts of this case prove that nothing the plaintiff provided the defendant Ryan Akamine, Chief Compliance Officer, was acceptable to "certify" the plaintiff's live in aide.

27.    Plaintiff claims that defendants intentionally **retaliated** against the plaintiff after she filed her FHEO complaint, by continuing its investigation from the previous year, under the guise as part of an "ongoing investigation" into **certifying** plaintiff's live in aide.

28.    Plaintiff claims that defendants, as part of their "ongoing investigation" in June 2023, communicated to members of the public, outside the agency, that the plaintiff and the live in aide were going to prison for fraud.  Plaintiff claims that by communicating this to the public, this constitutes a claim of **defamation** against the defendants.

29.    Plaintiff claims that defendants never notified the plaintiff or the live in aide that they were not in compliance with any federal or administrative rule. Had the defendants done so, the plaintiff and the live in aide would have immediately complied. The question still remains, what would warrant defendants to claim to members of the public that the plaintiff and live in aide are going to prison for fraud.

30.    Plaintiff claims that because of threats of prison and fraud, effective 09.18.23 **the live in aide quit.**  The plaintiff now lives alone.  This is the first time in over six years that the plaintiff is without her live in aide.

31.    Plaintiff claims defendants notified the plaintiff that she no longer qualified for a 2-bedroom voucher because her live in aide quit, and would be issued a 0-bedroom voucher at her next annual recertification.

32.   Plaintiff claims that defendants told her that she will no longer receive a 120% reasonable accommodation. This 120% reasonable accommodation was approved in 2017 to accommodate plaintiff's disability> Because plaintiff is unable to live in a high rise or even a low rise, the 120% reasonable accommodation allows the plaintiff to search for a rental in a very limited rental market.

33.   Plaintiff claims that she understood defendants policy was that the live in aide could only reside in her home when the live in aide was providing disability-related overnight care, and the live in aide was required to have his own separate residence, and was required to have a job to care for himself.

34.   Plaintiff claims that the defendants adopted illegal policy that is not in compliance with federal rules and HUD guidelines as it pertains to plaintiff's live in aide, nor is it in compliance with the defendant's own Administrative Rules (refer to HPHA Administrative Plan, Chapter 3, Rule 3-I.M, titled LIVE IN AIDE, Page 3-9).

35.   Plaintiff claims defendants fabricated illegal policies that plaintiff's live in aide must solely and exclusively reside in plaintiff's home even when *not* providing support services, is not permitted to provide disability-related overnight care as needed, is not permitted to have his own separate residence, and is not permitted to have a job.

This could be the reason the defendants opened an investigation into the live in aide, wanting to prove the live in aide had his own residence and had a job, and was thereby violating their new fabricated illegal policies, but for the purpose of interfering with the plaintiff's live in aide.

FHEO Enforcement Branch Chief Stephanie Rabiner confirmed the defendants investigated the live in aide's residence, but that she was unable to find any law that defined a live in aide's primary residence.

Ms. Rabiner also confirmed in her email that defendants investigation report into the live in aide proves that the defendants communicated with the former neighbor and landlord.  It was the former neighbor and landlord who informed the plaintiff and live in aide that the defendants

told them the plaintiff and the live in aide were going to prison for fraud. This threat of prison is why the live in aide quit.

36.   Plaintiff claims that defendant Executive Director Hakim Ouansafi was at all times fully aware of the unlawful acts of his employees, and yet did absolutely nothing to protect the plaintiff and live in aide from harm. It is the responsibility of the Executive Director to ensure that his employees are in compliance with federal laws and HUD guidelines that govern the behavior of his employees, and to ensure that the Section 8 Housing Choice Voucher Program is being implemented correctly.

37.   Plaintiff claims that the defendants acted outside the scope of their duties; therefore, liability is imputed to the employer and qualified immunity does not apply.  Hawaii Public Housing Authority is a state government entity organized under the laws of the State of Hawaii.

## C.  SUMMARY OF FACTS

(1)   The following is a summary of facts about the plaintiff:

(a)   Plaintiff, Laurie Thorson, is a 64-year old disabled woman. Plaintiff is a recipient of Social Security Disability Insurance (SSDI).  Plaintiff was determined to be permanently disabled over a decade ago and is unable to work. The plaintiff is disabled with Epilepsy (a neurological seizure disorder) and Transient Epileptic Amnesia (TEA).  Plaintiff has also been diagnosed with diabetes, anxiety, multiple back fractures (T3-T12), multiple pinched nerves in the thoracic and lumbar areas which cause chronic pain in her back and legs, and is blind in her right eye.

(b)   Plaintiff originally received subsidized housing through the Section 8 Housing Choice Voucher Program in Oregon. Plaintiff transferred her 2-bedroom Section 8 voucher to Hawaii in 2017. Plaintiff's reasonable accommodation to have a live in aide and 2-bedroom voucher was initially approved as a reasonable accommodation in Oregon. Only after the plaintiff's neurologist contacted the plaintiff's son in Hawaii, did the son agree to be his mother's live in aide, and then he made arrangements to move his mother to Hawaii.

(c)     It was plaintiff's neurologist and two other doctors from the mainland who determined the plaintiff could no longer live alone and required a live in aide as needed; mainly because of the frequency of seizures and amnesia. Because the plaintiff lived alone in Oregon, she was frequently in the emergency room and admitted into the hospital almost on a weekly basis for injuries from falling during seizures, and amnesia evident during and after seizures.

(d)     In Oregon, the plaintiff was issued a 2-bedroom voucher but only used a 1-bedroom voucher because the plaintiff refused to have a stranger live in her home as her live in aide.

(e)     Plaintiff moved to Hawaii on June 27, 2017.

(f)     In 2017, after the plaintiff arrived in Hawaii, defendants approved and issued the plaintiff a 2-bedroom voucher to accommodate the plaintiff's reasonable accommodation to have a live in aide. The approval was based on three (3) letters from three (3) different medical providers from the mainland, issued to the plaintiff over the span of the previous 4 years (2013 – 2017). All three (3) medical providers unanimously confirmed in writing that the plaintiff is disabled and is required to have a live in aide as needed. In 2017, defendants compliance department approved the plaintiff's reasonable accommodation to have a 2-bedroom voucher to accommodate plaintiff's live in aide when providing "disability-related overnight care" as needed.

(g)     In 2017, defendants also approved a 120% reasonable accommodation because the plaintiff is limited in where she can live. Plaintiff is unable to live in a high-rise, medium-rise, or low-rise rental due to her disability, which makes it difficult for plaintiff to secure a rental.  The 120% reasonable accommodation expanded plaintiff's ability to secure a rental to accommodate her disability, especially considering there is a shortage of rentals on the island.

(h)     Every year thereafter (2017 – 2022), the plaintiff's reasonable accommodations were approved at the plaintiff's annual recertification application process. During this period of time, from 2017 – 2022, defendants never questioned and/or investigated the plaintiff's reasonable accommodation to have a live in aide.

2.     The following is a summary of facts of plaintiff's claims against the defendants:

(a)     It was after the plaintiff was issued a new voucher in March 2022, that the defendants used one low comparable as policy in a rent reasonableness determinations.  In fact, the defendants used over 15 comparables in over 5 rent reasonableness tests, but for the purpose of intentionally interfering with plaintiff securing the rental in Hawaii Kai. By using the one low comparable, plaintiff's payment standard was reduced, and her contract rent was reduced, which caused plaintiff's approved 120% reasonable accommodation to be nullified.  Plaintiff complained about this to the defendants, and ever since defendants have not stopped harassing the plaintiff, even going as far as  intentionally interfering with her reasonable accommodation to have a live in aide.

(b)     On April 12, 2022 (1:17pm), Ryan Akamine, HPHA's Chief Compliance Officer, wrote to the plaintiff and introduced himself to the plaintiff for the first time. Ryan Akamine informed the plaintiff that he was instructed by Executive Director Hakim Ouansafi to "audit" the plaintiff.  Note: the plaintiff previously wrote a letter to Hakim Ouansafi about HPHA staff interfering with her housing by using low comparables in their rent reasonableness determinations. Ryan Akamine informed the plaintiff that the inspection scheduled for the following day at 8:00am would be cancelled if she did not answer numerous interrogating questions by the end of the day (4:00pm) regarding her disability and her live in aide.  Plaintiff was required to respond in **literally 2 hours and 43 minutes or the inspection scheduled the following morning would be cancelled.**

(c)     On April 12, 2022 (1:17pm), in the same email noted above, Ryan Akamine writes,

"...**With respect to your inspection**...scheduled to take place on Wednesday, April 13, 2022...the inspection is also subject to the questions below..."

"...**With respect to your Live-in aide**, your son Ryan Thorson executed his Live-in aide Housing Agreement in 2017.  In your subsequent discussions with Mr. Matsuura, you indicated that Ryan Thorson was NOT living in your unit on a full-time basis and would visit you only at certain times...provide us answers to the following **by 4:00pm today**..."

(Ryan Akamine addresses both the "inspection" and the "live in aide" in this email. Ryan Akamine claims he received information from Lyle Matsuura on or before April 6 about plaintiff's live in aide, and yet he waited 6 days until April 12, the day before the inspection, to investigate plaintiff's live in aide, requiring the plaintiff answer numerous interrogating questions about her live in aide, and respond in 2 hours and 43 minutes or the inspection would be cancelled. Ryan Akamine was determined to interfere with plaintiff securing the rental.)

(d)     On April 12, 2022 (3:35pm), the plaintiff respectfully responded to Ryan Akamine by answering all of his interrogatory questions. With her response, plaintiff attached copies of the reasonable accommodation for a live in aide approved by defendants in 2017, three (3) letters from three (3) different doctors, and included a new letter from Dr. Megan Bradham dated April 12, 2022, which reads as follows:

> Dr. Bradham writes:
> **"...Laurie Thorson is a patient of mine and medically required to have her son as her live in aide. Ryan Thorson is <u>permitted to live in</u> Laurie Thorson's home to provide monitoring and care <u>as needed</u>...".**

(Ryan Akamine now had four (4) letters from four (4) different doctors verifying that plaintiff is disabled and is permitted to have a live in aide.) **This did not satisfy Ryan Akamine.**

(e)     On April 12, 2022 (3:50pm), in an attempt to make sure that the inspection was not cancelled the following morning, plaintiff emailed Ryan Akamine again.  **Plaintiff provided Ryan Akamine additional documents** to prove her disability and need for a live in aide (i.e., medical records, chart notes, x-rays, and numerous pictures to prove what happened/happens if plaintiff is without a live in aide, picture of holes in tongue, puddles of blood all over the house, wounds on elbows and knees, scratches on her face from seizing, wounds on her face from falling and hitting her face on the corners of tables, x-rays of numerous back fractures (T-3 to T-12), x-ray of broken arm, x-rays of several pinched nerves in thoracic spine and lower lumbar area which cause plaintiff chronic pain in her back and legs, etc.).
**This did not satisfy Ryan Akamine.**

(f)     On April 13, 2022 (6:29am), plaintiff again emailed Ryan Akamine. **Plaintiff provides Ryan Akamine with even more documents,** medical records, chart notes, and more pictures.  The plaintiff did the best she could to provide Ryan Akamine all the information he needed so the inspection scheduled at 8:00am was not cancelled.  The information Ryan Akamine had in his possession now proved that the plaintiff is disabled with epilepsy and TEA (Transient Epileptic Amnesia), and is permitted to have a live in aide to provide disability-related overnight care as needed.
**This did not satisfy Ryan Akamine.**

(g)     On April 13, 2022 (8:00am) the inspector arrived at the rental, and the plaintiff and her son were present.  The inspection was performed, and it passed.  The inspection was performed based on the RFTA and Lease for the contract rent of $4,000, which documents were submitted to HPHA on March 21, 2022. Prior to the inspection, defendants never required the owner and plaintiff to revise the RFTA and Lease.

(The inspection was performed __23__ days after the RFTA and Lease documents were submitted, which is a violation of 42 USC §1437f which requires that inspections are to be performed before **15** days from when defendants received the RFTA and Lease.)

(h)     On April 13, 2022 (8:03am), after Ryan Akamine received the letter from Dr. Megan Bradham dated April 12, 2022, Ryan writes, "...we will contact Dr. Megan Bradham for our **required certification**...".

**This just proves that Dr. Bradham's April 12 letter was not acceptable to Ryan Akamine. Nothing satisfied Ryan Akamine, because he had ulterior motives.**

(i)     On April 13, 2022 (8:03am) Ryan Akamine writes in response to plaintiff's pictures he received the previous day, "...Your live in aide is supposed to be living in your unit solely to provide you necessary support services. The injuries that you shared are either an unusual result where **no live in aide is necessary** or typical of what can result when **you don't have a proper live in aide**..."

(Plaintiff provided the pictures to Ryan Akamine, which were taken in Oregon before the plaintiff moved to Hawaii and when the plaintiff did not have a live in aide, only to prove what happened/happens if defendant does not have a live in aide.)

**HUD confirms that Ryan Akamine is not a gatekeeper to verify if "...no live in aide is necessary..." or plaintiff doesn't have "...a proper live in aide...".**

(j)     On April 13, 2022 (4:03pm) after the inspection, Lyle Matsuura called the plaintiff and left a voicemail message in which Lyle said, **"...the unit passed inspection and you can move in today...".**

(The rent began the day the unit passed inspection, on April 13, 2022. This is confirmed in the HAP contract signed on May 9, 2022.)

(k)     On April 13, 2022, the plaintiff moved into her new home, based on the RFTA and Lease submitted on March 21, 2022 for the contract rent in the amount of $4,000.

(l)     After the inspection, after the plaintiff moved into the rental, defendants refused to communicate with the owner and the plaintiff for

**16 days**.  Defendants never returned phone calls or responded to emails by the owner or the plaintiff.  The owner needed to sign the HAP contract so he could start receiving payment for his rental.  Our phone calls and emails went unanswered for 16 days (from April 13 to April 29). It was on April 29 that communications resumed, only because the owner and plaintiff submitted a revised lease for $3,273 in order to initiate payment to the owner for the rental that the plaintiff was already living in. This was agreed upon between the owner and landlord, contingent on plaintiff appealing the low comparable of $1,621 that caused the contract rent to reduced from $4,000 to $3,273.

(m)     During this period of time (April 13 to April 29), defendants were not communicating with the owner to sign the HAP contract, because Ryan Akamine was in full force maliciously harassing and intimidating the plaintiff's reasonable accommodation to have a live in aide, in an effort to intentionally interfere with plaintiff's housing by reducing plaintiff's 2-bedroom voucher to a 1-bedroom voucher.  The goal was to interfere with plaintiff remaining in the rental before the HAP contract was signed with the owner.

(n)     On April **25**, 2022, Ryan Akamine writes to the plaintiff, "...As I previously indicated to you, attached please find my letter and attachment **certification** sent via facsimile transmission to Dr. Bradham regarding **certifying information for your Live-in-Aide**..."

Ryan Akamine writes to the doctor (after having already receiving the doctors letter on April 12, 202), "...This request seeks your professional opinions regarding the **necessity for a live in aide for your patient, the time and schedule requirements of a live in aide** for your patient, and your **knowledge** about your patient's **proposed** live in aide...".

(The live in aide was not "proposed" in 2022. He was "approved" in 2017.)

(Plaintiff chooses her own live in aide.  The doctor do not choose or approve. Neither do the defendants or Ryan Akamine.)

(o)   Ryan Akamine refused to accept any documentation the plaintiff provided:

**The SSDI award letter did not satisfy Ryan Akamine**. The federal rules outlined in this complaint prove the SSDI award letter is sufficient to confirm the plaintiff is disabled. The SSDI award letter specifically has the word "indefinite" on it, proving the plaintiff is indefinitely disabled.

**The four (4) letters from four (4) different doctors did not satisfy Ryan Akamine**. The letters from plaintiff's doctors was sufficient for Ryan Akamine to "certify" plaintiff is disabled and is required to have a live in aide.
**Nothing would satisfy Ryan Akamine.**

(p)   On April 26, 2022, plaintiff writes to Ryan Akamine, "...as determined by SSDI, my disability is permanent...", and provides Ryan Akamine another copy of her SSDI award letter, another copy of the 120% reasonable accommodation approved in 2017, and another copy of the four (4) letters from four (4) different doctors to prove plaintiff is disabled and is required to have a live in aide.
**Nothing would satisfy Ryan Akamine.**

(q)   On April 27, 2022, Ryan Akamine responds to plaintiff by writing, "...Thank you for your email and for *agreeing* that you will assist us in **gathering information regarding your live in aide**..." and "...During the process of your search for a new housing unit, **you informed** Hawaii Public Housing Authority **staff and others** that your approved live in aide (Ryan Thorson) comes over to see you only when you have a seizure or episode, and that your son travels a lot for his job.  In your Friday, April 8, 2022 10:51pm email to Executive Director Ouansafi, you said "In the past, on numerous occasions, Ryan has moved in permanently to give me round the clock care when I am experiencing seizures on a daily basis.  In your email Tuesday, April 12, 2022 3:35pm email to me, you said: "Ryan Thorson works varying hours as a project manager" and "Ryan Thorson has a job with varying hours" and "Ryan Thorson is employed with PTC Construction".  Additionally, Dr. Bradham's April 12,

2022 letter in support of a live in aide says, "Ryan Thorson is permitted to live in Laurie Thorson's home to provide monitoring and care as needed."..."

(Ryan Akamine is lying.  Plaintiff never spoke to "staff and others" about her live in aide. This proves Ryan Akamine's position that the live in aide is required to solely reside in plaintiff's unit, is not permitted to have a separate residence, and is not permitted to have a job.)

Ryan Akamine also writes, "...The photos of your injuries in your Tuesday, April 12, 202 (3:49pm) email to me are very concerning, as your live in aide is supposed to be living in your unit *solely* to provide you necessary support services. The injuries that you shared are either an unusual result where **no live in aide is necessary** or typical of what can result when **you don't have a proper live in aide**.  In light of the above, the Hawaii Public Housing Authority is seeking clarifying and necessary information from Dr. Bradham....."

Ryan Akamine also writes, "...HPHA does not question that you have a disability; the HPHA is diligently and conscientiously trying to fulfill our fiduciary duty by asking relevant questions **to determine if you only need assistance "to provide monitoring and care as needed" or someone else who "shall be living in the unit solely to provide supportive services" to you**..."

(According to Federal Register 98-10374, pages 23850 (on page 51), HUD writes that it is not Ryan Akamine's responsibility to determine if no live in aide is necessary or I don't have a proper live in aide.)

(In 2017, it was caseworker Mrs. Villasteros who processed plaintiff's reasonable accommodation for a live in aide. Mrs. Villasteros informed the plaintiff that the live in aide was required to have his own bedroom when he stayed with her overnight when providing disability-related overnight care as needed.  Therefore plaintiff was issued a 2-bedroom voucher to accommodate her live in aide. Never did Mrs. Villasteros inform the plaintiff that the live in aide was to reside in her home when

not providing support services, and the live in aide could not have his own residence, and the live in aide could not have a job.)

(Ryan Akamine received plaintiff's photos on April 12, 2022, which he knew were taken before plaintiff had a live in aide, when plaintiff lived alone in Oregon alone.  Plaintiff provided the photos to Ryan Akamine only to prove what happened/happens if plaintiff is without a live in aide.  But at this point, plaintiff knew Ryan Akamine was rejecting anything and everything plaintiff provided, i.e., doctors letters, medical records, pictures, etc., but why?)
**Nothing was acceptable to Ryan Akamine.**

(r)     On April 28, 2022, plaintiff responds to Ryan Akamine, and writes: "...Please allow me to officially clear the air on a few things so we can all be on the same page moving forward.  You claim that I verbally stated that my son visits me only when I have a seizure or an episode.  **This is false. I never said this**..." "...You claim that I verbally stated that my son travels a lot for his job.  **This is false.  I never said this**.  My son does not travel for his job.  My son works from home quite often due to the nature of his work..." "...the photos of my injuries in my email sent on Tuesday, April 12, 2022 were taken when I lived alone in Oregon without a live in aide, before I moved to Hawaii. My sending you these pictures was for the sole purpose of proving what happens to me when I don't have a live in aide..."
**Plaintiff never heard from Ryan Akamine again.**

(s)     On April 29, 2022, after it was apparent to the plaintiff that defendants were making absolutely no attempt to return her phone calls or to contact the owner to sign the HAP contract, and realizing the owner needed to get paid for the rental she was **already living in for 16 days**, the plaintiff and owner took it upon themselves to provoke defendants into signing the HAP contract by submitting a revised Lease for $3,273. The purpose was to provoke the defendants into signing the HAP contract so the owner could get paid something for his rental which the plaintiff was already living in since April 13, 2022.

(The contract rent never should have been reduced from $4,000 to $3,273, because defendants performed the inspection on April 13, 2022 based on the RFTA and Lease for $4,000, dated March 21, 2022.)

(t)     On May 9, 2022, defendants and the owner signed the HAP contract for $3,273 (**49 days after** the original RFTA and Lease for $4,000 was submitted on March 21, 2022, and **28 days after** the unit was inspected on April 13, 2022, and **28 days after** the plaintiff moved into the unit on April 13, 2022).

(u)     Before the HAP contract was signed (on May 9, 2022), Ryan Akamine was in full force maliciously harassing and intimidating the plaintiff and her live in aide (for the purpose of interfering with the plaintiff securing the rental in Hawaii Kai)  After the HAP contract was signed, Ryan Akamine never contacted the plaintiff again.

### D.  CLAIMS AGAINST RYAN AKAMINE, HPHA CHIEF COMPLIANCE OFFICER

1.     Ryan Akamine was hired by HPHA in January 2022 as the Chief Compliance Officer.  The first sentence of the job description for the Chief Compliance Officer reads as follows:

> "..This position oversees and manages the agency's Housing Compliance Office to ensure all public housing programs comply with State and Federal Housing Laws.."
>
> (http://www.hpha.hawaii.gov/jobs/Announcement_Various %20Exempt%20Positions%20%20(admin)%206.26.17.htm)

2.     Plaintiff claims Ryan Akamine had a fiduciary duty to ensure that the federal rules and HUD guidelines that govern the Section 8 Housing Choice Voucher Program were being correctly implemented.

3.     On April 6, 2022, HPHA's Executive Director, Hakim Ouansafi, instructed Ryan Akamine to follow up on the plaintiff's complaints that low comparables were being used in rent reasonableness determinations,

which ultimately caused the plaintiff's contract rent and payment standard to be drastically reduced, and caused plaintiff's 120% reasonable accommodation to be nullified.

4.  Plaintiff claims that instead of Ryan Akamine investigating the plaintiff's complaint regarding the low comparables being used in the rent reasonableness determinations, Ryan Akamine immediately began attacking the plaintiff's live in aide.

5.  Plaintiff claims that Ryan Akamine acted outside the scope of his duties by acting as the gatekeeper to determine whether or not the plaintiff requires or does not require a live in aide. It's not because Ryan Akamine was truly concerned about the plaintiff, but rather his purpose was to intentionally interfere with the plaintiff's housing by causing her 2-bedroom voucher to be reduced to a 1-bedroom, or terminate her voucher altogether (which would cause the plaintiff to be homeless).

6.  HUD confirms in this Federal Register, that Ryan Akamine is not plaintiff's gatekeeper:

**Federal Register 98-10374, pages 23850:**

**"...HA does <u>not</u> assess the nature and character of the occupant's disability in order to match the occupant with requirements for occupancy...or to assure that the occupant will benefit from appropriate supportive services...",**

**"...An elderly or disabled Section 8 participant chooses whether [where] to live** in a group home or in other housing that satisfies the HUD housing quality standards.  The HA may not bar access to group housing **because the HA believes that the participant can live independently, and does not need supportive services.**  Conversely, the HA may not bar access to group housing because the HA believes that the participant needs supportive services that are not available at the housing...",

"...the HA has <u>no</u> responsibility or authority to act as a <u>gatekeeper</u> who determines whether the assisted family has or lacks the capacity to live independently...", "...The HA may <u>not</u> inquire into the nature or extent of disability..."

7.   Plaintiff claims that Ryan Akamine's only "fiduciary duty" as the Chief Compliance Officer was to approve the live in aide based on the four (4) letters he had from four (4) different doctors, and to approve the live in aide in compliance with the applicable rules.

8.   Plaintiff claims that Ryan Akamine acted outside the scope of his duties by demanding that the plaintiff, the plaintiff's live in aide, and the plaintiff's doctor answer numerous interrogating invasive questions about plaintiff's disability and live in aide.

9.   Plaintiff claims Ryan Akamine acted outside the scope of his duties by purposefully and intentionally not complying with the federal rules and HUD guidelines that dictate how the Section 8 Housing Choice Voucher Program is to be implemented.

10.   Plaintiff claims Ryan Akamine acted outside the scope of his duties by purposefully and intentionally:

    (a)   creating illegal policy to use one low comparable in all rent reasonableness policy

    (b)   creating illegal policy to use one low comparable for the purpose of accumulating "surplus grant funds"

    (c)   causing plaintiff's contract rent to be reduced

    (d)   causing plaintiff's approved "exception payment standard" to be reduced,

    (e)   causing plaintiff's voucher to be reduced from a 2-bedroom voucher to a 0-bedroom voucher

(f)     interfering with plaintiff's housing

(g)     interfering with plaintiff's choice of where to live (steering)

(h)     interfering with plaintiff's "approved payment standard"

(i)     nullifying plaintiff's 120% reasonableness accommodation

(j)      interfering with plaintiff's reasonable accommodation to have a live in aide

(k)      illegally investigating plaintiff and her live in aide for fraud

(l)     defaming the plaintiff and live in aide by telling members of the public (outside of the agency) that the plaintiff and live in aide are going to prison for fraud.

(m)    creating policy that plaintiff's live in aide is required to reside in plaintiff's home, even when not providing support services

(n)     creating policy that plaintiff's live in aide is not permitted to have a separate residence

(o)     creating policy that plaintiff's live in aide is not permitted to have a job

(p)     creating policy that plaintiff's live in aide is not permitted to provide "disability-related overnight care" as needed

(q)     denying plaintiff's request that the live in aide provide "disability-related overnight care" as needed

(r)     causing the live in aide to quit as his mother's live in aide

(s)     causing the plaintiff to live alone without her live in aide

**11.  Plaintiff requested an exception for defendants to permit "...disability-related overnight care..." as needed, and Ryan Akamine refused plaintiff's request.**

The rules quoted below, 24 CFR 982.316 and HUD Notice PIH 2009-22, prove Ryan Akamine had a fiduciary duty to accommodate the plaintiff's disability by approving "disability-related overnight care" as needed:

### 24 CFR §982.316

Live in Aide
(a) A family that consists of one or more elder ['elder' is 62 years old or older – plaintiff is 64], near-elderly, **or** disabled persons [plaintiff is disabled] may request that the PHA approve a live in aide in the unit and provide necessary supportive services for a family member who is a person with disabilities. The **PHA <u>must</u> approve a live in aide if needed as a reasonable accommodation in accordance with <u>24 CFR part 8</u> to make the program accessible to and usable by the family member with a disability.**

### HUD Notice PIH 2009- 22 (HA)

(https://www.hud.gov/sites/documents/DOC_8989.PDF)

"...The definition of a live-in aide is recorded in 24 CFR Section 5.403 which states that a live-in aide is a person who resides with one or more elderly persons [over 60], near-elderly persons or persons with disabilities and who is: (1) determined to be essential to the care and well-being of the persons; (2) is not obligated for the support of the persons; and (3) **would not be living in the unit <u>except</u> to provide the necessary supportive services...**"

"...**Occasional, intermittent, multiple or rotating care givers typically do not reside in the unit and would not qualify as live-in aides. Therefore, an additional bedroom should not be approved for a live-in aide under these circumstances...**"

"...A family may always request a reasonable accommodation to permit program participation by individuals with disabilities. A family's composition or circumstances may warrant the provision of an additional bedroom **to permit disability-related overnight care** [Plaintiff made this request and defendants denied her request.] and allow the family equal use and enjoyment of the unit. Such limited exceptions to the established subsidy standards are permitted under 24 CFR Section 982.402(b)(8). The PHA must consider requests for an exception to the established subsidy standards on a case-by-case basis and **provide an exception, where necessary, as a reasonable accommodation**. The PHA shall document the justification for all granted exceptions..."

12.    Ryan Akamine, as the Chief Compliance Officer, had a fiduciary duty to comply with the federal rules that govern  how the Section 8 Housing Choice Voucher Program is  implemented.

13.    Ryan Akamine had in his possession plaintiff's SSDI award letter which confirmed plaintiff is permanently disabled and is unable to work, in compliance with 42 USC 423 §223.

14.    Ryan Akamine had in his possession four (4) letters from four (4) different doctors over the span of the previous 8 years, which all stated that the plaintiff is disabled and is required to have a live in aide, in accordance with 24 CFR 982.316, 24 CFR 8.6, & 24 CFR 5.403.

(The doctors letters are sufficient "verification" to prove that plaintiff is disabled and is required to have a live in aide. But Ryan Akamine ignored the letters he had from the medical providers and was determined to interfere with the plaintiff's housing, purposefully and intentionally acting as the **gatekeeper to have precedence over the doctors** letters.)

15.    Ryan Akamine had in his possession the approved reasonable accommodation for a live in aide, and the approved 120% reasonable accommodation, both approved in 2017, and every year thereafter for five years, as part of plaintiff's annual recertification application.

16.    Ryan Akamine confirms in emails that his sole purpose for
"investigating" and/or "certifying" plaintiff's live in aide was [not out of
concern that plaintiff is cared for, but] to change the size of plaintiff's
voucher, from a 2-bedroom voucher to a 1-bedroom voucher (for the
purpose of interfering and disqualifying the plaintiff in securing the
2-bedroom rental in Hawaii Kai.

17.    After the HAP contract was signed on May 9, 2022, Ryan Akamine
dropped his investigation into the plaintiff's live in aide, and plaintiff
never heard from Ryan Akamine again.

...only to find out on June 12, 2023 from Stephanie Rabiner, FHEO
Branch Chief, that Ryan Akamine resumed his "investigation" from the
previous year into plaintiff's live in aide.

Ms. Rabiner writes:

"...Please be advised that HPHA has informed FHEO that HPHA has
continued its investigation into your son's residency between 2017
and April 2022. HPHA's ongoing investigation is a continuation of
its April 2022 inquiry into your need for a live-in aide and your
son's place of residence as your designated live-in aide...".

18.    On June 12, 2023, the plaintiff is informed by the FHEO Branch
Chief, Stephanie K. Rabiner, that the defendants reopened their
investigation into plaintiff's live in aide (from a year ago), and that the
defendants indeed were in communications with the former neighbor and
landlord, who are the ones who told the plaintiff and the live in aide that
the defendants said they are going to prison for fraud:

Ms. Rabiner writes:

"...Ms. Thorson, FHEO is not investigating you for fraud – fraud is
outside of our jurisdiction. HUD's Office of Inspector General is
responsible for investigating fraud within the Department's
programs, and we are unaware of any complaint made to that office
about you or your live-in aide..."

"...FHEO is only investigating whether there is reasonable cause to believe that HPHA violated the Fair Housing Act, Section 504 and/or the ADA. Your complaint alleges that, in retaliation for asserting that HPHA was using the rent reasonableness test to circumvent your exception payment standard accommodation, HPHA improperly began looking into the status of your live-in aide. You further alleged that HPHA said that it would not conduct an HQS inspection of the new unit until you answered several questions about your need for a live-in aide. As the emails you attached show, HPHA also asked questions about where your son, who has been your designated live-in aide since 2017, had been living and where he would be living once you moved..."

"...HPHA pointed to Chapter 14 to explain that, once it came across information indicating that your son did **not** live with you full time, it was required to ask questions about your need for a live-in aide and your son's residence..."

"...Generally speaking, a housing provider should not inquire as to whether an individual still requires an approved reasonable accommodation except in limited circumstances. **One such circumstance is when the housing provider has information indicating that the individual no longer requires the reasonable accommodation.** FHEO, in investigating your complaint, must thus assess whether HPHA had information on April 6, 2022 and in the days thereafter **to warrant further inquiry and investigation into whether your son had resided with you** since 2017 and whether you still required an extra bedroom and a live-in aide as a reasonable accommodation..."

**(What information did the defendants have that would support plaintiff no longer required a live in aide?  They made it up.)**

**(only the plaintiff's doctors determine if the plaintiff is required to have a live in aide, not the defendants)**

"...Please be advised that HPHA has informed FHEO that HPHA has continued its investigation into your son's residency between 2017 and April 2022. HPHA's ongoing investigation is a continuation of

its April 2022 inquiry into your need for a live-in aide and your **son's place of residence** as your designated live-in aide. FHEO is thus also assessing whether HPHA's **ongoing investigation is a potential violation of the Fair Housing Act, Section 504 and/or the ADA**. Mr. Wong is thus not asking questions of your son to harass him or scare him away, but rather, he is asking questions for the purpose of helping FHEO determine whether HPHA's choice to continue its investigation is a violation of your fair housing rights..."

"...Do note that **HPHA has given FHEO the evidence it has collected during its investigation, including information that HPHA staff obtained from your former neighbor and former landlord**. Mr. Wong has not spoken to your neighbor, nor has he spoken to anyone who was not already aware that you receive housing assistance. I assure you that he is not spreading rumors and that investigators are trained to explain to witnesses that they are a neutral party, the investigation is ongoing, and that the Department has not made any determination about whether there has been any wrongdoing on the part of any individual. Unfortunately, some witnesses fail to heed this disclaimer and jump to their own conclusions..."

"...I also want to assure you that FHEO did not send or otherwise direct anyone to send the text messages your son received. We are unaware of who sent them and I personally conducted a public records search to try and identify the owner of the phone number, but was unable to do so. It's a text-only number and uses a service often used by spammers. The Department does not condone or otherwise endorse the content of the messages..."

19. The following is Ms. Rabiner's email dated 06.13.23, confirming to the plaintiff that there is no rule about a live in aides primary residence:

"...Ms. Thorson, I have looked in our Housing Choice Voucher handbooks (old and new), out regulations, and the PIH notices that refer to live in aides. **I cannot find anything that refers to live in aide's primary residence or HUD's definition of a live in aide's primary residence...**"

(It is illegal for Ryan Akamine to create policy that plaintiff's live in aide must only reside in her home, and could not have his own residence.)

20.    Defamation claim against defendants:

(a)    FHEO Branch Chief Stephanie Rabiner confirmed in her email that the defendants communicated with the former neighbor and landlord, under the guise of an ongoing investigation.  It was the former neighbor and former landlord who informed the plaintiff and live in aide that, according to the defendants, they are going to prison for fraud.

The defendants also confirmed that it was the defendants who provided them with plaintiff's personal and confidential information: (i.e., disability, medical conditions, housing information, FHEO complaint, claims of discrimination, live in aide information, etc.).

Defendants actions to defame the plaintiff and the live in aide can be construed as retaliation for the plaintiff filing her FHEO complaint.

(b)    Defamation occurs where a false and defamatory statement is communicated to a third party outside of the agency. An allegation of fraud, in and of itself, is serious, and capable of defamatory meaning.

(c)    A claim for defamation is the fact that statements were made by defendants and were communicated to third parties, members of the public who are outside of the agency.

(d)    Defamatory statements are defined as subjecting another to hatred, contempt or ridicule or tend to diminish the esteem, respect, goodwill or confidence in which the other is held in the community or to excite adverse, derogatory or unpleasant feelings or opinions against the other.

(e)    The plaintiff was informed on **June 12, 2023** by FHEO, Stephanie Rabiner (Enforcement Branch Chief), that the defendants reopened their investigation from April 2022 as part of an on-going "investigation" into the plaintiff's live in aide.  Ms. Rabiner confirmed that the defendants submitted the results of their investigation to FHEO, which confirmed that the defendants did contact plaintiff's former neighbor and landlord.

Ms. Rabiner writes,

"...Do note that HPHA has given FHEO the evidence it has collected during its investigation, including information that HPHA staff obtained from your former neighbor and former landlord..."

(f)      Ryan Akamine should be terminated for purposefully and intentionally providing plaintiff's personal information to a member of the public outside of the agency, for making defamatory statements that the plaintiff and live in aide are guilty of fraud, for intentionally interfering with plaintiff's live in aide (who quit because of Ryan Akamine's threats, and interfering with plaintiff's housing by causing her 2-bedroom voucher to be reduced to a 0-bedroom voucher, and nullifying the plaintiff's reasonable accommodations.

21.      Ryan Akamine continued to "investigate" the plaintiff's disability and live in aide, acting as the gatekeeper for the purpose of intentionally harassing and interfering with plaintiff's housing under the guise that he had a "fiduciary duty" to investigate, certify, assess, determine, and evaluate the plaintiff's disability and if plaintiff is required or not required to have support services.  HUD makes it clear that **Ryan Akamine is not the gatekeeper, per Federal Register 98-10374, pages 23850 (quoted several times in this complaint).**

22.      Ryan Akamine knew the plaintiff received SSDI benefits as a permanently disabled person. This is sufficient evidence to prove plaintiff is disabled, in accordance with 42 USC 423 §223. **This did not satisfy Ryan Akamine.**

23.      Ryan Akamine continued to "investigate" the plaintiff's disability and live in aide, even though he had in his possession four (4) letters from four (4) different doctors over the span of the previous 8 years confirming that the plaintiff is disabled and is required to have a live in aide.  By law, no additional information is required to "certify" plaintiff's disability or  "certify" plaintiff's live in aide. The doctor's letters are sufficient evidence in accordance with HPHA's own Administrative Plan, Rules 2-II.D. and 7.11.F., which reads, "...PHA will not inquire about the nature or extent of any disability...".
**Nothing satisfied Ryan Akamine to certify the plaintiff's live in aide.**

24.    Plaintiff claims that Ryan Akamine's fiduciary duty is/was to "...oversees and manages the agency's Housing Compliance Office to ensure all public housing programs comply with State and Federal Housing Laws..". However, this case proves that he did not perform his duties as required, but acted outside the scope of his duties.

### E. CLAIMS AGAINST LYLE MATSUURA, HPHA SUPERVISOR IV

1.    Plaintiff claims Lyle Matsuura acted outside the scope of his duties by intentionally interfering with plaintiff's housing, by interfering with plaintiff's choice of where to live (steering), by interfering with plaintiff's payment standard and contract rent by purposefully and intentionally using illegitimate low comparables as policy in the rent reasonableness determinations, by interfering with plaintiff's reasonable accommodation to have a live in aide, by intentionally nullifying plaintiff's 120% reasonable accommodation, and by lying to Ryan Akamine.

2.    Plaintiff claims that Lyle Matsuura approved approximately 15 comparables in 5 rent reasonableness determinations, but for the purpose of interfering with plaintiff securing the rental in Hawaii Kai.

3.    Plaintiff claims that Lyle Matsuura approved the "low" comparable in the amount of $1,621 in order to interfere with the plaintiff securing the rental in Hawaii Kai, zip code 96821.

4.    Plaintiff claims that Lyle Matsuura lied (aka: defamatory statements) to Ryan Akamine, which resulted in plaintiff and her live in aide being investigated by Ryan Akamine for fraud.

5.    On March 29, 2022, Lyle Matsuura wrote to the plaintiff that a rent reasonableness test was performed on the Hawaii Kai rental, and that two comparables were used (submitted by the plaintiff's son) in the amounts of $4,321 and $4,500; and that defendants added their own "low" comparable in the amount of $1,621. The contract rent was $4,000, and plaintiff's approved payment standard was $4,031. The "low"

comparable caused the plaintiff's rent to be reduced from $4,000 to $3,273, a drastic decrease in the contract rent by $727, which also nullified the plaintiff's 120% reasonable accommodation.

6.    Plaintiff claims that Lyle Matsuura communicated to a Senator's assistant and said to this person, "who does she [plaintiff] think she is, doesn't she know Section 8 don't get an ocean view".

7.    Plaintiff claims that Lyle Matsuura is part of defendants plan to accumulate as much "surplus grant funds" as possible, since he is the gatekeeper to enforce low comparables used against the contract rent. Lyle Matsuura has final authority to approve low comparables to lower the rent below the contract rent, all the for purpose of assisting his employer in accumulating as much "surplus grant funds" as possible. Lyle Matsuura knows that his employer collects $728 each month in "surplus grant funds" from the plaintiff's voucher.

8.    The following is a list of actions and/or inactions by Lyle Matsuura, HPHA supervisor, that caused harm to the plaintiff:

- Lyle retaliated against the plaintiff because she required he use the correct payment standard and utility allowance charts.
- Lyle had the authority to approve and disapprove the comparables.
- Lyle permitted the low comparable in the amount of $1,621 to be included in the rent reasonableness determination, and to have precedence over the plaintiff's reasonable accommodations.
- Lyle used 15 comparables in 5 rent reasonableness tests in order to interfere with the plaintiff's housing.
- Lyle caused the plaintiff's contract rent to be drastically reduced.
- Lyle caused the plaintiff's payment standard to be reduced.
- Lyle caused the plaintiff's 120% reasonable accommodation to be nullified.
- Lyle delayed the inspection from taking place after receiving the RFTA and Lease.

- Lyle delayed the HAP contract from being signed.
- Lyle had an ulterior motive, acting outside the scope of his duties, to interfere with the plaintiff securing the rental in Hawaii Kai.
- Lyle fabricated lies to Ryan Akamine that plaintiff said things about her live in aide that are not true.
- Lyle has continued to play a part in harassing the plaintiff. The last was when he mailed a letter to plaintiff instructing her to complete forms 'to add a member of her household', and that if she did not return the forms by the deadline, her housing assistance would be terminated.  Plaintiff never requested to add a member to her household.

## F.  CLAIMS AGAINST HAKIM OUANSAFI, HPHA EXECUTIVE DIRECTOR

1.     Hakim Ouansafi is the Executive Director of the Hawaii Public Housing Authority. Mr. Ouansafi is solely responsible for ensuring that the agency implements the Section 8 Housing Choice Voucher Program in compliance with the federal rules and HUD guidelines. Mr. Ouansafi is responsible for the actions of his employees, especially if he has full knowledge that his employees are acting outside the scope of their duties.  Mr. Ouansafi is solely responsible for supervising the Chief Compliance Officer, Ryan Akamine, who reports directly to Mr. Ouansafi.

2.     Hakim Ouansafi received all of plaintiff emails, proving he was always informed of the actions of his employees Ryan Akamine and Lyle Matsuura, and how they were treating the plaintiff. Mr. Ouansafi's silence proves that he supported his employees harassing the plaintiff.

3.     On April 5, 2022, Hakim Ouansafi responded in an email and confirmed to the plaintiff that Ryan Akamine was now handling the plaintiff's complaints. Instead of making sure the plaintiff's complaints were addressed, Mr. Ouansafi instructed Ryan Aksamine to "audit" the

plaintiff, which actually meant to go on the attack against the plaintiff. And that's exactly what Ryan Akamine did, at the direction of the Executive Director Hakim Ouansafi.

4.    Plaintiff notified Hakim Ouansafi that his employees were interfering with her housing, were interfering with her live in aide, were interfering with reasonable accommodations, etc. **Hakim Ouansafi did absolutely nothing.**

5.    Plaintiff notified Hakim Ouansafi that Ryan Akamine was retaliating against her by investigating her live in aide a year **after** the plaintiff filed her FHEO complaint. Plaintiff also informed Mr. Ouansafi that Ryan Akamine was telling members of the public, outside of the agency, that the plaintiff and live in aide are going to prison for fraud. **Hakim Ouansafi did absolutely nothing.**

6.    Plaintiff claims that Executive Director Hakim Ouansafi is solely responsible for adopting the illegal policy to use one <u>low</u> comparable in all rent reasonableness determinations against the contract rent. Plaintiff claims that Mr. Ouanafi knew at all times that "surplus grant funds" were being accumuldated, as a result of the illegal policies. Mr. Ouansafi must be held accountable by providing an accounting of the approximately $32M per year that he accumulated since he was employed with the Hawaii Public Housing Authority. Plaintiff claims that Mr. Ouansafi' illegal policies do not benefit the tenant or the landlord, but only benefits the defendants.

7.    Plaintiff claims that the illegal policies were in effect prior to the employment of Mr. Hakim Ouansafi, who was hired on January 3, 2012. Besides being the Executive Manager of the Hawaii Public Housing Authority, Mr. Ouansafi is also the current registered owner/manager of First Commercial Consulting Services llc, located at 679 Kaumakani Street, Honolulu, Hawaii, 96825. This could be a conflict of interest.

## G.  RENT REASONABLENESS DETERMINATIONS
## and COMPARABLES

### (HPHA RULES v. FEDERAL RULES)

1.    The defendant is required to comply with the federal laws and
HUD guidelines that dictate how low comparables are used in rent
reasonableness determinations.

> 24 CFR §982.54

> **"...The administrative plan <u>must</u> be in accordance with HUD
> regulations and requirements..."**

2.    There is no federal rule to support defendants using one **low**
comparable as policy in all rent reasonableness determinations.

In fact, according to HUD, it's the opposite:

**HUD/PIH Housing Choice Voucher Program Guidebook,
Chapter 3, Rent Reasonableness** (refer to page 8, section 3.1.2.)

"...PHAs should take a common-sense approach to valuing a unit based
on these factors..."

3.1.2  **PHAs need to be careful not to limit their rent reasonableness
analysis** to only mid-range units or only units in certain more affordable
neighborhoods. **Voucher families may choose to rent units above the
payment standard.** As a rule of thumb, the **PHA should collect data on
units with gross rents at least <u>20-25 percent <i>above</i> the greater of
the payment standard or the FMR, including any HUD approved
exception payment standards</u>...**"
("approved exception payment standard" is the plaintiff's 120%
reasonable accommodation approved in 2017)

https://www.hud.gov/sites/dfiles/PIH/documents/HCV_Guidebook_Rent_Reasonableness.pdf

3       There is no Administrative Rule to support defendants can use one low comparable in rent reasonableness determinations.  However, the defendants do confirm it on their website and in board meetings.

(a)     The following is a link to the defendants website, which proves defendants adopted the illegal policy to use one **low** comparable.

http://www.hpha.hawaii.gov/faqs/s8hcvli.html

   **05.15.23, HPHA's website**

   **HPHA's website, as of 05.15.23, confirms that HPHA's illegal policy is to use "...one lower rent..." as a comparable in rent reasonableness tests:**

\*      **HPHA's website reads:**

   **"...What is rent reasonableness?**
   The State is required to ensure that the unit rent is reasonable according to prevailing market conditions. HPHA must determine if the rent is reasonable or too high according to market conditions for units of similar size, features, and amenities in the same area. **HPHA will choose two higher rents and <u>one lower rent</u>** based on proximity to the subject property to compare rents..."

(b)     The following is a link to the defendants website, which proves defendants adopted the illegal policy to use one low comparable.

http://www.hpha.hawaii.gov/boardinfo/board_mtgs_completed/2023/4.20.23%20Board%20Packet.pdf

   **04.20.23, HPHA's Board of Directors Meeting**

   This document is from the Board of Directors Meeting Agenda dated 10.20.22 (see page 22), which reads:

B.  Rent Reasonableness

3. At least three comparable units are used for each rent determination and of which **at least two must have a gross rent that exceeds the subject gross contract rent and one must have a gross rent that is <u>lower than the subject contract rent</u>**.

This is very important to note.  The defendants say "...lower than the subject **contract rent**...".  But that is not what the HUD guidelines say.  The HUD guidelines confirm:

> "...PHA should collect data on units with gross rents **at least 20-25 percent *above* the greater of the payment standard or the FMR, including any HUD approved exception payment standards...**"

(Defendanta are clearly not in compliance with the HUD guidelines as it pertains to using comparables in rent reasonableness determinations.)

(c)     The following is a link to the defendant's website, which proves defendants allow tenants to submit their own comparables, but we know that's not true.  Plaintiff submitted 4, and they were thrown out.  The plaintiff's son submitted 4, and the defendants kept 2 and then introduced their own low comparable.

Executive Director Hakim Ouansafi confirmed in a board meeting that tenants are allowed to submit their own comparables.  If that truly is the case, **what tenant in their right mind would submit low comparables?** Landlords are also allowed to submit their own comparables, but again, **what landlord in their right mind would submit low comparables?**

**This is the link to the board meeting where Hakim Ouansafi said tenants are allowed to bring in their own rent comps.**  Pay attention to the dialogue, everyone at the board meeting wants to talk about the comps, and Hakim Ouansafii shuts them down.

http://www.hpha.hawaii.gov/boardinfo/board_mtgs_completed/2023_Public/06.28.23%20Public%20Packet.pdf

**06.28.23 HPHA's Board of Directors Meeting**

Refer to page 21 to read what Hakim Ouansafi said about comparables:

"...Executive Director Ouansafi clarified that the rent comparable is required by law and the payment standards are set. [Note: He does not say "low" comparables.] He stated that City & County leases are different because the City & County is able to use existing leases, while the HPHA cannot because of tenant confidentiality. He added that the HPHA can always improve and wants what is fair to everyone, including landlords. He stated that he has reached out to Ms. Iwamoto with possible meeting dates to discuss the issue and find possible solutions. [Note: Iwamoto is a landlord whose rents were reduced because of defendants using low comparables.] ..."

"...Executive Director Ouansafi stated the HPHA has more information and cannot discuss it at this time as it is not on the agenda for this meeting. Designee Campos added that for rent comps, quality needs to be considered in pricing as well. Director Pulmano asked if the rent comps are based on publicly available data. Executive Director Ouansafi stated that is correct, rent comps are based on publicly available data. He acknowledged that rent prices can change within a few months based on the prices of other available units at that time. Executive Director Ouansafi explained that most of the time, the outcomes of the rent comparable software are what they should be, and sometimes they do not come out correctly and **that is why people are allowed to bring in their own rent comps**..."

"...He reported that he needs to stop the conversation as it is not an agenda item and does not want to be in violation. Director Pulmano asked if this matter can be added as an agenda item. Chairperson Hall stated he is not sure how that can be added to the agenda..."

4.     The following federal rules prove the defendants policy to use one low comparables is fabricated. Remember, the defendants are the only PHA in the country that uses one low comparable as policy in their rent reasonableness determinations.

**(a)     42 USC §1437f**

SEC. 512.

(1) Comparable properties. ...'comparable properties' means properties <u>in</u> **the same market areas**...that-
(A) are similar to...**neighborhood (including risk of crime), type of location, access, street appeal, age, property size, apartment mix, physical configuration, property and unit amenities, utilities, and other relevant characteristics.**

https://uscode.house.gov/view.xhtml?hl=false&edition=2021&req=granu leid%3AUSC-prelim-title42-section1437f&num=0#amendment-note

**(b)     24 CFR §982.503 refers to 507**

**(c)     24 CFR §982.507**

(b) Comparability.
The PHA must determine whether the rent to owner is a reasonable rent in comparison to rent for other **comparable** unassisted units.

**(d)     24 CFR 983.303, Reasonable Rent**

**Nowhere in this CFR does it say that a low comparable is to be used. The defendants are wrong in adopting policy contrary to the federal rules.** There is no federal rule to support the defendants using one low comparables in conjunction with two high comparables.

https://www.ecfr.gov/current/title-24/subtitle-B/chapter-IX/part-983/subpart-G/section-983.303

## H.  LIVE IN AIDE

### (CFR's, FEDERAL REGISTER, HUD GUIDELINES, HUD NOTICES, HPHA ADMIN RULES)

1.    The following federal rules and HUD guildelines proves that the defendants adopted or fabriated policies, as it pertains to plaintiff's live in aide, that are not in compliance with the federal rules and HUD guidelines,  which are quoted verbatim below:

**(a)    24 CFR §5.403**

**Live in aide means** a person who resides with one or more elderly persons, or near elderly persons, or persons with disabilities, and who:
(1) Is determined to be essential to the care and well being of the person
(2) Is not obligated for the support of the person; and
(3) **Would not be living in the unit _except_ to provide the necessary supportive services**.

**(b)    24 CFR §982.316**

**Live in Aide**
(a) A family that consists of one or more elder [over 62 years of age, plaintiff is 62 years of age], near-elderly, or disabled persons may request that the PHA approve a live in aide in the unit and provide necessary supportive services for a family member who is a person with disabilities. The PHA must approve a live in aide if needed as a reasonable accommodation in accordance with 24 CFR part 8 to make the program accessible to and usable by the family member with a disability.
(b) At any time, the PHA may refuse to approve a particular person as a live-in aide, or may withdraw such approval, **if**:
(1) The person commits fraud, bribery or any other corrupt or criminal act in connection with any federal housing program;

(2) The person commits drug-related criminal activity or violent criminal activity; or

(3) The person currently owes rent or other amounts to the PHA or to another PHA in connection with Section 8 or public housing assistance under the 1937 Act.

**(c)   Refer to HUD Notice PIH 2009-22 (HA)  (short version)**

(https://www.hud.gov/sites/documents/DOC_8989.PDF)

Page 1, para. 3, "...live-in aide is a person who resides with..."  and "...**would not be living in the unit <u>except</u> to provide the necessary supportive services...**"

**Page 2, para. 2, "...A family's composition or circumstances may warrant the provision of an additional bedroom <u>to permit disability-related overnight care</u> and allow the family equal use and enjoyment of the unit..."**

(The live in aide is permitted to stay overnight only if providing "disability-related overnight care".  This does not say that the live in aide is required to solely reside in the unit and is not permitted to have a secondary residence, as HPHA falsely claims.)

**(d)   Refer to HUD Notice PIH 2009- 22 (HA)  (extended version)**

(https://www.hud.gov/sites/documents/DOC_8989.PDF)

"...The definition of a live-in aide is recorded in 24 CFR Section 5.403 which states that a live-in aide is a person who resides with one or more elderly persons [over 60], near-elderly persons or persons with disabilities and who is: (1) determined to be essential to the care and well-being of the persons; (2) is not obligated for the support of the persons; and (3) **would not be living in the unit <u>except</u> to provide the necessary supportive services**..."

"...Occasional, intermittent, multiple or rotating care givers typically do not reside in the unit and would not qualify as live-in aides. Therefore, an additional bedroom should not be approved for a live-in aide under these circumstances..."

"...**A family may always request a reasonable accommodation to permit program participation by individuals with disabilities.**

**A family's composition or circumstances may warrant the provision of <u>an additional bedroom</u> to permit disability-related overnight care and allow the family equal use and enjoyment of the unit.** Such limited exceptions to the established subsidy standards are permitted under 24 CFR Section 982.402(b)(8). The PHA must consider requests for an exception to the established subsidy standards **on a case-by-case basis and <u>provide an exception, where necessary,</u>** as a reasonable accommodation. The PHA shall document the justification for all granted exceptions..."

**(e)   HUD document:  4350.3 REV-1**

(https://www.hud.gov/sites/documents/43503c3HSGH.PDF)

Page 3-9
3-6(E.)(3.)(a.)  Live-in aide.
(1) A person who resides with one or more elderly persons, near-elderly persons, or persons with disabilities, and who:
(a) Is determined to be essential to the care and well being of the person(s);
(b) Is not obligated for the support of the person(s); and
(c) **<u>Would not be living in the unit except</u> to provide the necessary supportive services.**
(2) To qualify as a live-in aide:
(a) The owner [PHA] must <u>verify</u> the need for the live-in aide. **Verification that the live-in aide is needed to provide the necessary supportive services essential to the care and well-being of the person must be <u>obtained from the person's physician</u>,** psychiatrist or other medical practitioner or health care provider. The owner must approve a live-in aide if needed as reasonable accommodation in accordance with 24 CFR Part 8 [which includes epilepsy] to make the

program accessible to and usable by the family member with a disability. The owner may verify whether the live-in aide is necessary **only to the extent necessary to document that applicants or tenants who have requested a live-in aide have a disability-related need for the requested accommodation. This may include verification from the person's physician...**or health care provider. The owner may **not** require applicants or tenants to provide access to confidential medical records or to submit to a physical examination.

(re (2)(a) above, "verification" must be "obtained from the person's physician", not from HPHA's employee Ryan Akamine. The actions of Ryan Akamine to act as the gatekeeper proves he is acting outside the scope of his duties.)

**(f)      Federal Register 98-10374, pages 23850, HUD writes:**

"...**HA does not assess the nature and character of the occupant's disability** in order to match the occupant with requirements for occupancy...or to assure that the occupant will benefit from appropriate supportive services...",

"...**An elderly or disabled Section 8 participant chooses whether [where] to live** in a group home or in other housing that satisfies the HUD housing quality standards.  The HA may not bar access to group housing **because the HA believes that the participant can live independently, and does not need supportive services.** Conversely, the HA may not bar access to group housing **because the HA believes that the participant needs supportive services** that are not available at the housing...",

"...**the HA has no responsibility or authority to act as a gatekeeper** who determines whether the assisted family has or lacks the capacity to live independently...",

"...**The HA may not inquire into the nature or extent of disability**...")

(to clarify: Ryan Akamine did not have the authority to "assess the nature and character of the occupant's disability" and "may not inquire into the nature or extent of [plaintiff's] disability".  Ryan Akamine has "..no responsibility or authority to act as [plaintiff's] gatekeeper...")
"...(c) [Live in aide] qualifies for occupancy <u>only</u> as long as the individual needing supportive services requires the aide's services and remains a tenant..."

(to clarify, the above sentence says:  as long as the "individual" remains a tenant, not as long as the "live in aide" remains a tenant.]

"...(f) (4) An adult child is eligible to move into a Section 202/8 project after initial occupancy **only if they are essential to the care or well-being of the elderly parent(s).** The adult child may be considered a live-in aide if all of the requirements in 1, above, apply and **there is a <u>verified</u> need for a live-in aide** in accordance with 2(a), above..."

(verification must be provided by a physician, not the defendants)

**(g)    24 CFR §5.403**

Live in aide means a person who resides with one or more elderly persons, or near elderly persons, or persons with disabilities, and who:
(1) Is determined to be essential to the care and well being of the person
(2) Is not obligated for the support of the person; and
(3) **<u>Would not be living in the unit</u> *except* to provide the necessary supportive services.** (emphasis added)

**(h)    24 CFR §982.316**

Live in Aide
(a) A family that consists of one or more elder [over 62 years of age, plaintiff is 62 years of age], near-elderly, or disabled persons may request that the PHA approve a live in aide in the unit and provide necessary supportive services for a family member who is a person with disabilities. **The PHA must approve a live in aide if needed as a reasonable accommodation in accordance with 24 CFR part 8 to**

**make the program accessible to and usable by the family member with a disability.**

(b) At any time, the PHA may refuse to approve a particular person as a live-in aide, or may withdraw such approval, **if:**

> (1) The person commits fraud, bribery or any other corrupt or criminal act in connection with any federal housing program;
>
> (2) The person commits drug-related criminal activity or violent criminal activity; or
>
> (3) The person currently owes rent or other amounts to the PHA or to another PHA in connection with Section 8 or public housing assistance under the 1937 Act.

**(i)      HPHA Admin Rule 3-I.M.**

**PHA Policy**

A family's request for a live-in aide must be made in writing. **Written verification will be required from a reliable, knowledgeable professional, such as a doctor**, social worker, or case worker, that the live-in aide is essential for the care and well-being of the elderly, near-elderly, or disabled family member.

In addition, the family and live-in aide will be required to submit a certification stating that the live-in aide is (1) not obligated for the support of the person(s) needing the care, and (2) **would not be living in the unit except to provide the necessary supportive services**.

**(j)    § 966.53**

**The following CFR confirms that a live in aide is not considered a tenant of the disabled person's home:**

(https://www.ecfr.gov/current/title-24/subtitle-B/chapter-IX/part-966/subpart-B/section-966.53)

§ 966.53 Definitions.

For the purpose of this subpart, the following definitions are applicable:
**Tenant shall mean** the adult person (or persons) **(other than a live-in aide)**:

(1) **Who [tenant] resides in the unit, and who [tenant] executed the lease** with the PHA as lessee of the dwelling unit.

2.    The following email is from FHEO Branch Chief, Stephanie Rabiner. The email is dated 06.13.23.

(a)    FHEO Branch Chief Stephanie Rabiner confirms in her email (quoted verbatim) that in June 2022 Ryan Akamine reopened his investigation into plaintiff's live in aide (from April 2022).

Ms. Rabiner writes in her dated 06.18.23:

> "...Please be advised that HPHA has informed FHEO that HPHA has continued its investigation into your son's residency between 2017 and April 2022. HPHA's ongoing investigation is a continuation of its April 2022 inquiry into your need for a live-in aide and your son's place of residence as your designated live-in aide..."

(b)    Ryan Akamine claims that it is policy that plaintiff's live in aide is not permitted to have his own separate residence, and must reside solely and exclusively in the plaintiff's home (even if not providing support services), and is not permitted to have a job.

But there's no law to support Ryan Akamine's position.  He's just making up stuff in order to interfere with plaintiff's housing and reasonable accommodation to have a live in aide.

Ms. Rabiner writes in her email dated 06.13.23:

> "...Ms. Thorson, I have looked in our Housing Choice Voucher handbooks (old and new), out regulations, and the PIH notices that refer to live in aides.  **I cannot find anything that refers to live in aide's primary residence or HUD's definition of a live in aide's primary residence...**"

/

/

/

/

# I.    CONCLUSION

1.    Plaintiff claims that the defendants refuse to comply with the federal rules and HUD guidelines that govern how the Section 8 Housing Choice Voucher Program is to be implemented.

2.    Plaintiff claims that the federal rules and HUD guidelines do not support defendants' illegal policy to use of low comparables in rent reasonableness determinations.

3.    Plaintiff claims that the federal rules and HUD guidelines do not support defendants' illegal policy to use comparables against the contract rent (instead of the payment standard).

4.    Plaintiff claims that the federal rules and HUD guidelines do not support defendants' illegal policy to use low comparables in rent reasonableness determinations against the contract rent for the purpose of lowering the contract rent.

5.    Plaintiff claims that the federal rules and HUD guidelines do not support defendants' illegal policy to use low comparables in rent reasonableness determinations against the contract rent for the purpose of lowering the contract rent so the defendants can collect "surplus grant funds".

6.    Defendant is the only PHA in the country that uses a **low** comparable as policy in all their rent reasonableness determinations.

7.    Plaintiff claims that landlords and tenants do not benefit from defendant using one low comparable as policy, but rather it is only the defendants who benefit because defendants keep the "surplus grant funds", which is the difference between the FMR/payment standard *and* the contract rent.  The contract rent is always lowered as a result of defendants using one low comparable.   The lower the defendants can lower contract rent, the more "surplus grant funds" defendants can keep.

8.     Plaintiff claims that the federal rules and HUD guidelines do not support defendants illegal policy as it pertains to live in aides being required: (1) to reside in plaintiff's home only, even when not providing support services, (2) is not permitted to have a separate residence, (3) is not permitted to provide "disability-related overnight care" as needed, and (3) is not permitted to have a job.

9.     Plaintiff claims that the federal rules and HUD guidelines do not support defendants policy regarding live in aides, but rather plaintiff has provided authorities in this complaint to prove that live in aides (1) may reside in plaintiff's home only when providing support services which includes disability-related overnight care as needed, (2) may not reside in plaintiff's home when not providing support services, (3) is required to have a separate residence, and (4) must have a job to provide for his own living expenses (especially considering that  plaintiff only receives SSDI and is unable to pay for or care for a live in aide).

10.    Plaintiff claims that all defendants were obligated to comply with the following basic HUD requirements as a PHA, and failed:

(a)     Defendant is required to not discriminate against disabled recipients.
**HPHA failed this obligation.**

(b)     Defendant is required to ensure decent safe housing units are accessible to **all** recipients.
**HPHA failed this obligation.**

(c)     Defendant is required to make reasonable accommodations to its own policies, practices, and procedures, to exercise discretion and flexibility to avoid displacement of tenants, and to prevent actions that have a negative impact on the disabled recipient.
**HPHA failed this obligation.**

(d)     Defendant is required to train their employees to be aware of civil rights obligations and their own obligations under the Fair Housing Act to further fair housing for all the disabled recipients. **HPHA failed this obligation.**

(e)     Defendant is required to use appropriate utility allowance charts. Defendants failure to use the appropriate utility allowance chart caused the plaintiff financial harm, since it is the responsibility of the plaintiff to pay the electric bill, which averages $500 per month. This is a hardship on the plaintiff because of her limited monthly income, in which 60% of her income is currently going towards the electric bill. **HPHA failed this obligation.**

(f)     Defendant is required to use appropriate payment standard charts. Defendants failure to use appropriate payment standard charts caused the plaintiff harm, since it determines the amount of the payment standard on the voucher, which assists the tenant to search for a rental. **HPHA failed this obligation.**

(g)     Defendant is required to comply with the HUD guidelines as it pertains to comparables used in rent reasonableness determinations. Defendants used the low comparable in the amount of $1,621 for the purpose of causing harm to the plaintiff, by interfering with plaintiff's housing, interfering with plaintiff's payment standard and contract rent (which nullified plaintiff's 120% reasonable accommodation). It is not reasonable for the defendants (or any PHA) to allow low comparables to have precedence over plaintiff's 120% reasonable accommodation (aka: "approved exception payment standard").

The $1,621 "low" comparable located in zip code 96816 was $2,379 less than the contract rent of $4,000 rental located in zip code 96821. This caused plaintiff's contract rent to be reduced from $4,000 to $3,273, a 20% decrease in the contract rent, which nullified plaintiff's 120% reasonable accommodation. **HPHA failed this obligation.**

(h)     Defendant is required to comply with HUD/PIH guidelines when using comparables, which HUD states: "...the PHA should collect data on [comparable] units with gross rents **at least 20-25 percent <u>above</u>** the greater of the payment standard or the FMR, including any HUD approved exception payment standards...".
**HPHA failed this obligation.**

(i)     Defendant is required to comply with HUD/PIH guidelines "...to use a common sense approach..." in rent reasonableness determinations, and "...may justify a higher rent under the rent reasonableness provisions in 24 CFR § 982.507(b)(1)...", and "...must permit a higher rent that may be necessary as a reasonable accommodation for persons with disabilities in accordance with Federal civil rights laws..." (https://www.hud.gov/program_offices/public_indian_housing/programs/hcv/guidebook)
**HPHA failed this obligation.**

(j)     Defendants are required "... to be careful not to limit their rent reasonableness analysis to only mid-range units or only units in certain more affordable neighborhoods. Voucher families may choose to rent units above the payment standard. As a rule of thumb, **the PHA should collect data on units with gross rents <u>at least 20-25 percent</u> <u>above</u> the greater of <u>the payment standard or the FMR</u>, including any HUD approved *exception* payment standards...**"
[120% reasonable accommodation is plaintiff's "approved exception payment standard"]
(https://www.hud.gov/program_offices/public_indian_housing/programs/hcv/guidebook)
**HPHA failed this obligation.**

(k)     Defendants are required to be in compliance with 24 CFR §100.400, and Hawaii's Fair Housing Act under HRS Ch.515 (42 USC §3617), which **prohibits acts of retaliation** against a person who is exercising her rights under the Fair Housing Act. Defendants purposefully and intentionally threatened, harassed, and intentionally interfered with plaintiff's housing under the pretext of a sudden

"investigation" and/or "certifying" the plaintiff's live in aide. Defendants took all of plaintiff's reasonable accommodations away from her, which were approved in 2017, including her live in aide by communicating to the public that the live in aide was going to prison for fraud, causing the live in aide to quit.
**HPHA failed this obligation.**

(l)     Defendants are required to not defame the plaintiff and her live in aide, and are required to not intentionally cause them harm.
**HPHA failed this obligation.**

(m)    Defendants are required to protect plaintiff's personal and confidential information and not provide it to third parties outside of the agency. Defendants are required to not discuss or disclose the plaintiff's disability or medical condition, or her housing assistance, or any other personal and confidential information.

(n)     Defendants are required to not communicate to third parties outside of the agency that the plaintiff and the live in aide are going to prison for fraud. If defendants believed that the plaintiff and live in wide were not in compliance with any administrative rule, then the defendants had a fiduciary duty to notify the plaintiff and live in aide, and allow them to comply.

(o)     Defendants threat caused the live in aide to quit as his mother's live in aide and permanently moved out of his mother's home. This is the first time in over six years that the mother is now without a live in aide. As a result of the live in aide moving out, the plaintiff's 2-bedroom voucher has been reduced to a 0-bedroom voucher. Defendants had a fiduciary duty to protect and assist the plaintiff in her housing, not destroy her.
**HPHA failed this obligation.**

(p)     Defendants were determined to terminate the plaintiff's reasonable accommodation for a live in aide, which defendants knew would cause the plaintiff's 2-bedroom voucher to be reduced to a 0-bedroom voucher, or possibly terminate the plaintiff's voucher altogether, which would

ultimately cause the plaintiff to be homeless. The responsibility of defendants is to be a safety net so the disabled elderly are not homeless. **HPHA failed this obligation.**

(q)      Defendants had a legal obligation to not interfere with the plaintiff's live in aide, not to interfere with plaintiff's reasonable accommodation to have a live in aide (approved in 2017), not interfere with plaintiff's voucher, and not interfere with plaintiff's housing. Defendants continually harassed the plaintiff under the guise of "certifying" the plaintiff's disability and "certifying" the live in aide. **HPHA failed this obligation.**

(r)      Defendants continued to harass the plaintiff under the guise of "certifying" live in aide, by requiring the plaintiff, the plaintiff's live in aide, and the plaintiff's doctor answer numerous interrogating questions regarding plaintiff's disability and live in aide. Defendants had an obligation to not act as the gatekeeper, but rather should have assisted the plaintiff and made every effort to not cause her harm. **HPHA failed this obligation>**

(s)       Defendants already had in their possession a total of four (4) letters from four (4) different doctors over the span of the previous eight (8) years, which all the doctors confirmed the plaintiff is disabled and is required to have a live in aide.  But these letters did not satisfy Ryan Akamine in order to "certify" the plaintiff's live in aide. Even after plaintiff provided Ryan Akamine with a voluminous amount of documents and medical records to prove her disability, and what happened/happens if she is without a live in aide, Ryan Akamine was never satisfied.  This proves that defendants had ulterior motives to interfere with plaintiff's housing, to interfere with plaintiff's live in aide, and to interfere with plaintiff's reasonable accommodations. **HPHA failed this obligation..**

(t)      Defendants purposefully and intentionally harassed and intimidated the plaintiff, for the purpose of discriminating and interfering with plaintiff's housing, by interfering with plaintiff's reasonable

accommodations previously approved by defendants in 2017. Plaintiff expected defendants to assist in her housing, not find fault with the plaintiff for following the rules and making sure correct charts and comparables were used. Now we know low comparables are always used so the defendants can accumulate as much "surplus grants funds" as they can. It is only the defendants who benefit from using low comparables. The tenant and landlord do not benefit from defendants using low comparables as policy in all their rent reasonableness determinations.

**HPHA failed this obligation..**

## J. PRAYER

1.     Plaintiff prays the court **declares** that the defendant's actions, policies, and practices, as alleged herein, violate the federal rules outlined in this complaint.

2.     Plaintiff prays the court orders the defendants to **comply** with all the federal rules that govern how the Section 8 Housing Choice Voucher Program is to be implemented.

3.     Plaintiff prays the court orders the defendants to **revise** their Administrative Plan to reflect the federal rules and HUD guidelines that govern how the Section 8 Housing Choice Voucher Program is implemented. Plaintiff prays the court will order defendants to revise their Administrative Plan to be in accordance with HUD regulations and requirements, in compliance with **24 CFR §982.54, which reads:**

> **24 CFR §982.54**
> **"…The administrative plan must be in accordance with HUD regulations and requirements…"**

4.     Plaintiff prays the court orders the defendants to revise their Administrative Plan to reflect the written methodology in using appropriate comparables in rent reasonableness determinations in compliance with HUD guidelines.

5.     Plaintiff prays the court orders the defendants be restrained from using **low** comparables in their rent reasonableness determinations, in compliance with the **HUD/PIH Housing Choice Voucher Program Guidebook, which reads as follows:**

> Chapter 3 Rent Reasonableness
> 3.1.2  "...the PHA should collect data [comparables] on units with gross rents at least **20-25 percent <u>above</u> the greater of the payment standard or the FMR, including any HUD <u>approved exception payment standards</u>...**"

(Note: "approved exception payment standard" included plaintiff's 120% reasonable accommodation, approved in 2017)

6.     Plaintiff prays the court orders the defendants to take all necessary and appropriate affirmative steps to correct the effects of their unlawful conduct in using low comparables by revising all the existing vouchers to ensure that the correct comparables were used in rent reasonable determinations, and recalculate all the contract rents to reflect the correct payment standard, and correct the rent portions recipients pay and landlord receive (retroactively).  Defendants should be ordered to go back at least ten (10) years to review and correct all the files, and reimburse all recipients and landlords accordingly.

7.     Plaintiff prays the court orders the defendants to create a database to reflect accurate comparables by zip code. HUD requires this of all PHAs.  Executive Director Halim Ouansafi confirms in the 06/23 board meeting that the database is not accurate, and this is why he permits tenants to submit their own comparables.

8.     Plaintiff prays the court orders the defendants be restrained from **steering** recipients away from living in certain neighborhoods, and into high-crime poverty-stricken neighborhoods.

9.     Plaintiff prays the court orders the defendants act in the best interest of all tenants and all landlords without prejudice and without harassment, not be bullied by defendants into lowering their contract rent below the payment standards established by HUD.

10.    Plaintiff prays the court orders the defendants to no longer use low comparables as policy in all rent reasonableness determinations for the purpose of accumulating "surplus grant funds".

11.    Plaintiff prays the court orders the defendants to provide an accounting of where the $29M/year of "surplus grants funds" are.

12.    Plaintiff prays the court orders **restraining orders** against the defendant's employees to protect the plaintiff and live in aide. Restraining orders are necessary to protect the plaintiff and the live in aide from future retaliation, harassment, and defamation.

13.    Plaintiff prays the court orders defendants be subject to a full audit of 'surplus grant funds' accumulated as a result of defendants low comparable policy in their rent reasonableness determinations.  This is a huge task, but we're talking about approximately $2.4M monthly and $29M annually in "surplus grant funds" that are being accumulated by the defendants as a result of defendants low comparable policy.

14.    I pray that HPHA and its employees are subject to Fair Housing **training** programs.  The facts of this case are not merely allegations, but rather factual findings against HPHA's inability to follow federal rules.

15.    Based on my research of the past and present leadership of Hawaii Public Housing Authority, it is well documented that there is a pattern of abuse and lack of leadership.  To date, there have been multiple lawsuits against the Hawaii Public Housing Authority.

(a)    The link below proves that HPHA **has a history of <u>not</u> complying with federal rules**. This is a Compliance Agreement, which HUD required HPHA sign. The link below is a HUD/FHEO Section 504 Voluntary Compliance Agreement between Hawaii Disability Rights Center and Hawaii Public Housing Authority, was signed by HPHA's executive director Hakim Ouansafi on July 6, 2018.

https://www.hud.gov/sites/dfiles/FHEO/documents/18VCA_HDRC.pdf

(b)    The link below proves that HPHA **has failed to adequately train their employees to comply with the federal rules that dictate fair housing**. This would be a great time to order HPHA leadership to provide on the job training to HPHA employees as it pertains to fair housing.

> "...This study proves that only **18.4% of HPHA employees have received on the job training for fair housing**..."

https://dbedt.hawaii.gov/hhfdc/files/2020/04/FINAL_AI.pdf

## K.  CLAIMS FOR RELIEF

1.     As it pertains to the plaintiff's contract rent, that the court order the defendants reinstate the correct contract rent in the amount of $4,000, which is the contract rent confirmed in the RFTA and Lease dated March 21, 2022, which was signed by the plaintiff and the owner; noting that the inspection performed on April 13, 2022 was based on the RFTA and Lease dated March 21, 2022 for the contract rent of $4,000.

2.     As it pertains to the plaintiff's contract rent, that the court order the defendants reinstate the correct contract rent in the amount of $4,000, effective retroactively from the date the unit passed inspection on April 13, 2022, which is also the effective date of the HAP contract.

3.     As it pertains to plaintiff's 120% reasonable accommodation, that the court order defendants restore the plaintiff's 120% reasonable accommodation in calculating the plaintiff's contract rent (which was nullified effective April 13, 2022 when HPHA used the low comparable).

4.     As it pertains to the inappropriate payment standard and utility allowance charts initially provided to the plaintiff in 2022, that the court order defendants use appropriate charts in determining the plaintiff's rent portion; applied retroactively effective April 13, 2022.

5.     As it pertains to plaintiff's medical records, pictures, and any other documents that pertain to plaintiff's disability, plaintiff prays the court order the defendants purge all their computer and hard files of all records that pertain to plaintiff's disability.  In compliance with HIPAA

laws, plaintiff requests that all medical information remain confidential and private and order the defendnats not to provide plaintff's medical information or disability to the members of the public, outside of the agency.  Plaintiff requests that such an order is in compliance with the following rules:

**HPHA Admin rule 7-II.F.**

"...PHA will **not** place this information in the tenant file. Under **no** circumstances will the PHA request a participant's **medical record(s)**..."

**HPHA Admin rule 2.II-D.**

"...The PHA will **not** inquire about the nature or extent of any disability...**Medical records** will **not** be accepted or retained in the participant file..."

6.   As it pertains to discrimination, defamation, harassment, retaliation, manipulation, coercion, and intentional interference, plaintiff prays that the court grant the plaintiff a restraining order against the defendants from future discrimination, defamation, harassment, retaliation, manipulation, coercion, and intentional interference.

7.   As it pertains to the defendants, that they are ordered to comply with the federal rules and HUD guidelines that govern how comparables are to be collected and used in rent reasonableness determinations.

8.   As it pertains to the defendants using low comparables, that the court order defendants to:

    (a)   not use low comparables as policy in any rent reasonableness determinations.

    (b)   not use low comparables as policy in any rent reasonableness determinations for the purpose of reducing the contract rent.

    (c)   not use low comparables as policy in any rent reasonableness determinations for the purpose of accumulating "surplus grant funds".

    (d)   provide an accounting of how the "surplus grant funds" have been allocated for the last ten (10) years.

## L.  CLAIMS FOR MONETARY DAMAGES

### 1.  GENERAL DAMAGES

**Plaintiff prays that the court enters an order for monetary damages in the amount of $350,000.**

(a)    As outlined in this complaint, the actions of the defendants caused the plaintiff harm, which includes but is not limited to: caused plaintiff's 2-bedroom voucher to be reduced to a 0-bedroom voucher, caused plaintiff's contract rent to be reduced (as a result of defendant's using low comparables as policy), caused plaintiff's payment standard to be reduced which caused plaintiff to lose her 120% reasonable accommodation – approved in 2017 (as a result of defendant's using low comparables as policy), and caused plaintiff to no longer have a live aide (as a result of defendant's intentionally interfering and causing harm to the live in aide, the live in aide quit).

(b)    As of the date of this complaint, the defendants refused to grant plaintiff's request that her live in aide be approved to provide disability-related overnight care as needed. This would allow for plaintiff's live in aide to return, with the conditions that he be permitted to reside in his mother's home only to provide support services – including disability-related overnight care as needed, be permitted to have a separate residence (to reside in when he is not providing support services). and be permitted to have a job to take care of himself.
**But defendant's refused.**

(c)    Plaintiff claims she is not able to pay for and care for a live in aide on her limited income of SSDI.  The very reason the plaintiff moved to Hawaii was so her son could be her live in aide for free and provide the necessary support services, including disability-related overnight care as needed. Defendants approved these reasonable accommodations for the plaintiff in 2017, but now the **defendants refuse.**

(d)    Plaintiff claims that the defendants refuse to provide her and the landlord with the information needed to go forward, which includes the

payment standard for the 0-bedroom voucher (which defendants caused plaintiff's 2-bedroom to be reduced to a 0-bedroom voucher). Plaintiff claims that the defendants refuse to cooperate and provide her and the landlord the necessary information needed to determine if the plaintiff can continue residing in the rental.

(e)     An award for $350,000 is justified for the purpose of making the plaintiff whole for the damages inflicted upon her by the defendants acting outside the scope of their duties. As a result, defendants' actions were purposeful and intentional to cause the plaintiff harm. Defendants discriminated and retaliated against the plaintiff, interfered with plaintiff's housing, interfered with plaintiff's reasonable accommodations (approved in 2017), interfered with plaintiff's voucher size, and interfered with plaintiff's live in aide.

(f)     An award for $350,000 is justified for the damages that include, but are not limited to: retaliation, intentional interference, defamation of character, coercion, manipulation, intimidation, harassment, intentional infliction of emotional distress, mental anguish, pain and suffering, and discrimination, which were inflicted upon plaintiff by the defendants.

(g)     An award for $350,000 is justified for the purpose of making the plaintiff whole.  Defendants failed to administer the Section 8 Housing Choice Voucher Program in accordance with the federal rules and HUD guidelines, also in conformity with title VI of the Civil Rights Act of 1964, the Fair Housing Act, and other Federal, State, and local laws; which prohibits discrimination and promotes fair equal housing opportunities for all disabled persons.

(h)     The following federal rules prove that the conduct of the defendants is unlawful, and warrants an award for damages to the plaintiff:

**24 CFR 100.400**

Prohibited interference, coercion, or intimidation.
(a) This subpart provides the Department's interpretation of the conduct that is **unlawful** under section 818 of the Fair Housing Act.

(b) It shall be **unlawful** to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of...any right granted or protected by this part.

(c) **Conduct made unlawful under this section includes, but is not limited to the following:**

(1) Coercing a person, either orally, in writing, or by other means, to deny or limit the benefits provided that person in connection with the...rental of a dwelling...because of race, color, religion, sex, handicap, familial status,or national origin.

(2) Threatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons.

(5) Retaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act.

(6) Retaliating against any person because that person reported a discriminatory housing practice to a housing provider or other authority.

## 24 CFR §100.600

Quid pro quo and hostile environment harassment.

(a) General. Quid pro quo and hostile environment harassment because of race, color, religion, sex, familial status, national origin or handicap may violate sections 804, 805, 806 or 818 of the Act, depending on the conduct. The same conduct may violate one or more of these provisions.

(1) Quid pro quo harassment.

(2) Hostile environment harassment.

(b) Type of conduct. Harassment can be written, verbal, or other conduct, and does not require physical contact.

(c) Number of incidents. **A single incident of harassment** because of race, color, religion....or handicap may constitute a discriminatory housing practice, where the incident is sufficiently severe to create a hostile environment, or evidences of a quid pro quo.

## 2.   PUNITIVE DAMAGES

**Plaintiff prays that the court enters an order for punitive damages in the amount of $5,000,000.**

(a)    An award for $5,000,000 in punitive damages is less than two months of what the defendants accumulate in "surplus grant funds" from the landlords and the recipients of the Section 8 Housing Choice Voucher Program by illegally using one low comparable in all rent reasonableness determinations.

(b)    An award for $5,000,000 in punitive damages is justified to vindicate the plaintiff, and to punish the defendants for failing to implement the Section 8 Housing Choice Voucher Program in conformity with the federal rules and HUD guidelines, in addition to, defendants own administrative plan, local laws, title VI of the Civil Rights Act of 1964, the Fair Housing Act which prohibits discrimination and promotes equal opportunity and fair housing for all disabled Section 8 recipients.

(c)    An award for $5,000,000 in punitive damages is justified because plaintiff claims that the defendants should be punished for:

(1) violating federal rules and HUD guidelines that govern how the Section 8 Housing Choice Voucher Program is to be implemented,

(2) adopting policies that are not in compliance with the federal rules and HUD guidelines that govern how the Section 8 Housing Choice Voucher Program is to be implemented.

(3) implementing their own illegal policy as it pertains to using one low comparables as policy in all rent reasonableness determinations, and refusing to document their illegal policies in their Administrative Plan (refusing to comply with 24 CFR §982.54, "...The administrative plan <u>must</u> be in accordance with HUD regulations and requirements..."

(4) implementing their own illegal policy as it pertains to using one low comparables in all rent reasonableness determinations, for the purpose of reducing the contract rent to accumulate "surplus grant funds", and refusing to document their illegal policies in their Administrative Plan.

(5) implementing their own illegal policy as it pertains to live in aides, which is not in compliance with federal rules and HUD guidelines, and refusing to document their illegal policies in their Administrative Plan.

(6) implementing illegal policies that caused harm to the plaintiff.

(7) implementing illegal policies that causes harm to all Section 8 recipients.

(8) implementing illegal policies that causes harm to all landlords.

(d)   An award for $5,000,000 in punitive damages is justified to set a precedence that all PHAs must follow federal rules and HUD guidelines when implementing the Section 8 Housing Choice Voucher Program.

(e)   An award for $5,000,000 in punitive damages is justified because an award for punitive damages will discourage and deter the defendants and its employees from future acts of acting outside the scope of their duties, acts construed as egregious, malicious, grossly negligent, oppressive, and intentional. The end result has to be that the punishment is severe enough to deter defendants from future acts of discrimination, interference, harassment, etc., and to deter defendants from adopting illegal policies in the future that are not in the best interest of the Section 8 recipient and/or the landlord/owner.

(f)   Plaintiff prays the court awards a civil penalty against the defendants in an amount authorized by 42 USC 3614(d)(1)(C).

(g)   Plaintiff prays the court award any additional relief and penalties against defendants the court determines is in the best interest of justice.

In closing, plaintiff reserves the right to retain counsel at any time during the proceedings of this case, and that an award for attorney fees be granted (if necessary).  If the court deems it necessary to appoint a court-appointed attorney to represent the plaintiff, plaintiff requests the court appoint the U.S. Attorney General, Clare Connors. It is assumed that the U.S. Attorney General would be the appropriate attorney to represent the plaintiff, acting in the best interest of the plaintiff and all recipients of the Section 8 Housing Choice Voucher Program.

Date: _10-4-23_____          Plaintiff: _Laurie Thorson_____
Laurie Thorson, pro se
P. O. Box 1409
Kailua, Hawaii 96734
(808) 222-5885
Lthorson7@gmail.com

## TABLE OF CONTENTS

A.   VENUE AND JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 2
B.   PLAINTIFF'S CLAIMS AGAINST THE DEFENDANTS . . . . . . . . . . Page 3
C.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 14
D.   CLAIMS AGAINST RYAN AKAMINE. . . . . . . . . . . . . . . . . . . . . . Page 24
E.   CLAIMS AGAINST LYLE MATSUURA . . . . . . . . . . . . . . . . . . . . . Page 35
F.   CLAIMS AGAINST HAKIM OUANSAFI . . . . . . . . . . . . . . . . . . . . Page 37
G.   RENT REASONABLENESS DETERMINATIONS . . . . . . . . . . . . . . Page 39
     COMPARABLES (HPHA RULES V. FEDERAL RULES)
H.   LIVE IN AIDE (AUTHORITIES, CFR's, FEDERAL . . . . . . . . . . . . . Page 44
     REGISTER, HUD GUIDELINES, HUD NOTICES,
     HPHA ADMIN RULES)
I.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 51
J.   PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 57
K.   CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 60
L.   CLAIMS FOR MONETARY DAMAGES . . . . . . . . . . . . . . . . . . . . . Page 62