IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| LAURIE THORSON,<br><br>        Plaintiff,<br><br>    vs.<br><br>HAWAII PUBLIC HOUSING<br>AUTHORITY, HAKIM OUANSAFI,<br>RYAN AKAMINE, and LYLE<br>MATSUURA,<br><br>        Defendants. | Case No. 23-00412 MWJS-WRP<br><br>ORDER DENYING MOTION FOR<br>INJUNCTIONS (EMERGENCY) |

## <u>ORDER DENYING MOTION FOR INJUNCTIONS (EMERGENCY)</u>

Plaintiff Laurie Thorson receives federal rental assistance because of her

disabilities.  In this civil action, she contends that a state agency and various state

officials have sought to deprive her of that assistance, both out of discriminatory

and retaliatory motives.  And, proceeding *pro se*, she has moved (in substance) for

preliminary injunctive relief.  Her motion alleges that Defendants are depriving her

of reasonable accommodations, putting her needed subsidized housing at risk.

Thorson's motion papers express serious concerns.  But her submissions do

not make a strong enough showing to justify the extraordinary and drastic remedy

of injunctive relief.  At this early stage in the proceedings, the evidence does not

adequately show that Defendants have denied or will deny Thorson any reasonable

accommodation to which she is entitled.  Nor does it sufficiently support her

contention that the Defendants have retaliated against her to deprive her of the

benefit of any reasonable accommodation.  For these reasons, the motion for

preliminary injunctive relief is DENIED.

## BACKGROUND

### A.    The Housing Choice Voucher Program

This case involves the Housing Choice Voucher (HCV) Program, a federal

program designed to provide rental assistance to individuals in need.  In broad

terms, the program makes federal funds available so that eligible individuals can

rent privately owned housing units they otherwise could not afford.  The funds are

federal, but the program is administered at the state or local level through "public

housing agencies."  24 C.F.R. § 982.1(a) (2023).  The designated public housing

agency in Hawaiʻi is a state agency, Defendant Hawaiʻi Public Housing Authority

(HPHA).  *See* Hawaiʻi Administrative Rules (HAR) § 17-2031-1 (eff. 2022).

Under the HCV Program, HPHA approves reasonable accommodations for

individuals with disabilities so that federal rental assistance might be realistically

available to them.  For example, if an individual needs the assistance of a live-in

aide—*i.e.*, someone who resides with them, is not obligated to support them,

provides them essential care, and would not be living with them were it not to

provide that care—then HPHA would authorize a voucher for a rental with two

2

bedrooms, rather than one or zero, to allow the live-in aide to reside in the rental

unit.  *See* 24 C.F.R. § 5.403; HAR § 17-2031 Ex. D.  Or if an individual is limited

in the types of units they are able to rent—say, because their disability precludes

them from living in a high-rise or near busy streets—then HPHA might authorize

assistance of up to 120 percent of the ordinary payment, to acknowledge the fact

that the individual's ability to find a unit will be more limited than that of most

people.  *See* 24 C.F.R. § 982.503(b)(1)(v); HAR § 17-2031-54.

Before a unit is rented with a voucher, HPHA must determine whether the

requested rent is reasonable.  *See* 24 C.F.R. § 983.303.  Under this rent

reasonableness test, HPHA calculates a reasonable rent amount by obtaining the

average rent of three comparable units on the market.  Only if a unit's rent does not

exceed that average may a voucher be used to rent it.

### B.    Factual Background

#### 1.    Thorson's Original Voucher and Move to Hawaiʻi Kai

In this case, Thorson—who, as alleged in her complaint, suffers from

disabilities including epilepsy and transient epileptic amnesia—originally received

federally subsidized housing through the HCV Program in Oregon.  ECF No. 1, at

PageID.14 (Compl.).  In 2017, she moved to Hawaiʻi and began to rent a unit in

Kailua, Oahu.  Given her disabilities, she sought and received approval from

HPHA for two reasonable accommodations:  a live-in aide and an amount of

assistance that was 120 percent of the norm.  Or in the parlance of HPHA, Thorson

received a two-bedroom "voucher" with a 120-percent "exception payment

standard."  HPHA approved her son, Ryan Thorson, to serve as her live-in aide.

No problems emerged for five years, until March 2022, when Thorson's

Kailua landlord informed her that she would need to vacate the rental unit soon.

Thorson began to look for a new place to live.  This is where things went wrong,

and at the heart of the parties' dispute is the question of why that happened.

Thorson identified a new rental unit in Hawai'i Kai, Oahu, and her two-

bedroom voucher (with the 120-percent exception payment standard) would have

been sufficient to rent it.  But when an HPHA public housing supervisor,

Defendant Lyle Matsuura, examined whether the Hawai'i Kai landlord's requested

rent amount was reasonable, HPHA's numbers came back suggesting the requested

rent was too high.  Matsuura received alternative comparable units via email from

Thorson and her son, only some of which HPHA used in additional rent

reasonableness tests.  The tests, however, still showed that the requested rent for

the Hawai'i Kai unit was too high.  ECF No. 35-10, at PageID.584-90.

### 2. Thorson's Notice to HPHA and the Subsequent Questions About Thorson's Live-in Aide

On April 4, 2022, through attorneys from the Legal Aid Society of Hawai'i,

Thorson emailed a "notice" to HPHA that she would be filing a complaint with the

U.S. Department of Housing and Urban Development (HUD) if HPHA did not

4

modify its rent reasonableness conclusions for Thorson.  *Id.* at PageID.605.

Thorson contended that HPHA had, among other things, improperly compared the

Hawaiʻi Kai unit to a unit with a substantially lower rent amount than was

reasonable, and that this had been done to "deny Ms. Thorson this prospective unit

in Hawaii Kai."  *Id.*

 The next day, HPHA's executive director, Defendant Hakim Ouansafi,

responded to Thorson's counsel that he had "instructed staff to do a complete

review of th[ese] files" and that Defendant Ryan Akamine from HPHA's

compliance office would be the "lead on this matter."  *Id.*

 On April 6, 2022, Akamine emailed Thorson's counsel to explain how

HPHA had reached its rent reasonableness determination.  He also noted his

understanding that the Hawaiʻi Kai landlord had agreed to allow Thorson to rent

the unit even using HPHA's lower rent reasonableness determination.  *Id.* at

PageID.604.  But Akamine now flagged a new concern:  he understood that in

Thorson's communications with HPHA staff, she "mentioned that her son would

go to her unit *at certain times*."  *Id*. (emphasis added).  In addition, in his

discussions about the rent reasonableness assessment, Ryan Thorson

communicated using an email account (and signature block) suggesting that he was

working as a "Site Safety Health Office" and "Project Supervisor" for a

construction company.  ECF No. 35-12, at PageID.736-37.  Because this

information raised a question about whether Ryan Thorson was still residing with

Thorson as her live-in aide and able to provide her the essential care needed,

Akamine asked Thorson's counsel to advise "how many hours a day (or per week)

does Ms. Thorson's son visit[] her unit to provide the necessary supportive services

previously certified?"  ECF No. 35-10, at PageID.604.  In a follow up message,

Akamine clarified that he was "asking about Ms. Thorson's son's status because

his status is pertinent and consequential to the size of the voucher that she

receives"—that is, Thorson would be eligible for a two-bedroom voucher only if

her son would be residing with her as a live-in aide.  *Id.* at PageID.602.

Thorson's counsel responded that Ryan Thorson's live-in aide status "was

addressed years ago."  *Id.* at PageID.601.  Counsel added that the "fact that

Ms. Thors[o]n asserted rights under the Fair Housing Act just this past Monday

[via the email complaining about the rent reasonableness determination] and now,

just a couple days later, you are threatening her voucher" constituted unlawful

"retaliation."  *Id.*  Counsel asserted that HPHA's "sudden 'investigation'" was a

"pretext," and that it was "hard to fathom why you, personally, and HPHA have

chosen to exacerbate an already unfortunate situation."  *Id.*  In that email, counsel

did not answer any questions about the residential status of Thorson's son.

Thorson herself emailed Ouansafi on April 8, 2022, questioning why he was

"allowing HPHA to continually harass me?  Nobody at HPHA is acting in my best

interest.  Now they are questioning my live in aide, who is my son (Ryan

Thorson)."  *Id.* at PageID.608.  Thorson explained that her "son is and always will

be my live-in aide," and that "[i]n the past, on numerous occasions, Ryan has

moved in permanently to give me round the clock care when I am experiencing

seizures on a daily basis, which is the case now.  As soon as you allow my new

rental to be inspected, my son will be moving in with me as my permanent live-in

aide."  *Id.*

An inspection of the Hawaiʻi Kai unit was scheduled for April 13, 2022.

But in light of Thorson's April 8 email—which indicated that Ryan Thorson only

moved in with Thorson "on numerous occasions," rather than live with her

permanently—Akamine sent an email to Thorson on April 12, 2022.  In this email,

Akamine asked Thorson to provide answers to a series of questions about her son.

ECF No. 36-6, at PageID.856.  Thorson answered by email that same day.  *Id.* at

PageID.854-55.  In response to Akamine's question of whether Ryan Thorson

would be "living full-time with you," Thorson answered, "Yes, Ryan Thorson will

be living with me full time."  In response to Akamine's questions of "[h]ow many

hours per day will Ryan Thorson be providing you with care" and "[w]hat hours of

the day or night will Ryan Thorson be providing you with care," Thorson

answered, "24hr a day."  To the question of what "type of care" her son would

provide, Thorson answered, "1-on-1 help on a daily basis," including assistance

after her seizures.  Thorson added that she had "seizures multiple times a day" and

that Ryan Thorson's care was "essential to my life."  And in response to the

question of whether Ryan Thorson would be working a full-time job, Thorson said,

"No, Ryan Thorson has a job with varying hours."  *Id.* at PageID.855.

Thorson ultimately was approved to move into the Hawaiʻi Kai unit with a

two-bedroom voucher (based on a live-in aide) and a 120-percent exception

payment standard.  Thorson has lived in the Hawaiʻi Kai unit since.

### 3.    Thorson's Complaint to HUD

On November 22, 2022, Thorson submitted an agency complaint with HUD.

ECF No. 28, at PageID.181; ECF No. 35-12, at PageID.634.  It raised two claims.

First, Thorson alleged that HPHA discriminated against her based on her disability,

in violation of Sections 804(f)(2), 804(f)(3)(B), and 818 of the Fair Housing Act

(FHA),[1] by using allegedly inappropriate comparables in its rent reasonableness

determination.  ECF No. 35-12, at PageID.634.  Second, Thorson alleged that after

she had complained to HPHA about its rent reasonableness assessment, HPHA

"retaliated against her," in violation of Section 818 of the FHA, by "conducting a

---

[1]    The FHA is codified at 42 U.S.C. §§ 3601-19.  Section 804 has been
codified at 42 U.S.C. § 3604, and Section 818 at 42 U.S.C. § 3617.  For purposes
of the FHA, "discrimination" is defined to include "a refusal to make reasonable
accommodations . . . when such accommodations may be necessary to afford such
person equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).

review of her file, questioning her continued need for a live-in aide, and delaying

the execution" of her contract and payments to her landlord. *Id.*

HPHA responded that it had used appropriate comparables to conduct its

rent reasonableness assessment. HPHA further responded that it had properly

conducted a full file review of Thorson's case in response to the notice she had

provided to HPHA, and that in the course of that review, information emerged

indicating that Ryan Thorson did not live with Thorson as her live-in aide. *Id.* at

PageID.637. Given that the size of Thorson's voucher depended on whether she

had a live-in aid, HPHA asserted that it was required to confirm that Thorson's son

"would be living with her full-time as a live-in aide before approving her selected

unit." *Id.* HPHA also explained that, in preparing its response to Thorson's HUD

complaint, HPHA uncovered additional evidence—including evidence from a

former neighbor—suggesting that at times between 2017 and 2022, Ryan Thorson

had not been living with Thorson. ECF No. 35-11, at PageID.632; ECF No. 35-12,

at PageID.758-59.

In June 2023, Thorson provided the HUD investigator with images of text

messages that she alleged were from her former neighbor. Thorson wrote that

"HPHA's witness" had sent her and her son the text messages, one of which read,

"I love the investigators on your discrimination case!  You are so going to prison!

Awe!"  ECF No. 35-12, at PageID.683.

On September 15, 2023, HUD determined there was no probable cause to

support Thorson's complaints under the FHA.  *Id.* at PageID.625-33.[2]

### C.    The Procedural History of This Action

Thorson filed her *pro se* complaint in this Court on October 4, 2023.  ECF

No. 1.  Although the complaint does not clearly specify what causes of action are

alleged, the substance of the allegations appears largely to mirror those from her

agency complaint—that is, the FHA discrimination and retaliation claims.

On January 30, 2024, Thorson filed the present Motion for Injunctions

(Emergency).  ECF No. 28.  Thorson argues that "the defendants will inevitably

cause me to be homeless if the court does not intervene and stop them from

harassing me and interfering with my housing and my live in aide."  *Id.* at

PageID.125.  She argues that the "defendants fabricated illegal policies for the

purpose of interfering with my live in aide"—in particular, that they claim the live-

in aide must permanently reside with her.  *Id.* at PageID.131.  She further argues

---

[2]     HUD's determination addressed only Thorson's FHA claims.  HUD
observed that it also had "opened concurrent investigations against HPHA as a
recipient of federal funding pursuant to Section 504 of the Rehabilitation Act of
1973 and Title II of the Americans with Disability Act of 1990," and that as of the
time of its decision, those "investigations remain[ed] ongoing."  ECF No. 35-11, at
PageID.627 n.1.

that Ryan Akamine "threatened the plaintiff and live in aide that they would go to prison for fraud for noncompliance with his illegal policies," which Thorson says is the reason her son is no longer willing to serve as her live-in aide. *Id.* at PageID.133. And she argues that because of "the defendants, I am now living alone without a live in aide, and I have no one to help me." *Id.* at PageID.131. Moreover, because her voucher renewal is coming up in April 2024, and because she no longer has a live-in aide, she will lose her two-bedroom voucher and be required to move to a location that could accommodate a smaller, zero-bedroom voucher. *See id.*

Defendants filed an opposition to the motion on February 16, 2024, and Thorson filed a response to their opposition on February 20, 2024. ECF Nos. 35 & 36. On February 28, 2024, the parties appeared by video for a status conference, at which the parties confirmed that they do not seek an evidentiary hearing on the motion. ECF No. 41. At that status conference, the Court also asked Defendants to file a supplemental brief providing additional detail about Defendants' interpretation of what is required to constitute a live-in aide. Defendants filed their supplemental brief on March 5, 2024, and Thorson filed a response on March 6, 2024. ECF Nos. 42 & 43.

Having reviewed the parties' submissions, the Court elects to decide the motion without a further hearing, as is permitted by Local Rule 7.1(c). The Court

11

thanks the parties for their helpful submissions, as well as for the preparedness
they displayed at the status hearing.

## DISCUSSION

### A.    The Standards Governing Motions for Preliminary Injunctions

Ordinarily, the merits of a plaintiff's claim are conclusively resolved before
a court turns to the question of remedies.  But there are situations in which a
plaintiff is at risk of suffering serious and irreparable harm before the merits of
their claim can be resolved.  In these situations, without early court intervention,
the eventual vindication of the plaintiff's claim will ring hollow.  And for these
reasons, Rule 65 of the Federal Rules of Civil Procedure authorizes courts to issue
preliminary injunctions to protect a plaintiff from immediate injury while the case
is being litigated.

But the Supreme Court has cautioned that preliminary injunctive relief is an
"extraordinary and drastic remedy."  *Munaf v. Geren*, 553 U.S. 674, 689 (2008)
(quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure*
§ 2948 (2d ed. 1995)).  This extraordinary remedy "may only be awarded upon a
clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def.
Council, Inc.*, 555 U.S. 7, 22 (2008).  To make that clear showing, a plaintiff must
establish that they are "likely to suffer irreparable harm in the absence of
preliminary relief."  *Id.* at 20.  Moreover, the plaintiff must show that the *cause* of

the threatened irreparable injury is the defendant's alleged wrongful conduct.  *See*

*Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1324-25 (9th Cir. 1994).  And even if a

plaintiff makes these showings, they must further show that they are "likely to

succeed on the merits," that "the balance of equities tips" in their favor, and that

"an injunction is in the public interest."  *Winter*, 555 U.S. at 20.

## B.    Thorson Has Not Satisfied the Standards Governing a Motion for Preliminary Injunction

Thorson has not satisfied these imposing standards.  For that reason, her

motion for a preliminary injunction must be denied.

1.  As an initial matter, Thorson's motion cannot show a strong likelihood of

success on the merits as to HPHA because the Eleventh Amendment likely bars

Thorson's claims against it.  *See Bylsma v. HPHA*, 951 F. Supp. 2d 1116, 1120 (D.

Haw. 2013).  *See generally Doe v. Regents of the Univ. of Cal.*, 891 F.3d 1147,

1153 (9th Cir. 2018).  Furthermore, the Court cannot say there is a likelihood that

Thorson will be able to show either that HPHA is waiving its Eleventh

Amendment immunity (after all, Defendants have preserved an Eleventh

Amendment defense in their answer to Thorson's complaint, *see* ECF No. 24, at

PageID.113) or that Congress has abrogated HPHA's Eleventh Amendment

immunity through the passage of the FHA, *see, e.g.*, *Kalai v. Hawaii*, No. 06-cv-

433, 2008 WL 3874616, at *2 (D. Haw. Aug. 20, 2008) (holding that the FHA did

not abrogate Eleventh Amendment immunity, and collecting cases reaching the

13

same conclusion); *Hansen v. Delaney*, No. 21-cv-135, 2021 WL 3010241, at *3

(D. Nev. July 14, 2021) (similar).  As far as HPHA is concerned, therefore,

Thorson cannot show a likelihood of success on the merits of her claim.

To be sure, the *Ex parte Young* exception to the Eleventh Amendment does

allow a party to seek "prospective injunctive relief against an individual state

officer in her official capacity" to enjoin an ongoing violation of federal law,

*Regents of the Univ. of Cal.*, 891 F.3d at 1153, and so the Amendment would not

preclude the requested preliminary injunctive relief against Defendants Ouansafi,

Akamine, or Matsuura.  For that reason, the Court now turns to the question of

whether Thorson has met her burden with respect to her claims against those

individual Defendants.

2.  As noted, Thorson's first set of claims appear to be discrimination claims,

under Sections 804(f)(2), 804(f)(3)(B), and 818 of the FHA, related to rent

reasonableness.  She alleges that Defendants "adopted an illegal policy to use one

low comparable in all their rent reasonableness determinations, which is not in

compliance with the federal rules and the HUD guidelines."  ECF No. 1, at

PageID.3 (emphases omitted).  According to Thorson, Defendants appear to be

attempting to reduce the size of HCV vouchers so that they can build "surplus

excess funds" to "support other recipients and programs."  *Id.* at PageID.8 (cleaned

up).  Thorson contends they are not allowed to reduce the size of her and others'

vouchers to do this.  *Id.*  This practice, Thorson argues, constitutes discrimination
under FHA, in the form of a refusal to make needed reasonable accommodations.
*See id.* at PageID.56-57; *supra* note 1.

It is true that HPHA's rent reasonableness determination resulted in her
receiving approval for a smaller rental amount.  But in 2022, Thorson's current
landlord in Hawaiʻi Kai ultimately accepted her voucher even at that reduced rent
rate.[3]  And Thorson does not claim that a new rent reasonableness determination
would let her stay in the two-bedroom Hawaiʻi Kai unit.  Defendants are therefore
correct that, whatever the ultimate merits of this claim, it is not the cause of any
irreparable injury for which a preliminary injunction would be needed.  *See* ECF
No. 35, at PageID.435 n.1, 451 n.10.

Accordingly, as to this first set of claims, Thorson has not adequately shown
that, absent injunctive relief, she would suffer irreparable injury because of the
form of wrongdoing alleged in these claims.  And for that reason, the Court denies
her motion as it relates to these claims.

3.  In her second set of claims, Thorson argues that Defendants have
retaliated against her, in violation of the FHA, by subjecting her live-in aide

---

[3]    Thorson has submitted a February 19, 2024 letter bearing the signature of
her landlord, which indicates that her landlord would be willing to negotiate an
even lower rent rate if necessary to allow Thorson to remain in the unit.  *See* ECF
No. 36-10, at PageID.922-23.

arrangement to inappropriate scrutiny and by threatening that live-in aide with

fraud charges or prison.  This retaliation was the result, Thorson says, of her

having complained about Defendants' use of a low cost comparable in their rent

reasonableness assessments.  And the result of the retaliation, she adds, was that

her son became—and remains—too afraid to serve as her live-in aide.  ECF No. 1,

at PageID.12, 16, 50.

To assess whether Thorson has shown a likelihood of success on the merits

of this retaliation claim, the Court begins with the elements of the claim.  "To

establish a prima facie case of retaliation, a plaintiff must show that (1) [they]

engaged in a protected activity; (2) the defendant subjected [them] to an adverse

action; and (3) a causal link exists between the protected activity and the adverse

action."  *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001).  If the

plaintiff presents a prima facie case, "the burden shifts to the defendant to

articulate a legitimate nondiscriminatory reason for its decision."  *Id.*  Finally, if

the defendant "articulates such a reason, the plaintiff bears the ultimate burden of

demonstrating that the reason was merely a pretext for a discriminatory motive."

*Id.*

Defendants do not appear to dispute, at this early stage of the case, the first

and third elements of a prima facie claim.  That is, they do not appear to dispute

that Thorson engaged in a protected activity when her counsel emailed notice to

16

HPHA that she would be submitting a complaint to HUD if HPHA did not modify
its rent reasonableness assessment.  Nor do they appear to dispute that HPHA
began to scrutinize Thorson's live-in aide arrangement as a result of the full file
review it conducted as a consequence of Thorson's notice.

Defendants do appear to dispute the second element:  whether Defendants'
investigation into Thorson's live-in aide arrangement would qualify as an adverse
action.  Defendants argue that they have never withdrawn her approval to have a
live-in aide, which would be the most obvious form of adverse action.  According
to Defendants, whether Thorson is required to relocate from her current unit turns
entirely on "whether Plaintiff decides to identify a live-in aide before the April
2024 annual recertification" of her voucher.  ECF No. 35, at PageID.452.

But the FHA contains "broad and inclusive" statutory language defining an
adverse action as any coercion, intimidation, threat, or interference.  *Walker*, 272
F.3d at 1128-29 (cleaned up).  And some of the facts Thorson presents do appear to
fit within that language.  In *Walker*, for example, the Ninth Circuit found
"interference" where, among other things, a defendant city "supervised the
organization more closely than it had before, by sending city officials to monthly
meetings," and also "contacted other cities to complain about the [plaintiff
organization]."  *Id.* at 1129.  The Ninth Circuit also favorably cited a National
Labor Relations Act precedent that had found "surveillance" to constitute

17

"interference" in the labor context.  *See id.* at 1130 (citing *Cal. Acrylic Indus., Inc. v. Nat'l Lab. Rels. Bd.*, 150 F.3d 1095, 1099 (9th Cir. 1998)).  Defendants' increased scrutiny of Thorson's live-in aide arrangement could, therefore, qualify as "interference" within the broad meaning of that statutory term.

Showing a prima facie case is not, however, enough to show a likelihood of success on the merits.  Assuming Thorson has made out a prima facie case, the next question is whether Defendants can articulate a "legitimate nondiscriminatory reason for its decision." *Id.* at 1128.  And Defendants have done so.  As Defendants explain in their supplemental briefing, live-in aides must "reside[]" in the rental unit of an HCV Program participant to provide "essential" care.  ECF No. 42, at PageID.1920 (quoting 24 C.F.R. § 5.403).  HUD documents further spell out that the subsidized unit must be "the aide's primary residence," and that "[h]elpers who come and go during the day are considered guests or employees of the participant" and would not constitute live-in aides. *Id.* at PageID.1923 (emphasis omitted); *see also id.* at PageID.1923-24 (citing HUD Pub. & Indian Hous., Notice PIH 2014-25 (HA) at 3 (Oct. 16, 2014) ("Occasional, intermittent, multiple or rotating care givers typically do not reside in the unit and would not qualify as live-in aides.")).  There are good reasons for these restrictions:  "Since housing funds are limited and there are many eligible families on the [public housing authority, or PHA] waiting lists, PHAs must ensure that a live-in aide is

18

necessary for the support of a person with a disability." ECF No. 42-8, at

PageID.1943.[4]  This is a legitimate nondiscriminatory reason for HPHA's scrutiny

of Thorson's live-in aide arrangement with her son, the peculiarities of which came

distinctly to their attention as they were conducting their full file review in

response to her rent reasonableness complaint.

Moreover, Thorson has not shown, at this stage, that Defendants' legitimate

nondiscriminatory reason for scrutinizing her live-in aide arrangement was

pretextual.  Thorson's argument here is that "there's no law to support" HPHA's

interpretation of the live-in aide requirements, and that this proves HPHA is just

"making up stuff in order to interfere with plaintiff's housing and reasonable

accommodation to have a live in aide." ECF No. 1, at PageID.50.  She contends

that her son can qualify as a live-in aide (and she can receive additional funding for

a second bedroom in her unit for him) even if he is generally not living with her,

---

[4]    Thorson separately argues that HPHA should have no role in making
medical determinations as to whether an individual requires a live-in aide. *See,
e.g.*, ECF No. 1, at PageID.11, 29.  But Defendants do not appear to disagree with
that contention—indeed, as Defendants point out, Thorson *still* has approval for a
live-in aide until her recertification period in April 2024, and if she were to secure
a live-in aide who meets HPHA's residency standards, she would maintain her
current voucher.  ECF No. 35, at PageID.436.  HPHA's position is that it has an
obligation to approve additional funding based on a medically required reasonable
accommodation. *See id.*  This requires HPHA to assure itself that a person is
actually using an approved reasonable accommodation, because an individual
should not receive additional funds for an approved reasonable accommodation
they have chosen not to actually use.

maintains his residence elsewhere, and only occasionally stays with her as needed to provide care. *Id.* at PageID.52.

The evidence, at this early stage, does not support Thorson's contention. Because a live-in aide must be "essential to the care" of the voucher holder, *see* 24 C.F.R. § 5.403, HPHA takes the position that a live-in aide must provide the care that doctors deem "essential," ECF No. 42, at PageID.1924.  And it was reasonable for HPHA to require Thorson's son to reside with her full-time, given (1) her doctor's May 2022 representation that Thorson requires care "24 hours" a day, ECF No. 36-14, at PageID.944; and (2) Thorson's own representations to HPHA that her son would be "moving in with me [into the Hawaiʻi Kai unit] as my permanent live-in aide," that he would be living with her "full time," and that he would be providing her with "24hr a day" care and "1-on-1 help on a daily basis." ECF No. 35-10, at PageID.608; ECF No. 36-6, at PageID.855.  In light of this evidence, the Court cannot find it likely that it was pretextual or bad faith for Defendants to make efforts to determine whether Thorson's live-in aide arrangement comported with general policy and Thorson's own stated needs.

In any event, even if Thorson had shown a likelihood of success on the merits of her retaliation claim, there would be an additional impediment to granting her relief.  Thorson must also show that she would suffer irreparable injury absent relief, and that the threatened injury is caused by the alleged wrongdoing.  *See*

*Stanley*, 13 F.3d at 1324-25.  Here, the threatened injuries are (1) that Thorson's

health will suffer because she is living without the assistance of a live-in aide; and

(2) now that her son is too afraid to continue as her live-in aide, she is at risk of

losing her two-bedroom voucher.  She has not shown that these injuries are the

result of any alleged wrongdoing on the part of Defendants.

First, although Thorson explains that she is in physical danger because she

has been living on her own for the last several months and has not received any

help from her son, *see, e.g.*, ECF No. 28, at PageID.132, there is no evidence to

support the conclusion that this is the result of Defendants' conduct.  To the

contrary, Defendants made clear at the February 28, 2024, status conference, and

confirmed in writing in their supplemental brief, that "HPHA in no way precludes

Mr. Thorson from visiting the Hawaii Kai unit to provide the '[o]cassional' or

'intermittent' care Plaintiff now appears to seek."  ECF No. 42, at PageID.1923 n.1

(alteration in original).  While Thorson may be "especially" worried about

"irreversible physical damages," ECF No. 43, at PageID.1954, Ryan Thorson is

already free to help his mother as needed, and there is no need for a preliminary

injunction to ensure that he is able to do so.

Second, Thorson has expressed the fear that without a live-in aide, she will

no longer have a voucher for a two-bedroom unit and will be required to move

from the Hawaiʻi Kai rental.  And Thorson argues that she is without a live-in aide

because Defendants' conduct caused her son to be unwilling to remain in that role.

But Thorson's motion papers make it clear that HPHA's April 2022 inquiry into

her live-in aide arrangement did not cause her son to halt his services.  Ryan

Thorson continued to serve as Thorson's live-in aide until September 18, 2023.

*See* ECF No. 1, at PageID.12.  And Thorson herself alleges that her son "quit," not

because of any general HPHA inquiry into the live-in aide arrangements, but more

specifically because HPHA officials threatened that she and her son were "going to

prison for fraud."  *Id.* at PageID.14.  As Thorson puts it in no uncertain terms,

"[t]his threat of prison is why the live in aide quit."  *Id.*; *see also id.* at PageID.12

("Plaintiff claims that because of threats of prison and fraud, effective

[September 18, 2023] the live in aide quit.  The plaintiff now lives alone.").  Yet

Thorson has not supplied sufficient evidence that HPHA officials themselves are

responsible for these perceived threats.  She does not suggest that any Defendant

ever communicated such a threat to her or her son directly.  Her allegation is,

instead, that a "former neighbor and landlord" informed her and her son "that the

defendants told them the plaintiff and the live in aide were going to prison for

fraud."  *Id.* at PageID.13-14.  But she has provided no sworn statements or

declarations from a former neighbor, landlord, or her son.

    To be sure, Thorson has submitted images of text messages that she alleges

are from a former neighbor, which appear to express satisfaction at the possibility

of Thorson and her son going to prison. *See* ECF No. 36-3, at PageID.843 ("I love the investigators on your discrimination case! You are so going to prison!"); ECF No. 36-4, at PageID.845 ("Oh man . . . the investigator just contacted me again and you seem so screwed! . . . [T]hey are seeking fraud for both of you!"); *id.* ("Is fraud spelt with a capital F? Is Prison spelt with little p? You and mommy will be finding out SOON! Ha!").

This is not sufficient evidence to make a strong showing that any HPHA officials made any such comments themselves, particularly since there is no evidence that HPHA has any criminal enforcement authority.[5] And as a consequence, Thorson has not met her burden of showing that the irreparable

---

[5]    In its submissions to the HUD official investigating Thorson's complaint, HPHA stated that it was "considering further action and/or investigation . . . to determine whether this might be an occurrence of fraud." ECF No. 35-9, at PageID.497-98. But when faced with possible program abuse, HPHA's policy is to "refer the case to state or federal officials for criminal prosecution," not to take enforcement action itself. ECF No. 35-10, at PageID.621; *see also* ECF No. 35-12, at PageID.708. Insofar as Thorson and her son worry that HPHA will prosecute them, Defendants appear to have no authority to do so. And in any case, evidence in the record suggests that it was not Defendants, but rather the inquiries of an investigator with HUD (which, unlike Defendants, does have criminal investigative authority) that caused Ryan Thorson to begin to be too afraid to continue in his role as his mother's live-in aide. *See* ECF No. 35-12, at PageID.666 (Ryan Thorson's June 7, 2023, voice message with HUD investigator saying, among other things, "I just, uh, got your email yesterday. And, uh, (laughs), threw me back, I, I, very intense, and it's kind of scary, it feels like I'm being a-accused or investigated . . . . Yeah, if you just give me a call and chat. I, I don't mind at all, um, just want to get to the bottom of this and get this over with because I, I don't want to be involved in this at all. This isn't my issue, so, um, yeah, please give me a call back.").

injury she fears—the loss of her two-bedroom voucher because she no longer has a live-in aide—is the result of any alleged wrongdoing on behalf of Defendants.

4.   Defendants make the further argument that the balance of the equities and the public interest weigh in favor of conserving affordable housing funding and avoiding overpayments.  Given the Court's conclusion that Thorson has not met other required showings, it does not here resolve whether other factors also weigh against her requested relief.  *See Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (explaining that a court need not consider the other factors if a movant fails to show a likelihood of success on the merits).

## CONCLUSION

None of this is to diminish the difficulty that Thorson would face if required to find a new place to live.  She asserts that the last time she moved—from Kailua to Hawaiʻi Kai in April 2022—it took her "21 days to find another rental," and she anticipates it will take her "even longer this time because of the shortage in affordable housing (confirmed in the Governor's recent 'affordable housing' proclamation)."  ECF No. 28, at PageID.143.  Defendants, for their part, do not dispute that it took Thorson 21 days to find another rental in April 2022, or that it might be more difficult for her to find a new rental this time.  So there are serious practical consequences at stake.

But for the reasons discussed above, the Court concludes that Thorson has not carried her burden of showing that she is likely to succeed on the merits of a claim for which she has also shown a likelihood of irreparable injury. Accordingly, her motion is DENIED.

IT IS SO ORDERED.

DATED:  March 11, 2024, at Honolulu, Hawaiʻi.



/s/ Micah W.J. Smith
_____
Micah W.J. Smith
United States District Judge

*Laurie Thorson v. Hawaii Public Housing Authority, Hakim Ouansafi, Ryan Akamine, and Lyle Matsuura*; No. 23-cv-00412-MWJS-WRP; Order Denying Motion for Injunctions (Emergency)

25