IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| LAURIE THORSON, | Civil No. 23-00412 MWJS-WRP |
| Plaintiff, | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| HAWAIʻI PUBLIC HOUSING AUTHORITY, HAKIM OUANSAFI, RYAN AKAMINE, and LYLE MATSUURA, | |
| Defendants. | |

**INTRODUCTION**

In this pro se lawsuit, Plaintiff Laurie Thorson makes allegations of discrimination and retaliation against the Hawaiʻi Public Housing Authority (HPHA) and three of its officials. She seeks monetary, injunctive, and declaratory relief under the federal Fair Housing Act.

Defendants have now moved for summary judgment, contending they are entitled to prevail as a matter of law. The court agrees. Some of Thorson's claims are legally precluded by the doctrine of sovereign immunity. And as to the rest, Thorson has not identified evidence sufficient to rationally support a jury verdict in her favor. For these reasons, spelled out more fully below, Defendants' motion for summary judgment is GRANTED.

## BACKGROUND

**A.      Overview of the Housing Choice Voucher Program**

Thorson has long received federal rental assistance through the Housing Choice

Voucher (HCV) Program, which is commonly known as Section 8.  With the aim of

helping low-income persons afford housing, *see* 42 U.S.C. § 1437f(a); 24 C.F.R.

§ 982.1(a)(1), the program extends federal funds to subsidize eligible individuals' rent in

the private housing market, *see* 42 U.S.C. § 1437f(o); 24 C.F.R. § 982.1.  It is funded and

regulated by the U.S. Department of Housing and Urban Development (HUD), but is

locally administered by state or local agencies called public housing agencies (PHAs).

24 C.F.R. § 982.1(a)(1); *see also Nozzi v. Hous. Auth. of Los Angeles*, 806 F.3d 1178, 1184 (9th

Cir. 2015).  In Hawaiʻi, the program is administered by Defendant HPHA.  *See* Hawaiʻi

Administrative Rules (HAR) § 17-2031-1 (eff. 2024).  This means that, within the

constraints of HUD rules, *see* 24 C.F.R. § 982.52, HPHA directs the distribution of

federal funds—through subsidies known as housing vouchers—by deciding who in

Hawaiʻi is eligible for rental assistance and how much rental assistance they should

receive.  *See Nozzi*, 806 F.3d at 1184.

Because Thorson's claims arise out of her interactions with HPHA officials, some

background on HPHA's work is warranted.  Before HPHA can approve a unit for a

federal Section 8 subsidy, the unit must pass at least three benchmarks.  First, it must

pass a physical unit inspection.  24 C.F.R. § 982.305(a)(2).  Second, if the gross rent for

2

the unit is above the "payment standard," which is a reflection of the fair market rent in the local housing market, the recipient's share of the rent must not exceed forty percent of their monthly income. *See id.* §§ 982.1(a)(3), 982.305(a)(5), 982.508. Third—and most critically here—the requested rent for the unit must pass a more tailored affordability, or "rent reasonableness," test. *Id.* §§ 982.305(a)(4), 982.507(a)(1).

Under the "rent reasonableness" test, HPHA compares the requested rent with that for similar, non-Section 8 units on the market; the charged rent for the proposed Section 8 unit may not exceed that for the comparable units. *See id.* § 982.4 (defining "reasonable rent" as a rent "that is not more than rent charged: (1) [f]or comparable units in the private unassisted market; and (2) [f]or comparable unassisted units in the premises"). Comparable units are selected considering the "location, quality, size, unit type, and age of the contract unit," as well as "[a]ny amenities, housing services, maintenance and utilities to be provided by the owner." *Id.* § 982.507(b). Under the HPHA administrative plan, at least three comparable units are used for each rent determination, including at least two "high comparables" (units whose rent exceeds that of the proposed unit). HPHA Admin. Plan, ch. 8, pt. III.D., at 8-17 (May 16, 2024).

HPHA is also tasked with approving reasonable accommodations for individuals receiving Section 8 rental assistance. Under Section 8, individuals with disabilities may be eligible for reasonable accommodations so that federal rental assistance—and housing—might be realistically available to them. The HCV program acknowledges,

3

for example, that when a disability limits the type of unit a person might safely live in,

their housing costs might necessarily increase.  Under those circumstances, HPHA

might authorize a payment standard of up to 120 percent of the ordinary fair market

rent to account for the recipient's needs (which is called a "120 percent payment

standard exception").  24 C.F.R. § 982.503(d)(5); HAR § 17-2031-54(a) (eff. 2024).

Similarly, because some individuals with disabilities require intensive, around-the-clock

care, HUD authorizes housing vouchers with an additional bedroom to allow a live-in

aide to reside in the rental unit and provide the required support services.  *See* 24 C.F.R.

§ 982.316(a); *see also id.* § 5.403 (defining a live-in aide); HAR § 17-2031 Ex. D.

### B.     Factual Background

#### 1.     Thorson's Housing Voucher and Move to Hawaiʻi

Thorson initially obtained a federal Section 8 housing subsidy in Oregon.  ECF

No. 102, at PageID.4502 (Defs.' Concise Statement of Facts (CSF) ¶ 5).  Thorson lives

with disabilities, including epilepsy and transient epileptic amnesia.  ECF No. 101-1, at

PageID.4454; ECF No. 113, at PageID.4813.  On the advice of doctors that she needed

additional support to help manage her disabilities, in 2017, Thorson moved to Hawaiʻi

to be closer to her son, Ryan Thorson.  ECF No. 102-20, at PageID.4585 (Sep. 18, 2023,

email from Thorson to HPHA staff explaining why she moved).  Thorson transferred

her housing voucher here, ECF No. 102, at PageID.4502 (Defs.' CSF ¶ 5), and initially

received two reasonable accommodations for her disabilities.  First, Thorson's doctor

attested that her disabilities precluded her from living in a high-rise or near busy streets, so she received a 120 percent payment standard exception.  *Id.* at PageID.4502-03 (Defs.' CSF ¶¶ 6-7).  Second, Thorson's doctor attested that she needed 24/7 care.  ECF No. 102-33, at PageID.4636 (Ryan Akamine Decl. ¶ 23).  To allow for a live-in aide to reside with Thorson, HPHA approved a two-bedroom unit voucher.  ECF No. 102, at PageID.4502-03 (Defs.' CSF ¶¶ 6-7).  According to her submissions to HPHA, Thorson's son Ryan was to serve as her full-time live-in aide.  *Id.*

Using her voucher, Thorson moved into a unit in Kailua, Oʻahu, and lived there for nearly five years.  *Id.* at PageID.4503 (¶¶ 9-10).  In March 2022, however, Thorson's landlord informed her that she would need to vacate the unit, and she began to search for a new rental.  *Id.* (¶ 11).

### 2.    Thorson's 2022 Move and Defendants' Live-In Aide Investigation

Thorson's claims stem from this 2022 rental search.  She located a new unit in Hawaiʻi Kai, Oʻahu, and submitted it to HPHA for approval.  *Id.* (¶ 12); ECF No. 102-7, at PageID.4531-43.  The requested rent was $4,000 a month, not including utilities.  ECF No. 102, at PageID.4503 (Defs.' CSF ¶ 13); ECF No. 102-7, at PageID.4531.  According to HPHA, Thorson's existing two-bedroom, 120 percent payment standard exception housing voucher sufficed to cover much, but not all, of that rent.  ECF No. 102, at PageID.4503 (Defs.' CSF ¶ 14); *see also* ECF No. 102-10, at PageID.4547 (Mar. 29, 2022, email explaining that Thorson's payment standard for that zip code was $3,948

including utilities).  Thorson's remaining share of the rent would have exceeded forty

percent of her gross monthly income.  ECF No. 102-10, at PageID.4547.  And as noted,

under HUD rules, even if a voucher could otherwise cover a proposed unit, HPHA

must subject the unit to a "rent reasonableness" test.  ECF No. 102, at PageID.4503-04

(¶ 16).  After submitting Thorson's proposed unit to three such tests, HPHA determined

that the requested rent for the Hawai'i Kai unit was not reasonable.

The rent reasonableness tests were conducted by HPHA Housing Quality

Standards (HQS) inspector Gary Shinde, who is not a named defendant in this suit.

ECF No. 102-25, at PageID.4599-600 (Gary Shinde Decl. ¶¶ 1, 5).  Shinde performed the

first test on March 23, 2022.  *Id.* at PageID.4600 (¶ 6).  Although the HPHA

administrative plan directs that the test should include two "high" comparables (units

with rent higher than the proposed unit), Shinde attests that he was "unable to find"

two comparables with a gross rent higher than the proposed unit at that time.  *Id*.  So he

instead used comparables from the area with listed base rents of $1,500, $2,500, and

$4,200—only one of which had a gross rent higher than the proposed unit.  *Id.*; *see also*

ECF No. 102-27, at PageID.4604-08.  Because the gross rents of those comparables

averaged $2,854.33, which was less than the requested rent, HPHA notified Thorson

and the landlord of the proposed unit, Kelly McGill, that the requested rent was not

reasonable.  ECF No. 102-25, at PageID.4600 (Shinde Decl. ¶¶ 6-7).

Thorson challenged the results of the first rent reasonableness test. ECF No. 102, at PageID.4504 (Defs.' CSF ¶ 23). In an email dated March 24, 2024, she requested that HPHA redo the test using four of her own proposals for comparable units. ECF No. 102-28, at PageID.4610. Thorson's proposals—which she contended were comparable because they were all two-bedrooms with an ocean view—were listed for rent at $5,000, $7,000, $8,500, and $12,000. *Id.*; ECF No. 102-29, at PageID.4611-14.

At the direction of Lyle Matsuura, an HPHA supervisor—and now one of the three named Individual Defendants in this suit—Shinde conducted a second rent reasonableness test on March 28, 2022. ECF No. 102-25, at PageID.4601 (Shinde Decl. ¶ 10). But he declined to use Thorson's proposed comparables because they were a different type of unit than the subject unit—they were single-family homes, which are not comparable to a townhouse. *Id.* (¶ 9); *see* ECF No. 102-29, at PageID.4611-14. Instead, Shinde used nearby two-bedroom townhouse and duplex units that were listed for rent at $2,400, $2,500, and $4,200—again including only one high comparable. ECF No. 102-25, at PageID.4601 (Shinde Decl. ¶ 10); ECF No. 102-30, at PageID.4615-19. The average of those new comparables' gross rent (including utilities) was $3,114, and so Shinde concluded that the requested rent also failed the second rent reasonableness test. ECF No. 102-25, at PageID.4601 (Shinde Decl. ¶ 10).

Thorson challenged the results a second time:  Thorson's son Ryan emailed HPHA four new comparables, which he and Thorson requested Shinde use in a third rent reasonableness test.  *Id.* (¶ 11); ECF No. 102-31, at PageID.4620.

Shinde conducted a third and final rent reasonableness test on March 29, 2022. ECF No. 102-25, at PageID.4601-02 (Shinde Decl. ¶ 12).  This time, Shinde used two high comparables, one of which Thorson's son had submitted.  *See id.*  The listed base rent amounts for the comparable units were $1,500, $4,200, and $4,500.  ECF No. 102-32, at PageID.4621-29.  But even so, the three comparables averaged $3,480.67 in gross rent, and so the proposed unit's requested rent amount of $4,000 plus utilities still exceeded that average.  ECF No. 102-25, at PageID.4601-02 (Shinde Decl. ¶ 12).

Because the requested rent of $4,000 plus utilities exceeded the maximum amount for reasonable rent, Matsuura notified Thorson that the rent still did not pass the test.  ECF No. 102-4, at PageID.4522 (Matsuura Decl. ¶ 18); ECF No. 102-15, at PageID.4553 (Mar. 29, 2022, email from Matsuura to Thorson and Ryan).  Matsuura offered Thorson and her prospective landlord McGill the option to decrease the requested rent to comply with the third rent reasonableness test.  ECF No. 102-4, at PageID.4522 (Matsuura Decl. ¶ 18); ECF No. 102-15, at PageID.4553.  On April 5, 2022, Thorson informed HPHA that McGill had agreed to reduce the base rent to $3,273, and so she was able to proceed with renting the unit.  ECF No. 102-16, at PageID.4554.

8

Meanwhile, Thorson had retained counsel from the Legal Aid Society of Hawaiʻi. And the day before McGill agreed to reduce the requested rent, on April 4, 2022, Thorson's counsel notified HPHA that Thorson would be filing a HUD complaint if HPHA did not further modify its rent reasonableness determination. ECF No. 102-2, at PageID.4514-15. HPHA's Executive Director, Hakim Ouansafi, informed Thorson's counsel in an email the following day that he had instructed staff to "do a complete review" of Thorson's files, and that HPHA compliance officer Ryan Akamine was "now the lead on this matter." ECF No. 102-3, at PageID.4516. (Ouansafi and Akamine are now, together with Matsuura, the named Individual Defendants in this case.)

Akamine proceeded to review Thorson's files as directed. On April 6, 2022, Akamine emailed Thorson's counsel explaining how HPHA had reached its rent reasonableness determination and noting that McGill had agreed to reduce the rent to comply with the third rent reasonableness determination. ECF No. 102-35, at PageID.4641-42. But Akamine's review of Thorson's files raised a new question: whether Thorson's son, who was her designated live-in aide for her two-bedroom voucher, was indeed living with Thorson. ECF No. 102-33, at PageID.4632-33 (Akamine Decl. ¶¶ 11, 14). In his email, Akamine noted that although Thorson's son was her assigned live in-aide, Thorson had told HPHA supervisor Matsuura that he "would go to her unit at *certain times*." ECF No. 102-35, at PageID.4642 (emphasis added). Akamine directed Thorson's counsel to "advise how many hours a day (or per week)

does Ms. Thorson's son visit her unit to provide the necessary supportive services previously certified?" *Id.* After Thorson's counsel accused HPHA of retaliation, in a follow-up email on April 8, 2022, Akamine clarified that he was "asking about Ms. Thorson's son's status because his status is pertinent and consequential to the size of the voucher that she receives." ECF No. 102-39, at PageID.4649.

Akamine avers that this concern was raised based on three pieces of information found in his review of Thorson's file: First, Ryan Thorson's most recent emails to Matsuura had been sent from what appeared to be a work email, and his signature line indicated that he was a "Project Supervisor" for "Pacific Tech Construction, Inc." ECF No. 102-33, at PageID.4632-33 (Akamine Decl. ¶¶ 12-13). Second, Akamine discovered that in a Section 8 personal declaration form in Thorson's file dated October 9, 2020, Thorson had listed her son as her live-in aide, but she had also indicated that her son was employed. *Id.* at PageID.4633 (¶ 15); ECF No. 102-37, at PageID.4644-45. And finally, in an April 8, 2022, email to Ouansafi, Thorson stated that "*[i]n the past*, on numerous occasions, [Ryan] has moved in permanently to give me round the clock care when I am experiencing seizures on a daily basis, which is the case now. As soon as you allow my new rental to be inspected, my son *will be moving in with me* as my permanent live-in aide." ECF No. 102-33, at PageID.4633-34 (Akamine Decl. ¶¶ 16-17) (emphases added) (quoting ECF No. 102-38, at PageID.4648).

At that time, Thorson's counsel completed representation of her and withdrew as counsel. But Akamine pressed on with the investigation; he redirected his questions about Thorson's live-in-aide directly to her. In an email dated April 12, 2022, Akamine informed Thorson that the inspection of her new rental unit, which had been scheduled for the following day, was "subject to" her answers to these questions. ECF No. 102-41, at PageID.4651-52. Akamine listed several questions about Thorson's existing live-in aide arrangement, including, "Why did Ryan Thorson not live full-time with you?," as well as several questions addressing her new unit, all getting at the issue of whether "Ryan Thorson [will] be living full-time with you?" *Id.* Thorson responded by email that same day, representing that Ryan Thorson had "always lived with me full time"; that he "works varying hours as a project manager"; and that he would be providing her with care "24hr a day." ECF No. 102-42, at PageID.4653-55.

HPHA's inspection of the proposed Hawai'i Kai unit proceeded as scheduled on April 13, 2022. ECF No. 102, at PageID.4505 (Def.'s CSF ¶ 35). Akamine reached out to Thorson's primary care physician, who confirmed her continued need for a live-in aide. *Id.* at PageID.4508-09 (¶¶ 55-58). HPHA then approved Thorson to move into the Hawai'i Kai unit, and her voucher was left untouched. *Id.* at PageID.4509 (¶¶ 59-60). After Thorson and McGill submitted a lease with the reduced rent, the contract was executed on May 7, 2022. ECF No. 102-4, at PageID.4523 (Matsuura Decl. ¶¶ 22-23).

11

### 3.    Thorson's HUD Complaint

Thorson proceeded with submitting her HUD complaint on November 22, 2022. ECF No. 102-44, at PageID.4658-68.  In the complaint, Thorson asserted in relevant part that HPHA (1) discriminated against her based on her disabilities by using inappropriate comparables in its rent reasonableness determinations, in violation of Section 804(f) of the Fair Housing Act, 42 U.S.C. § 3604(f); and (2) retaliated against Thorson by conducting a review of her file, questioning her need for a live-in aide, and delaying the execution of her housing contract, in violation of Section 818 of the Fair Housing Act, 42 U.S.C. § 3617.  ECF No. 102-44, at PageID.4658-68.

HPHA submitted a response denying all of Thorson's allegations.  ECF No. 102-45, at PageID.4669-82.  The agency maintained that it used appropriate comparables in its rent reasonableness determinations, properly conducted a full review of Thorson's file to address her complaint, and that in that process, information emerged suggesting Thorson's son did not live with her.  *Id.* at PageID.4670-77.  Consistent with Akamine's declaration, the response identified both Ryan Thorson's March 28, 2022, email to Matsuura from his work address, which listed his job title and workplace, and the October 9, 2020, personal declaration in Thorson's file, which stated that Ryan Thorson was employed, as the items that raised the red flag.  *Id.* at PageID.4676.  HPHA, moreover, stated additional information emerged that "raised more questions": (1) internet search results for "Ryan Thorson" indicated he was based in Washington,

not Hawaiʻi; and (2) that "upon further inquiry" the HQS inspector who had inspected

Thorson's unit in 2021 "reported that it appeared nobody besides [Thorson] resided in

the unit" and that Thorson had told him she had cameras in her home "so that her son

could keep an eye on her in case she falls." *Id.* Finally, HPHA's response also notes

Thorson's "[p]erhaps most troubling" April 8, 2022, email to Ouansafi suggesting that

Ryan was not currently living with her. *Id.* at PageID.4676-77. Based on that

information, HPHA maintained that it was required to confirm that Ryan would be

residing with her as a live-in aide before approving her unit. *See id.* at PageID.4677-78.

HPHA also noted that it was "considering further action and/or investigation of these

circumstances in order to determine whether this might be an occurrence of fraud,

misrepresentation, or other violations of program requirements." *Id.*

Based on the parties' submissions, on September 15, 2023, the HUD Office of Fair

Housing and Equal Opportunity issued a decision finding no probable cause to support

Thorson's complaint. ECF No. 102-46, at PageID.4683-91.

### 4.    The Loss of Thorson's Live-In Aide

On September 18, 2023, Thorson emailed Ouansafi, Akamine, and Matsuura,

along with others, informing them that Ryan was no longer serving as her live-in aide.

ECF No. 102-20, at PageID.4585-86. Thorson explained that HPHA's questions about

her live-in aide had scared him away: "Akamine intentionally interfered with my live

in aide by communicating to members of the public . . . that my son . . . and I are guilty

13

of fraud and that we're going to prison . . . . [T]he threat alone was enough to scare my son away." [1]  *Id.* at PageID.4585.

Given the loss of her live-in aide, Thorson requested that HPHA issue her a new one-bedroom, 120 percent payment standard exception voucher, since she would no longer be eligible for the reasonable accommodation of a two-bedroom voucher for her live-in aide.  *Id.*  Thorson also requested additional information from HPHA about next steps, including whether she could remain in her current two-bedroom rental with a one-bedroom voucher, and when the one-bedroom voucher would take effect.  *Id.*

Matsuura informed Thorson that her current housing voucher—which included a two-bedroom reasonable accommodation for a live-in aide—would remain in effect until April 2024, at which point her voucher would be recertified.  ECF No. 102-21, at PageID.4587.  If she had not identified a new live-in aide by that date, HPHA would issue her a new zero-bedroom voucher for one individual without a live-in aide.  *Id.*

---

[1]      Thorson's fears appear to arise from communications with a former neighbor; she attaches text messages that express satisfaction at the possibility of Thorson and her son going to prison.  *See* ECF No. 113-39, at PageID.5061 ("I love the investigators on your discrimination case!  You are so going to prison!"); *id.* at PageID.5060 ("Oh man . . . the investigator just contacted me again and you seem so screwed! . . . [T]hey are seeking fraud for both of you!"); *id.* ("Is fraud spelt with a capital F?  Is Prison spelt with little p?  You and mommy will be finding out SOON!  Ha!").  Thorson does not, however, offer any evidence that Defendants ever in fact communicated to anyone a threat that she or her son were guilty of fraud or going to prison.  She has not provided a declaration from the neighbor, and the text messages themselves would be hearsay as to that alleged fact.

### 5.    This Suit and Thorson's 2024 Move

Thorson filed this suit on October 4, 2023, which the court liberally construes as raising the Fair Housing Act discrimination and retaliation claims from her HUD complaint. *See* ECF No. 1. She also filed a motion for a preliminary injunction on January 30, 2024, seeking to stop Defendants from allegedly harassing her and interfering with her housing and live-in aide. ECF No. 28. While acknowledging the gravity of Thorson's accusations, the court found that she had not met the high burden for issuance of a preliminary injunction and denied her motion. ECF No. 44. Thorson appealed that decision, and the Ninth Circuit affirmed. *Thorson v. Haw. Pub. Hous. Auth.*, No. 24-1999, 2024 WL 3519772 (9th Cir. July 24, 2024).

In the meantime, Thorson did not identify a replacement live-in aide, and so when her voucher came up for recertification, HPHA notified Thorson that effective April 1, 2024, her housing assistance payments would decrease and her own portion of the rent on the Hawaiʻi Kai unit would increase. ECF No. 102-4, at PageID.4524 (Matsuura Decl. ¶ 26). Thorson says she then requested permission for her two-bedroom Hawaiʻi Kai unit to be converted to a one-bedroom by locking or sealing off a bedroom. According to a February 28, 2024, email submitted by Thorson, Matsuura refused the request. ECF No. 113-45, at PageID.5078. He informed Thorson and her landlord that such an action was not lawful. *Id.* Nonetheless, at the apparent generosity of her landlord, Thorson was able to remain in the unit for some time.

15

Eventually, however, McGill decided to sell the Hawaiʻi Kai unit, and so Thorson

informed HPHA that she would need to move after all.  ECF No. 101-1, at PageID.4462.

Thorson filed for a temporary restraining order on September 4, 2024.  ECF No.

78.  She asserted, among other things, that Defendants were continuing to discriminate

and retaliate against her by refusing to permit the reasonable accommodation of

allowing her landlord to convert her unit to a one-bedroom by sealing off a bedroom.

*Id.* at PageID.2566-68.  And she contended that as an extension of that discrimination

and retaliation, Defendants also refused to issue her a preemptive 120 percent payment

standard exception for all zip codes on Oʻahu for her search for a new rental; under

existing HPHA policy, her existing accommodation on that front automatically applied

only to Thorson's current zip code, and she would need to individually request its

application for units outside that area.  *Id*. at PageID.2570-72.  The court denied

Thorson's request for a temporary restraining order.  ECF No. 85.  The court noted,

among other things, that Thorson had not shown that a restraining order would prevent

her from having to move out of the Hawaiʻi Kai unit.  *Id.*

HPHA issued Thorson a new zero-bedroom, 120 percent payment exception

standard voucher for her new rental search.  ECF No. 102, at PageID.4510 (Def.'s CSF

¶ 65); ECF No. 102-23, at PageID.4591-92.  Thorson eventually identified a new studio

rental unit in Kailua.  *Id.* (¶ 66).  She moved in on November 1, 2024, and continues to

reside there to date.  *Id.* (¶ 67).

Since then, Thorson says she has twice renewed her request for a live-in aide accommodation, but that Defendants once denied the request and once did not respond.  ECF No. 113, at PageID.4835-36.  In those requests, Thorson specified that she did not want a live-in aide—or anyone—to live with her full-time, but that she wanted a second bedroom for overnight care "when needed."  ECF No. 113-60, at PageID.5139; ECF No. 113-62, at PageID.5143.

### C.     Defendants' Motion for Summary Judgment

Thorson's case is now before the court on Defendants' motion for summary judgment.  ECF No. 101.  Thorson twice asked for permission to amend her complaint to add fraud claims against Defendants, ECF No. 76 & 94, but the magistrate judge denied those requests, ECF No. 91 & 110.  Accordingly, the court does not consider any argument or evidence concerning fraud on summary judgment.  Only Thorson's Fair Housing Act discrimination and retaliation claims are at issue here.  The court elects to decide the motion on the papers, as authorized by Local Rule 7.1(c).

### SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the movant shows there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine disputes of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A dispute is "genuine" if a "reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

If the moving party makes that showing, the burden then shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up). As the Ninth Circuit has explained, while "the burden on the nonmoving party is not a heavy one," they must "show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial." *Dark v. Curry County*, 451 F.3d 1078, 1082 n.2 (9th Cir. 2006) (cleaned up).

If "the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). Rather, the "nonmoving party's evidence must be taken as true," and the court must draw all reasonable inferences in the nonmoving party's favor. *Id.* But where a reasonable juror could not find for the nonmoving party—even accepting their evidence as true and drawing all reasonable inferences in their favor—summary judgment must follow. *See id.*

## DISCUSSION

### A.    Sovereign and Qualified Immunity

Defendants first raise threshold barriers to relief:  they contend that (1) Eleventh

Amendment sovereign immunity bars all of Thorson's claims against HPHA and the

Individual Defendants in their official capacities, and that (2) qualified immunity

protects the Individual Defendants from liability in their personal capacities.

Defendants preserved these arguments in their answer to Thorson's complaint.  *See* ECF

No. 24, at PageID.113; *Demshki v. Monteith*, 255 F.3d 986, 989 (9th Cir. 2001) (noting that

sovereign immunity must be raised "early in the proceedings to provide fair warning to

the plaintiff," but determining that the sovereign's assertion of Eleventh Amendment

immunity in its answer was sufficient to preserve the defense in that case (cleaned up)).

But because no motions to dismiss were filed, they are squarely raised for the first time

on summary judgment.  The court considers each form of immunity in turn.

### 1.    Sovereign Immunity

a.    The Eleventh Amendment bars suits against a state brought by citizens in

federal court without its consent.  *Shaw v. Cal. Dep't of Alcoholic Beverage Control*, 788

F.2d 600, 603 (9th Cir. 1986); *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001).

It is well established that the sovereign immunity offered by the Eleventh Amendment

extends to state agencies.  *Sato v. Orange Cnty. Dep't of Educ.*, 861 F.3d 923, 928 (9th Cir.

2017).  Sovereign immunity similarly encompasses claims for money damages against

state officials, so long as the "state is the real, substantial party in interest, or if

judgment is sought against the public treasury." *Shaw*, 788 F.2d at 604 (cleaned up).

Congress may expressly abrogate state sovereign immunity for particular federal

causes of action. But courts have determined that the Fair Housing Act "contains no

clear congressional statement unequivocally expressing such an intent." *Courtney v.*

*Hous. Auth. of Kings*, No. 20-cv-01296, 2021 WL 168285, at *5 (E.D. Cal. Jan. 19, 2021)

(citing *Kalai v. Hawaii*, Civ. No. 06-00433, 2008 WL 3874616, at *3 (D. Haw. Aug. 20,

2008)); *see also McMillon v. Hawaii*, Civ. No. 08-00578, 2009 WL 10757954, at *7 (D. Haw.

June 19, 2009) (same).

Thorson does not claim that Congress unequivocally sought to waive HPHA's

sovereign immunity, but she argues that the State of Hawaiʻi has chosen to waive that

immunity for itself. *See* ECF No. 113, at PageID.4847. She points to Hawaiʻi Revised

Statutes (HRS) § 356D-4(a)(1) (2015), which authorizes HPHA to "[s]ue and be sued."

And she draws the conclusion that she should therefore be entitled to sue HPHA in

federal court. But Thorson's conclusion does not follow. A state does not "consent to

suit in federal court merely by stating its intention to sue and be sued." *Coll. Sav. Bank*

*v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999) (cleaned up). And

HRS § 356D-4(a)(1) does no more than state that bare intention. Accordingly, while the

statute might perhaps fairly be construed as a waiver of immunity in the state's own

20

courts, it does not establish consent to suit in federal court.  *See id.*; *Kohn v. State Bar of Cal.*, 87 F.4th 1021, 1028-29 (9th Cir. 2023).

The court therefore agrees with Defendants that the Eleventh Amendment bars all of Thorson's claims against HPHA, including those for damages and declaratory and injunctive relief.  Thorson's claims for money damages against the Individual Defendants in their official capacities are similarly barred because the state is the real party in interest and any judgment would be against the public treasury.  *See Shaw*, 788 F.2d at 604.  Defendants' summary judgment motion is GRANTED to that extent.

b.    The protections of the Eleventh Amendment do not extend, however, to prospective declaratory or injunctive relief against a state official where there is an ongoing violation of federal law.  *See Ex parte Young*, 209 U.S. 123 (1908).  This exception to sovereign immunity is known as the *Ex parte Young* doctrine, and it demands that the named state officers "have some connection with the enforcement of the act."  *Coal. to Def. Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) (quoting *Ex parte Young*, 209 U.S. at 157).  That requirement is a "modest" one; it requires merely that the implicated state officials play a relevant role "beyond a generalized duty to enforce state law or general supervisory power over the persons responsible" for enforcement. *Mecinas v. Hobbs*, 30 F.4th 890, 903-04 (9th Cir. 2022) (cleaned up).  A plaintiff must at minimum show that "an injunction against a particular official would significantly

21

increase the likelihood of relief," but they need not show that such relief "is a guarantee." *R.W. v. Columbia Basin Coll.*, 77 F.4th 1214, 1227 (9th Cir. 2023) (cleaned up).

Individual Defendants Ouansafi, Akamine, and Matsuura argue that they are entitled to summary judgment on the official capacity claims even as to Thorson's requests for declaratory and injunctive relief because there is no ongoing violation of law, and Thorson has not established that any of the named Individual Defendants played a role in the alleged discrimination. The court considers each argument in turn.

First, the record is clear that Thorson asserts an ongoing denial of her reasonable accommodations and ongoing retaliation in violation of the Fair Housing Act. ECF No. 1, at PageID.4 (Compl.) ("Plaintiff claims that defendants discriminated, intimidated, harassed, defamed, and retaliated against the plaintiff (*and continue to do so*) for the purpose of intentionally interfering with plaintiff's housing, and interfering with plaintiff's approved reasonable accommodations." (emphasis added)). Defendants insist that Thorson's claims are primarily based on the rent reasonableness tests for the Hawai'i Kai unit in March 2022 and Akamine's investigation into her live-in-aide arrangement beginning in April 2022, both of which ended years ago. ECF No. 101-1, at PageID.4472-75. That may well be true. But Thorson continues to receive federal Section 8 rental assistance, and so Defendants' challenged rent reasonableness test policy continues to apply to her. And Thorson argues in her brief that Defendants' discrimination and retaliation encompasses post-2022 conduct, including during her

22

most recent move in 2024.  Thorson, moreover, asserts that Defendants' investigation has continued to prevent her son from serving as her live-in aide.  The court is therefore satisfied that Thorson asserts an ongoing violation of law.

Second, Thorson has also shown that the named officials, Ouansafi, Akamine, and Matsuura, have an adequate connection to the alleged discrimination and retaliation.  Akamine's connection is the most obvious:  he directly investigated and questioned Thorson about her live-in aide arrangement, which Thorson asserts was retaliation for her HUD complaint.  Ouansafi and Matsuura also played a role in the alleged discrimination and retaliation.  Ouansafi, for example, directed Akamine to review Thorson's file.  And most recently, Thorson says Matsuura denied her request to convert the two-bedroom Hawaiʻi Kai unit to a one-bedroom by locking a door.

Defendants respond that the challenged rent reasonableness tests were not performed by the named officials, but by Shinde, who is not named as a defendant in this suit.  It is true that Ouansafi, Akamine, and Matsuura played no *direct* role in performing the challenged rent reasonableness tests.  But that is not the relevant test— Thorson must show only that the named officials have "some connection" with enforcement of the policy beyond mere supervisory powers.  *Coal. to Defend Affirmative Action*, 674 F.3d at 1134.  Ouansafi is the Executive Director of HPHA, ECF No. 102-1, at PageID.4511 (Ouansafi Decl. ¶ 1); Matsuura is the supervisor of the Section 8 Subsidy Programs Branch of HPHA, ECF No. 102-4, at PageID.4518 (Matsuura Decl. ¶ 1)—the

23

branch in which Shinde serves as a Housing Quality Standards inspector, *id.* at

PageID.4521 (¶ 13); and Akamine is HPHA's Chief Compliance Officer, ECF No. 102-33,

at PageID.4630 (Akamine Decl. ¶ 1).

While the record indicates that Matsuura has supervisory authority over Shinde,

it shows more than just that:  Matsuura specifically directed Shinde to perform the rent

reasonableness tests, was involved in HPHA's communications with Thorson regarding

rent comparables, and informed Thorson when the Hawaiʻi Kai unit did not pass the

rent reasonableness test.  *See supra* pp. 7-8.

Ouansafi, for his part, avers in a declaration that "[i]t is the HPHA Board, not

[him], that is responsible for adopting policies such as the 'one low comparable' policy."

ECF No. 102-1, at PageID.4513 (Ouansafi Decl. ¶ 10).  But that assertion is not enough to

establish that Ouansafi lacks a sufficient connection to the alleged discrimination and

retaliation.  After all, a sufficiently high-placed agency official might, if enjoined, be able

to address ongoing violations, even if they are not currently carrying out those

violations themselves.  The Ninth Circuit's decision in *Coalition to Defend Affirmative*

*Action v. Brown*, 674 F.3d 1128, well illustrates that principle.  There, the plaintiff sought

to enjoin the president of the University of California from enforcing a state

constitutional provision that allegedly violated federal equal protection by restricting

the consideration of race in admission decisions.  *Id.* at 1130, 1134.  The president

argued that the *Ex parte Young* exception should not apply to him because he allegedly

24

lacked the authority to "amend, repeal, deviate from, or enforce" the challenged

constitutional provision.  *Id*. at 1134.  But the Ninth Circuit rejected that contention.  *Id*.

It explained that as the head of the university, the president did "more than just 'live

with'" the challenged provision; he enforced it.  *Id*.  He was "duty-bound to ensure that

his employees follow[ed] it."  *Id*.  And that duty was a "'fairly direct' connection, to say

the least," to enforcement.  *Id*. (quoting *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th

Cir. 1992)).  Similarly, here, as the Executive Director of HPHA, Ouansafi is duty-bound

to ensure that his employees follow HPHA's policies.  On this record, it appears that an

injunction against Ouansafi, too, would "significantly increase the likelihood" that

Thorson would obtain relief regarding future rent reasonableness tests.  *R.W.*, 77 F.4th

at 1227 (cleaned up).

   Because each official is adequately connected to Thorson's claims, the court

concludes that the *Ex parte Young* exception to sovereign immunity applies to Thorson's

requests for declaratory and injunctive relief against Individual Defendants Ouansafi,

Matsuura, and Akamine in their official capacities.

### 2.    Qualified Immunity

   Defendants separately contend that another, narrower form of immunity—

qualified immunity—protects Individual Defendants Ouansafi, Akamine, and

Matsuura from liability in their personal capacities.

Qualified immunity protects state officials from personal "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (cleaned up). Its protections extend "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (cleaned up). To determine whether qualified immunity applies to an official's actions, a court must consider (1) whether the officials violated a statutory or constitutional right, and (2) whether that right was "clearly established" at the time. *Scott v. County of San Bernardino*, 903 F.3d 943, 948 (9th Cir. 2018). The court may consider these prongs in either order, but both must be satisfied to overcome qualified immunity. *Id.*

Here, the court elects to consider the merits prong first. And for the reasons explained below, the court concludes that the record compels the conclusion that the officials in this case did not violate any of Thorson's rights under the Fair Housing Act. For that reason alone, Thorson cannot recover from the Individual Defendants in their personal capacities. The court need not, therefore, go on to consider whether Thorson's rights were "clearly established" for the purposes of qualified immunity.

### B.    Fair Housing Act Discrimination and Retaliation

Turning to the merits, Thorson asserts two violations of the Fair Housing Act: (1) discrimination under 42 U.S.C. § 3604(f) and (2) retaliation under 42 U.S.C § 3617.

26

## 1.    Discrimination

Thorson's first claim is for disability discrimination.  The Fair Housing Act makes it unlawful to "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of" that person.  *Id.* § 3604(f)(2)(A).  As relevant here, discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."[2]  *Id.* § 3604(f)(3)(B).

Defendants assert that Thorson's Fair Housing discrimination claims cannot survive summary judgment for two reasons:  she does not have Article III standing to challenge the rent reasonableness test on behalf of her landlord, and she cannot meet the elements of Fair Housing Act discrimination on the merits.

a.   In arguing that Thorson lacks Article III standing, Defendants cite *Epona v. County of Ventura*, for the proposition that a plaintiff generally "may only bring a claim on [her] own behalf, and may not raise claims based on the rights of another party." 876 F.3d 1214, 1219 (9th Cir. 2017) (quoting *Pony v. County of Los Angeles*, 433 F.3d 1138, 1146 (9th Cir. 2006)).  In reliance on that proposition, Defendants argue that any claim

---

[2]        Thorson does not rely on a theory of disparate treatment or disparate impact, which can also constitute disability discrimination under the Fair Housing Act.  *See Budnick v. Town of Carefree*, 518 F.3d 1109, 1114 (9th Cir. 2008).

arising from a rent reasonableness determination must be raised by the landlord themselves, and not the Section 8 recipient.  ECF No. 101-1, at PageID.4486.

The court agrees that Thorson cannot recover damages for the difference between the rent actually paid and the requested rent of $4,000 because she did not personally lose out on that difference in rent; any such loss was suffered only by her landlord.  Summary judgment is therefore GRANTED to Defendants to that extent.

But Thorson's rent reasonableness challenge does not *only* implicate the funds that her landlord received.  Thorson also more broadly asserts that Defendants' allegedly unlawful rent reasonableness tests effectively denied Thorson her reasonable accommodation of 120 percent of the fair market rent by lessening the amount she could spend on rent for a particular unit.  This Fair Housing Act claim for the denial of reasonable accommodations is undeniably Thorson's own.  The court concludes that Thorson has standing to assert a Fair Housing Act discrimination claim on those grounds, and it thus turns to the substance of her claim.

b.    A Fair Housing Act discrimination claim brought under 42 U.S.C. § 3604(f)(3) requires a plaintiff to establish that (1) she is handicapped within the meaning of 42 U.S.C. § 3602(h); (2) the defendants knew or should reasonably be expected to know of the handicap; (3) accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) the accommodation is reasonable; and (5) the defendants refused to make the requested

28

accommodation.  *Dubois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175,

1179 (9th Cir. 2006).  The inquiry for a refusal to make a reasonable accommodation "is

highly fact-specific, requiring case-by-case determination."  *Id.* (cleaned up).

The first few elements of this claim are undisputed.  No one disputes that

Thorson is handicapped within the meaning of the Fair Housing Act, and Defendants

are the first to acknowledge that they are aware of the need to accommodate her;

indeed, they have approved reasonable accommodations for her in the past.  But

Defendants persuasively argue that Thorson has not offered evidence sufficient to

support a rational jury finding that Defendants have denied her any reasonable

accommodation.

The only requested accommodation addressed in Thorson's HUD complaint for

discrimination is her 120 percent payment standard exception.  ECF No. 102-44, at

PageID.4658-68.  No one disputes that the 120 percent payment standard exception was

necessary and reasonable to afford Thorson an equal opportunity to use and enjoy her

housing; her doctor certified that she needed such an accommodation because she could

not live in a high-rise or near busy streets.  ECF No. 102, at PageID.4502-03 (Defs.' CSF

¶ 6).  But Defendants dispute that they refused to make the requested accommodation.

ECF No. 101-1, at PageID.4487.  And the merits of Defendants' argument are clear-cut,

for Defendants never rescinded Thorson's 120 percent payment standard exception.

Indeed, she still benefits from it in her current housing arrangement.  That fact alone is

sufficient to cut off liability. *See Dubois*, at 453 F.3d at 1179 (affirming summary

judgment on Fair Housing Act discrimination claim for the "simple" reason that

defendant never refused to make the requested accommodation).

Thorson, however, takes another angle: she argues that by using the allegedly

unlawful rent reasonableness tests, Defendants *effectively* nullified Thorson's 120

percent payment standard exception, even if they did not *expressly* do so. Along these

lines, Thorson argues that HPHA's use of low comparables is not in compliance with

HUD rules, ECF No. 113, at PageID.4844-45; in support, she cites a provision from

HUD's HCV program guidebook that says "[a]s a rule of thumb, the PHA should

collect data on units with gross rents at least 20-25 percent above the greater of the

payment standard" or the fair market rent, ECF No. 113-22, at PageID.4910. The

guidebook also makes clear, however, that HUD "does not prescribe the way in which

PHAs should arrive at their rent reasonableness determinations"—the primary goal is

to reflect market rent. *Id.* at PageID.4909.[3] In any case, the fundamental problem with

Thorson's argument is that she was approved for the very unit she requested, and her

---

[3]      Thorson separately contends that a HUD official, Jesse Wu, told her that HPHA's
rent reasonableness assessment was "not in compliance with HUD Regulations." ECF
No. 113, at PageID.4818. But Thorson has not supplied a declaration from Wu. Nor is
there any other evidence that Wu ever offered such an opinion. Although Thorson has
provided an unauthenticated email that she appears to have received from Wu, ECF
No. 113-21, at PageID.4901-02, that email merely supplies HUD's program guidebook,
which, as explained above, "does not prescribe the way in which PHAs should arrive at
their rent reasonableness determinations," ECF No. 113-22, at PageID.4909-10.

120 percent payment standard exception was applied to it.  The rent reasonableness test is not itself a reasonable accommodation; it is merely a mechanism used to ensure that landlords are paid a fair rent amount out of federal Section 8 funds, but no more than that.  The fact that Thorson's landlord ultimately received less rent than he had initially requested has no bearing on whether Thorson received any requested accommodation.  And thus no reasonable jury could conclude, from Thorson's critiques of Defendants' rent reasonableness tests, that Defendants denied her the reasonable accommodation that she in fact received and that her housing voucher continues to encompass.[4]

While Thorson's discrimination claim is centered around the rent reasonableness tests, her summary judgment papers also appear to contend that Defendants have separately denied Thorson her once-approved live-in aide accommodation.  Defendants do not appear to contest—at least at this stage—whether Thorson truly needs a live-in aide.  But it was Thorson herself, not Defendants, who cut off her use of that accommodation.  In a September 18, 2023, email, Thorson informed Defendants that she no longer had a live-in aide and requested that they therefore issue her a one-bedroom voucher.  ECF No. 102-20, at PageID.4585.  Defendants have consistently maintained that Thorson was approved to have a live-in aide, and that so long as she actually had

---

[4]    Similarly, Thorson suggests that in 2024, Defendants tried to ask her landlord to reduce the rent for her new studio unit, and argues that this would have "nullif[ied]" her 120 percent payment standard exception.  ECF No. 113, at PageID.4835.  But Thorson has not submitted a declaration or any other evidence in support of that claim.

one, she could obtain a two-bedroom voucher. Even when Thorson informed

Defendants that her son was no longer willing to serve as her live-in aide, Defendants

advised Thorson that she was welcome to identify a new one. *See* ECF No. 102-47, at

PageID.4692 (Oct. 18, 2023, email from Akamine stating that "no one at HPHA

questions your disability and you are still entitled to your 120%, 2-bedroom housing

choice voucher with the HPHA because you were approved to have a Live-in-Aide").

To be sure, Thorson says that when she renewed her request for her son to serve

as her live-in aide prior to her move in late 2024, Defendants denied that request. As

proof, she offers a letter from Akamine dated October 17, 2024. ECF No. 113-60, at

PageID.5139. But the letter explains that Thorson's request was denied because she

represented that her requested live-in aide would be staying overnight to provide care

only "when needed," "has his own residence and is employed," and that she did *not*

*want* a live-in aide living in her unit "as their primary residence." *Id.* Thorson cannot

persuasively say that she does not want a live-in aide—who, by definition, must

"reside" with her, *see* 24 C.F.R. § 5.403—and simultaneously claim that Defendants

denied her that aide. And Thorson has not created a genuine dispute about whether

her request for an aide that provides only "when needed" overnight, but not live-in,

care is a reasonable accommodation. *See Ohio House, LLC v. City of Costa Mesa*, 135 F.4th

645, 678 (9th Cir. 2025) ("An accommodation is reasonable when it imposes no

fundamental alteration in the nature of the program or undue financial or

32

administrative burdens." (cleaned up)); HUD Notice PIH 2014-25 (HA), at 3 (Oct. 16, 2014) (explaining that "[o]ccasional, intermittent, multiple or rotating care givers typically do not reside in the unit and would not qualify as live-in aides").

Similarly, Thorson says that she again requested a live-in aide accommodation on December 12, 2024, but that Defendants did not respond to that request. ECF No. 113, at PageID.4836. And an unreasonable delay in responding to a request for a reasonable accommodation can, in some circumstances, constitute a constructive denial of that request. *Salisbury v. Caritas Acquisitions V, LLC*, No. CV 18-08247, 2018 WL 10483437, at *2-3 (C.D. Cal. Nov. 20, 2018). But Thorson offers no affidavit or declaration representing that she received no response. And in any case, Thorson's request again states that she would like a two-bedroom voucher for overnight care "when needed"—not live-in support services. ECF No. 113-62, at PageID.5143.

Thorson separately argues that Defendants are ultimately at fault for the loss of her live-in aide because their investigation was retaliatory and caused her son to halt his assistance to her. But this argument is better couched within her retaliation claim; it does not change the fact that Defendants have never denied Thorson that accommodation on their own accord.

Thorson also makes mention of other possible denials of requested—but never approved—reasonable accommodations. She suggests, for example, that Defendants denied Thorson her request to convert her two-bedroom Hawaiʻi Kai unit to a one-

bedroom by locking a door prior to her move in 2024.[5]  ECF No. 113, at PageID.4830.  As

an initial matter, Thorson has again offered no declarations from the relevant parties or

authentication of the emails she produces about these events.  But even accepting that

Defendants refused to make that requested accommodation, Thorson has not done

enough on summary judgment to show that sealing off a bedroom was reasonable or

necessary.  It is the plaintiff's burden to show that an accommodation "seems

reasonable on its face," *Johnson v. Guardian Mgmt.*, 535 F. Supp. 3d 1004, 1014 (D. Or.

2021) (quoting *Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1156 (9th Cir. 2003)); only if that

initial burden is met does the burden shift to the defendants to show that the

"accommodation would cause undue hardship in the particular circumstances," *id.*

(cleaned up).  But Thorson has not explained in her summary judgment briefing why

that request was reasonable—and it is not immediately obvious that it is.  Nor has

Thorson provided any evidence whatsoever to show that her disabilities require that

her two-bedroom Hawaiʻi Kai unit be converted to a one-bedroom to make housing

realistically available to her.  She has provided no affidavit or declaration from a doctor,

---

[5]       At earlier stages of this case, Thorson similarly claimed that Defendants denied
her request to preemptively extend her 120 percent payment standard exception to all
zip codes on Oʻahu during her rental search in 2024.  *See* ECF No. 78, at PageID.2571-72
(TRO).  She does not, however, press this argument on summary judgment.  Nor does
she produce any evidence in support, aside from one email mentioning the request, *see*
ECF No. 113-55, at PageID.5109 (Aug. 29, 2024, email from Thorson to Matsuura stating
that Thorson was "still waiting" for his response to her request that her 120 percent
reasonable accommodation "apply to all rentals on the island").  And so that alleged
denial could not serve as grounds for Thorson to prevail at trial.

for example, that would support that idea. And the fact that Thorson has since found

another unit belies the notion that her Hawaiʻi Kai unit was the only appropriate unit

for her disabilities.

With these shortcomings, no reasonable jury could find in Thorson's favor.

Summary judgment is therefore GRANTED in Defendants' favor on Thorson's

discrimination claim.

## 2.    Retaliation

Thorson separately asserts a violation of the anti-retaliation provision of the Fair

Housing Act. In addition to its anti-discrimination protections, the Fair Housing Act

forbids retaliation for a person's exercise of their rights protected by the act. 42 U.S.C.

§ 3617. To establish a prima facie case of retaliation, a plaintiff must show (1) that she

was engaged in a protected activity; (2) that she suffered an adverse action in the form

of coercion, intimidation, threats, or interference; and (3) that such action was causally

linked to the protected activity. *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir.

2001). If the plaintiff presents a prima facie case, "the burden shifts to the defendant to

articulate a legitimate nondiscriminatory reason for its decision." *Id.* Finally, if the

defendant "articulates such a reason, the plaintiff bears the ultimate burden of

demonstrating that the reason was merely a pretext for a discriminatory motive." *Id.*

a.  Certain elements of Thorson's prima facie case are undisputedly met here. It

is undisputed, for one, that Thorson engaged in a protected activity when her counsel

notified HPHA that it would be filing a HUD complaint, and when she indeed did so.

For another, Defendants do not dispute that Thorson suffered an adverse action when

they investigated her live-in aide arrangement, which is the conduct at the heart of her

retaliation claim.  *See* ECF No. 101.  The Fair Housing Act's definition of adverse action

is "broad and inclusive," encompassing any coercion, intimidation, threat, or

interference.  *Walker*, 272 F.3d at 1128-29 (cleaned up).  And Defendants' increased

scrutiny of Thorson's live-in aide arrangement, including by questioning her and asking

for additional documentation from her doctors, could qualify as "interference" within

the broad meaning of that term.  *See id.* at 1129-30 (noting that "interference" "has been

broadly applied to reach all practices which have the effect of interfering with the

exercise of rights under the federal fair housing laws," and classifying increased

supervision and surveillance, among other things, as interference (cleaned up)).

On the prima facie case, Defendants primarily contest whether Thorson has

carried her burden on causation.  To show the requisite causal link, Thorson must

"present evidence sufficient to raise the inference that her protected activity was the

likely reason for the adverse action."  *Golden Gate Transactional Indep. Serv., Inc. v.*

*California*, No. CV 18-08093, 2019 WL 4222452, at *16 (C.D. Cal. May 1, 2019) (quoting

*Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982)).  Such an inference can be

supported by "close temporal proximity" between the protected activity and adverse

36

action. *Scoggins v. Falcon Ct.*, No. 24-cv-00188, 2025 WL 942819, at *2 (E.D. Cal. Mar. 28, 2025).

Here, Defendants admit that their investigation into Thorson's live-in aide arrangement began with their review of Thorson's file, which was directly initiated by her counsel's statement that she would be filing a HUD complaint. Thorson's counsel notified Ouansafi, Akamine, and Matsuura via email on April 4, 2022, that Thorson would be filing a HUD complaint if they did not modify their rent reasonableness test. ECF No. 102-2, at PageID.4514. And the next day, Ouansafi responded that he had instructed staff to "do a complete review" of Thorson's files. ECF No. 102-3, at PageID.4516. The day after that—two days after the protected activity—Akamine sent his first email questioning Thorson about her live-in aide arrangement. ECF No. 102-35, at PageID.4641-42. The court finds that the brief two-day period between the protected activity and the start of the alleged adverse action is sufficient to reasonably infer a causal connection between the two. *See Scoggins*, 2025 WL 942819, at *2 (holding service of notice to quit the day after protected activity was sufficient basis to infer retaliatory motive); *Walker*, 272 F.3d at 1130 (concluding there was an adequate showing of a causal link where the city sent a letter less than two weeks after receiving the complaint).

b. Because Thorson has made an adequate showing that she could prevail on her prima facie case, the burden shifts to Defendants to "articulate a legitimate nondiscriminatory reason" for its action. *Walker*, 272 F.3d at 1128. The court easily

finds that Defendants have met this burden.  That is because as the state administrator of federal funds, HPHA is required to conform to HUD regulations in distributing subsidies through the Section 8 program.  *See* 24 C.F.R. § 982.52(a) ("The PHA must comply with HUD regulations and other HUD requirements for the program.").  And under those rules, a live-in aide must actually reside with the Section 8 recipient.  *Id.* § 5.403 ("Live-in aide means a person who *resides with* . . . persons with disabilities, and who: (1) [i]s determined to be essential to the care and well-being of the persons; (2) [i]s not obligated for the support of the persons; and (3) [w]ould not be living in the unit except to provide the necessary supportive services." (emphasis added)).  HPHA's administrative plan, moreover, expressly requires officials to look into "inconsistent information related to the family that is identified through file reviews and the verification process."  HPHA Admin. Plan, ch. 14, pt. I.C., at 14-4 (Oct. 2013).

Defendants have submitted sufficient evidence for a jury to find that it was their duty to ensure that Section 8 recipients were in compliance with HUD rules, not retaliation, that motivated their investigation into Thorson's live-in aide arrangement.  Akamine's declaration identifies the discoveries he uncovered during his review of Thorson's file that raised concerns.  *See* ECF No. 102-33, at PageID.4632-34 (¶¶ 11-17).  Similarly, HPHA's response to Thorson's HUD complaint states that "[i]t was only as a result of information gathered during [Akamine's file] review process, together with additional information [Thorson] and her son provided to HPHA, that numerous

38

questions and red flags about [Thorson] and Mr. Thorson began to arise." ECF No. 102-45, at PageID.4675. This explanation amply covers Defendants' burden.

c.   The burden thus returns to Thorson, and she must demonstrate that Defendants' proffered reason for its live-in aide investigation is pretextual—that is, that it is a guise for a more sinister motive of retaliation. On this prong, a plaintiff may prevail "either directly by persuading the court that a [retaliatory] reason more likely motivated the defendant or indirectly by showing that the defendant's proffered explanation is unworthy of credence" through circumstantial evidence. *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) (cleaned up).

Here, Thorson does not offer any direct evidence of pretext. She does not have evidence of the smoking gun variety, such as a statement by Akamine directly implicating a retaliatory motive in his investigation.

That leaves circumstantial evidence, which sometimes can independently suffice to carry a plaintiff's burden on pretext. "Where the evidence of pretext is circumstantial, rather than direct, the plaintiff must present specific and substantial facts showing that there is a genuine issue for trial." *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1170 (9th Cir. 2007) (cleaned up).[6] Thorson's primary argument for pretext appears to be that Defendants are imposing arbitrary and unlawful live-in aide requirements that

---

[6]    While *Noyes* is a Title VII case, the same "Title VII discrimination analysis is used to examine claims under the" Fair Housing Act. *Budnick*, 518 F.3d at 1113-14.

go above and beyond the term "reside," such as preventing a live-in aide from holding

another job or having a family in a separate primary residence. *See* ECF No. 113, at

PageID.4812. The problem with this argument is that the information cited by HPHA

was sufficient to initiate their investigation under virtually any definition of "reside" —

and Thorson has not offered enough for any reasonable jury to conclude that they were

wrong in their interpretation. Thorson claims that a HUD Office of Fair Housing and

Equal Opportunity branch chief, Stephanie Rabiner, informed her that she was unable

to "find anything" in HCV handbooks or regulations that "refers to a live in aide's

primary residence." ECF No. 113, at PageID.4828-29; ECF No. 113-40, at PageID.5062

(June 13, 2023, email from Rabiner to Thorson). But Thorson has not offered Rabiner as

an expert, and her email to Thorson does not reflect any expertise on the precise issue

raised. Even assuming Rabiner could qualify as an expert on the proper interpretation

of "reside," Thorson has not supplied a declaration from her, and thus the only

evidence of what her testimony would entail is found in the email Thorson has

attached. And that email shows no more than that Rabiner could not find any guidance

on how to interpret the word. It would not provide evidence that Defendants'

interpretation is improper. Defendants, on the other hand, have pointed to HUD rules

that support their interpretation, including a HUD notice explaining that "[o]ccasional,

intermittent, multiple or rotating care givers typically do not reside in the unit and

would not qualify as live-in aides." HUD Notice PIH 2014-25 (HA), at 3. On this

40

record, no reasonable jury could conclude that HPHA was misinterpreting the definition of "reside" as pretext for retaliation.

Moreover, on the court's own review of the record—which the court is not obligated to undertake, *see* LR56.1(f)—the court has found little to no other circumstantial evidence that could support an inference of pretext, if there were enough of it. One clue is the timing of the investigation noted above, but the timing alone does not overcome Defendants' legitimate, nondiscriminatory reason for the investigation. While temporal proximity can sometimes support a showing of pretext, it generally does so alongside "independent evidence" of retaliation, and it is even "less persuasive if it also supports a defendant's independent reason for an adverse action." *Kama v. Mayorkas*, 107 F.4th 1054, 1059-61 (9th Cir. 2024). Here, the asserted nondiscriminatory reason is just as close in time with the adverse action as the alleged retaliatory reason: Akamine's discovery of information during his review of Thorson's file that indicated she might not be in compliance with the live-in aide requirements occurred immediately after Thorson's counsel threatened to file a HUD complaint. Because these two possible reasons for the investigation arose "during the same period," temporal proximity does not establish that retaliation "more likely than not motivated" Defendants—it just as easily supports the notion that the nondiscriminatory reason was their true motivation. *Id.* at 1061 (cleaned up).

41

Another possible clue is found in Akamine's declaration.  Akamine offers three

reasons for initiating his investigation into Thorson's live-in aide arrangement.  He

explains that upon reviewing her file as directed by Matsuura, three pieces of

information caught his attention:  (1) Ryan Thorson's most recent emails with Matsuura

had been sent from what appeared to be a work email, and his signature line included a

job title, ECF No. 102-33, at PageID.4632-33 (Akamine Decl. ¶¶ 12-13); (2) in a 2020

Section 8 personal declaration, Thorson had indicated that her son was employed, *id.* at

PageID.4633 (¶ 15); and (3) in an April 8, 2022, email to Ouansafi, Thorson stated that

"*[i]n the past*, on numerous occasions, Ryan has moved in permanently to give me

round the clock care when I am experiencing seizures on a daily basis, which is the case

now.  As soon as you allow my new rental to be inspected, my son *will be moving in with*

*me* as my permanent live-in aide," *id.* at PageID.4633-34 (¶¶ 16-17) (emphases added).

"Given this information," Akamine avers, "I asked Plaintiff's counsel" how frequently

Thorson's son provides her with services.  *Id.* at PageID.4634 (¶ 18).

The evidence in the record clearly supports two of Akamine's proffered reasons

for the investigation's launch.  Consistent with Akamine's declaration, HPHA's

response to Thorson's HUD complaint identifies both Ryan Thorson's March 28, 2022,

email to Matsuura from his work address, which listed his job title and workplace, and

the October 9, 2020, personal declaration in Thorson's file, which stated that Ryan

Thorson was employed, as the items that initially raised the red flag about Thorson's

live-in aide arrangement.  ECF No. 102-45, at PageID.4676.  The response to the HUD

complaint further notes the "[p]erhaps most troubling" April 8, 2022, email from

Thorson to Ouansafi, which suggested that Ryan was not currently living with her.  *Id.*

at PageID.4676-77.  All of this, according to HPHA, "reasonably raised a question of

whether [Thorson] truly required a" two-bedroom voucher.  *Id.* at PageID.4677.

There is a slight wrinkle in Akamine's declaration:  the third reason he offers for

initiating the live-in aide investigation was not available to him at the time he began

investigating.  Akamine's first email with questions about Thorson's live-in aide

arrangement was sent to Thorson's counsel on April 6, 2022.  ECF No. 102-35, at

PageID.4641-42.  Thorson's April 8, 2022, email—while it appears to raise serious

questions about whether Ryan was living with her at the time—was not sent until *after*

Akamine sent his initial question; indeed, it was Thorson's response to Akamine's first

email.  And so, Thorson might contend, this inconsistency could lead a jury to find that

Akamine's reasons for investigating the live-in aide were pretextual.

Against the backdrop of HPHA's response to the HUD complaint, however,

Akamine's declaration can only rationally be read as referring to Thorson's April 8,

2022, email as a *further* red flag confirming his concerns about Thorson's live-in aide

arrangements, rather than the initial flag.  Of course, it is not the court's role to

determine Akamine's credibility at this stage.  But HPHA's response highlights what is

absent from Thorson's case:  HPHA and its officials' bottom-line explanation for the

investigation has not changed.  Defendants have consistently represented that the

investigation was driven by compliance reasons, not retaliatory ones—and nothing

undermines Akamine's other two stated reasons for initiating his investigation of

Thorson's live-in aide arrangement.

Even if that slight inconsistency in Akamine's declaration could lend some

minimal support to a finding of pretext, it is not alone sufficient to support it.  Nor does

his declaration taken together with the timing of the investigation suffice to carry

Thorson's burden.  They still fall far short of the "specific, substantial" evidence that is

required to prove pretext when there is only circumstantial evidence in the record.

*Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003).

Thorson presses no other facts evincing pretext.  And the court has found none.

On this sparse record, no reasonable juror could find that HPHA's legitimate,

nondiscriminatory reason for its investigation into Thorson's live-in aide arrangement

was pretext for a more sinister motive of retaliation.

d.   Thorson's retaliation claim primarily arises from Defendants' live-in aide

investigation, but the question remains whether a jury could find that any other

conduct by Defendants constituted unlawful retaliation under the Fair Housing Act.

Thorson argues that just prior to her 2024 move, for example, Defendants retaliated by

denying her request to convert the two-bedroom Hawaiʻi Kai unit to a one-bedroom by

locking a door.[7]  There are a handful of emails and letters in the record mentioning this

request, including:  (1) a February 19, 2024, letter from McGill stating that his plan was

"to block off the master bedroom" so that Thorson could remain in her current rental

using her zero-bedroom voucher, ECF No. 113-44, at PageID.5071-72; (2) a February 28,

2024, letter from Matsuura to McGill explaining that HPHA is "required to treat a unit

as it is designated" by the City and County tax records website, ECF No. 113-45, at

PageID.5078; (3) an August 29, 2024, email from Thorson to Matsuura questioning why

McGill could not block off a bedroom, ECF No. 113-55, at PageID.5109; (4) an August

30, 2024, email from Thorson to Ouansafi, Akamine, and Matsuura purporting to

inform them that a City and County employee, Sam Rowland, told her that "the owner

of the property is legally allowed to lock a door to reduce the size of his rental from a 2-

bedroom unit to a 1-bedroom unit," ECF No. 113-57, at PageID.5132; (5) a September 4,

2024, email from Thorson to Ouansafi requesting that HPHA apply her zero-bedroom

voucher to her Hawaiʻi Kai rental as a one-bedroom, *id.* at PageID.5133; (6) a September

4, 2024, email from Matsuura to Thorson explaining that because her Hawaiʻi Kai unit is

designated as a two-bedroom unit with the City and County of Honolulu, her voucher

could not be applied to it as a one-bedroom, *id.*; and (7) a September 29, 2024, letter

---

[7]     As noted, at earlier stages of this case, Thorson separately claimed that during
her search for a new rental unit in 2024, Defendants denied her request to preemptively
extend her 120 percent payment standard exception to all zip codes on Oʻahu.  *See* ECF
No. 78, at PageID.2571-72 (TRO).  But she does not press that argument on summary
judgment, nor does she submit adequate evidence in support.  *See supra* note 5.

from McGill addressed to the court stating that McGill offered to reduce his Hawaiʻi

Kai unit to a one-bedroom by locking a door, but that HPHA refused, ECF No. 113-58,

at PageID.5135.  But these emails and letters—all of which are unauthenticated and

unsworn—are the only pieces of evidence in the record that support Thorson's claim.

Thorson has provided no affidavit, declaration, or deposition testimony on her own

behalf or anyone else's—such as McGill's or Rowland's—describing what happened.[8]

Moreover, because Thorson failed to submit a counter-concise statement of facts on

summary judgment as required by this court's Local Rules, *see* LR56.1(e); ECF No. 99

(entering order), there is no admission or denial by Defendants of any of these events

occurring.  Nor has Thorson explained how this conduct would constitute coercion,

intimidation, threats, or interference proscribed by the Fair Housing Act.

> Even setting aside all of these deficiencies on Thorson's prima facie case, Thorson

has offered no reason why Defendants' stated explanation for their denial—that they

are required to treat units as they are designated by the City and County—is pretext.

Again, Thorson's only evidence is an unauthenticated email she sent Ouansafi,,

Akamine, and Matsuura purporting to inform them that City and County employee

---

[8]      The court previously explained to Thorson at the preliminary injunction and
temporary restraining order stages that declarations might be necessary to carry her
burdens in this case.  *See* ECF No. 44, at PageID.2053 (noting that Thorson "provided no
sworn statements or declarations from a former neighbor, landlord, or her son" in her
preliminary injunction papers); ECF No. 85, at PageID.2866-69 (contrasting Thorson's
unsworn and unauthenticated evidence, including emails allegedly from McGill, with
Defendants' authenticated evidence).

Rowland allegedly told her that "the owner of the property is legally allowed to lock a door to reduce the size of his rental from a 2-bedroom unit to a 1-bedroom unit."  ECF No. 113-57, at PageID.5132 (Aug. 30, 2024, email).  That is inadmissible hearsay, and it is not enough to survive summary judgment.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (hearsay that could not be presented in an admissible form at trial should not be considered on summary judgment).

Thorson mentions two other sets of events as possible retaliation in her summary judgment papers.  First, Thorson suggests that she attended an HPHA board meeting on December 5, 2024, and that during the board meeting, Defendants' attorney "lied to the board" and told them that her neighbor had obtained two restraining orders against her.  ECF No. 113, at PageID.4836.  But this conduct cannot constitute an adverse action by Defendants because it was not taken by them, nor is there any suggestion that they directed their counsel to make the alleged statements.  Moreover, there is insufficient evidence in the record to support Thorson's assertions; she again relies on an email without authenticating it or providing any sworn statements.  *See* ECF No. 113-61, at PageID.5140 (Dec. 5, 2024, email from Thorson to attorney Chase Suzumoto stating that she was "disappointed" in his actions at the board meeting that morning).

Second and finally, Thorson suggests that HPHA tried to ask her new landlord to reduce the requested rent for her current studio rental when she most recently moved in 2024.  ECF No. 113, at PageID.4835.  But Thorson has not submitted a single piece of

evidence to back up her assertion, nor has she explained how that conduct would

constitute coercion, intimidation, threats, or interference.

Accordingly, Thorson has not met her burden to show she could prevail on her

Fair Housing Act retaliation claim at trial, and summary judgment is GRANTED in

Defendants' favor on that count, too.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment, ECF No.

101, is GRANTED.

IT IS SO ORDERED.

DATED:  June 6, 2025, at Honolulu, Hawaiʻi.



/s/ Micah W.J. Smith
_____
Micah W.J. Smith
United States District Judge

Civil No. 23-00412 MWJS-WRP; *Laurie Thorson v. Hawaiʻi Public Housing Authority,* et al.;
Order Granting Defendants' Motion for Summary Judgment

48